# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

MICHAEL LASCHE and JENNIFER LASCHE,

      Plaintiffs,

    v.

STATE OF NEW JERSEY, ET AL.,

      Defendants

CIVIL ACTION NO.
3:18-cv-17552-FLW-TJB

---

BRIEF IN SUPPORT OF
MOTION TO DISMISS

---

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 116
Trenton, NJ 08625
(609)376-2787
Attorney for Defendants,
State of New Jersey, the Division of Child Placement
and Protection, Kyle Higgins, Mary Lippencot, Katie
Epperly, and Janelle Clark

ROBERT J. McGUIRE (ID: 046361992)
DEPUTY ATTORNEY GENERAL
 On the Brief

# <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................. 3

STANDARD OF REVIEW ................................................................................. 9

    A. Motion to dismiss the complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) ................................................. 9

    B. Motion to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6) ................. 10

ARGUMENT ..................................................................................................... 11

    POINT I

        DEFENDANTS HAVE SOVEREIGN IMMUNITY FROM PLAINTIFF'S CLAIMS UNDER § 1983 AND THE NJCRA ......................................................................... 11

    POINT II

        PLAINTIFF'S §1983 AND NJCRA CLAIMS SHOULD BE DISMISSED AGAINST DCPP AND DEFENDANTSS SUED IN THEIR "OFFICIAL CAPCITY" BECAUSE THOSE DEFENDANTS ARE NOT "PERSONS" UNDER § 1983 OR THE NJCRA ........................ 13

    POINT III

        FOSTER PARENTS DO NOT HAVE PROTECTED CONSTITUTIONAL RIGHTS WITH RESPECT TO DECISIONS REGARDING THE PLACEMENT OF FOSTER CHILDREN ................................................................. 14

i

POINT IV

    THE INDIVIDUAL DEFENDANTS HAVE ABSOLUTE IMMUNITY WITH RESPECT TO ANY ACTIVITIES RELATED TO THE JUDICIAL PROCEEDING AT WHICH THE CLURT MADE THE DISPUTED CUSTODY DETERMINATION ...................................... 18

POINT V

    AT MINIMUM, DEFENDANTS HAVE QUALIFIED IMMUNITY AS TO THE LASCHES' CLAIMS ................................... 20

POINT VI

    DEFENDANTS DID NOT REMOVE FOSTER CHILD 1 FROM THE LASCHES' CARE – A COURT DID -- AND DEFENDANTS ARE NOT LEGALLY LIABLE FOR THE COURT'S DECISION ........................................................ 23

POINT VII

    DCPP IS NOT A "PLACE OF PUBLIC ACCOMODATION," AND THERFORE, PLAINTIFF'S NJLAD CLAIM SHOULD BE DISMISSED ......................................... 24

CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Creighton*, 483 U.S. 635 (1987) ........................................................... 21

*Anspach v. City of Philadelphia*, 503 F.3d 256 (3d Cir. 2007) .............................. 10

*Ashcroft v. al-Kidd*, 563 U.S. ___, ___, 131 S.Ct. 2074 (2011) ............................ 22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................. 10

*B.S. v. Somerset Cty.*, 704 F.3d 250 (3d. Cir. 2013) ............................................. 20

*Ballard v. Johnson*, 2017 WL 1151166 at * (E.D. Mich. March 28, 2017)  No. 15-11039, 2017 U.S. Dist. LEXIS 45215, at *6 ........................................................................ 15

*Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690 (3d Cir. 1995) ........................ 13

*Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524 (3d Cir. 2007) ............... 11

*Brown v. U.S. Steel Corp.*, 2010 U.S. Dist. LEXIS 115503 (W.D. Pa. Oct. 29, 2010)..... 10

*Camero v. Kostos*, 253 F. Supp. 331 (D.N.J. 1966) .............................................. 11

*Carswell v. Borough of Homestead*, 381 F.3d 235 (3d Cir. 2004) ......................... 21

Curley v. Klem, 499 F.3d 199 (3d Cir. 2007) ...................................................... 21

*Didiano v. Balicki*, 488 Fed. Appx. 634, 637-38 (3d Cir. July 17, 2012)........................... 14

*Drummond v. Fulton Cty. Dep't of Family & Children's Servs.*, 563 F.2d 1299, 1206-07 (5th Cir. 1977 (en banc) ............................................................................................... 16

iii

*Elwell v. Byers*, 699 F.3d 1208, 1214-15 (10th Cir. 2012) .................................................... 17

*Ernst v. Child and Youth Services of Chester County*, 108 F.3d 486 (3d Cir.1997) ............... 19

*Estate of Lydia Joy Perry ex rel. Kale v. Sloan*, Civ. 10-4646 (AET), 2011 U.S. Dist. LEXIS 58055, 2011 WL 2148813, at *2 (D.N.J. May 31, 2011) ................................................ 12

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 669-70 (1999) ........................................................................................................................... 11

*Flight Sys., Inc. v. Elec. Data Sys.*, 112 F.3d 124, 127-28 (3d Cir. 1997) ........................... 11

Gould Elecs., Inc. v. U.S., 220 F.3d 169 (3d Cir. 2000) ........................................................ 10

*Green v. Corzine*, Civ. 09-1600, 2011 WL 735719, at *7 (D.N.J. Feb. 22, 2011) ........... 12

*Hafer v. Melo*, 502 U.S. 21, 25-27 (1991) ........................................................................... 13

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ........................................................................ 22

*Howard v. N.J. Div. of Youth & Family Servs.*, 398 F. App'x 807 (3d Cir. 2010) .............. 12

*Huk v. Cty. of Santa Barbara*, 650 Fed. Appx. 365 (9th Cir. 2016) ................................... 15

*Imbler v. Pachtman*, 424 U.S. 409, 418, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976).............. 19

*Kentucky v. Graham*, 473 U.S. 159 (1985) ......................................................................... 12

*Kyees v. Cty. Dep't of Public Welfare*, 600 F.2d 693 (1979)................................................ 16

*Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 814 (11th Cir. 2004).... 16

*Lopez-Siguenza v. Roddy*, 2014 WL 1298300 at *5 (D.N.J. March 31, 2014) .................. 12

*McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178 (1936) ................................. 10

*Meyers v. Contra Costa Cnty. Dep't of Soc. Servs.*, 812 F.2d 1154, 1157 (9th Cir. 1987) ..... 19

*Morse v. Lower Merion School Dist.*, 132 F.3d 902 (3d Cir. 1997)........................................ 10

*Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884 (3d Cir. 1977) ............................. 9

*Olim v. Wakinekona*, 461 U.S. 238, 249 (1983) ............................................................. 17, 18

*Oran v. Stafford*, 34 F. Supp. 2d 906 (D.N.J. 1999), aff'd, 226 F.3d 275 (3d Cir. 2000) 11

*Pearson v. Callahan*, 555 U.S. 223 (2009) ......................................................................... 21

*Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) .......................................... 3

Plumhoff v. Rickard, ___ U.S. ___, 134 S. Ct. 2012 (2014) ........................................... 21

*Procopio v. Johnson*, 994 F.2d 325, 328 (7th Cir. 1993) ................................................... 16

Ramos v. Flowers, 429 N.J. Super. 13 (App. Div. 2012) ................................................... 13

Regents of the Univ. of California v. Doe, 519 U.S. 425 (1997) ....................................... 12

*Renfro v. Cuyahoga County Dept. of Social Services*, 884 F.2d 943 (6th Cir. 1989) ............... 16

*Rodriguez v. McLoughlin*, 214 F.3d 328, 339-41 (2d Cir. 2000) ................................... 16, 17

*Sandlin v. Conner*, 515 U.S. 472, 483-84 & n.5 (1995) ................................................... 17

Saucier v. Katz, 533 U.S. 194 (2001) .............................................................................. 21

*Slinger v. New Jersey*, Civ. 07-5561 (DMC), 2008 U.S. Dist. LEXIS 71723, 2008 WL
    4126181, at *5 (D.N.J. Sept. 4, 2008), rev'd in part, 366 F. App'x 357 (3d Cir. 2010)
    ..................................................................................................................................... 12

*Smolow v. Hafer*, 353 F. Supp. 2d 561 (E.D. Pa. 2005) ..................................................... 9

*Stephany v. Wagner*, 835 F.2d 497, 500 (3d Cir. 1987) ................................................... 18

*Wildauer v. Frederick Cty.*, 993 F.2d 369, 373 (4th Cir. 1993) ......................................... 17

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) ................................................... 13

*Zak v. Pilla*, 698 F.2d 800, 801 (6th Cir. 1982) ............................................................. 15

**Statutes**

42 U.S. § 1983 .................................................................................................. 13

N.J. Stat. Ann. 9:6-8.19a .................................................................................. 17

N.J.S.A. 10:5-5(l) ............................................................................................. 23

## Other Authorities

Kevin B. Frankel, *The Fourteenth Amendment Due Process Right to Family Integrity Applied to Custody Cases Involving Extended Family Members*, 40 Colum. J.L. & Soc. Probs. 301, 333 (2007).................................................................................................. 15

## Rules

Fed. R. Civ. P. 12(b)(1) ...................................................................................... 9

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 10

## Constitutional Provisions

U.S. Const. Amend. XI....................................................................................... 11

## PRELIMINARY STATEMENT

Plaintiffs, Michael and Jennifer Lasche ("the Lasches"), who briefly served as foster parents for two young girls (one of whom was later removed from the Lasches' home by consent) have brought this action, alleging that the removal of a child from their foster care -- by order of a New Jersey family court judge -- violated their rights, under the United States Constitution and the New Jersey Civil Rights Act, in serving as a foster parent, and in potentially adopting one of those girls.  The Lasches alleged that the sole basis for the decision to remove the child from their foster care was the Lasches' view that homosexuality is a sin – a view that became relevant to the foster children's potential placement and adoption when a potential same-sex adoptive couple expressed interest in adopting the two girls whom the Lasches were foster parenting, as well as those children's three other siblings.   The Lasches also claim that their New Jersey license to serve as foster parents was suspended based on their belief that homosexuality is a sin.  Finally, the Lasches' complaint claims that that court-ordered removal of the child in their care violated the New Jersey Law Against Discrimination ("NJLAD") based on the assertion that the New Jersey Division of Child Placement and Permanency ("DCPP") is a public accommodation.  The Lasches have asserted their claims against DCPP and several DCPP employees, both in those employees' "official" and personal capacities.

As shown herein, none of these claims can survive a motion to dismiss for numerous reasons, including that: (1) DCPP and the employees sued in their official

capacity have sovereign immunity with respect to the claims brought against them; (2) DCPP and the individual defendants sued in their "official capacity" are not "persons" who can be sued under § 1983 and the New Jersey Civil Rights Act ("NJCRA"); (3) even if the Lasches' allegations are accepted as true, there is no constitutional right to serve as a foster parents or to adopt a child after a short-term foster-parent placement; (4) the DCPP employees have absolute immunity with respect to any role they played in connection with investigation related to a later judicial hearing regarding whether continued placement of the child with the Lasches was appropriate;  (5) alternatively, defendants have qualified immunity from the Lasches' claims, because no "controlling authority" or "robust consensus of cases of persuasive authority" has held that making a determination about placement that takes into account a potential foster or adoptive parent's views on homosexuality clearly violates an established constitutional right; and (6) the Lasches' NJLAD claim fails as a matter of law because DCPP is not a "public accommodation" under the NJLAD.

In summary, the complaint states no valid claim of a violation of a constitutional right, or violation of the NJLAD by DCPP and its employees, that this court would have jurisdiction to entertain.  Therefore, the complaint should be dismissed.

2

## STATEMENT OF FACTS[1]

The Lasches had been licensed as foster parents licensed by the State of New Jersey.  *See* Complaint, attached as Exhibit A to the Certification of Robert J. McGuire ("McGuire Cert."), ¶ 1.)  They described themselves as "devout Christians who hold to traditional values and beliefs about family, marriage and sex."  *Ibid*.

On or about September 1, 2017, the defendants Kyle Higgins ("Higgins") and Katie Epperly ("Epperly") -- both of whom are employees of the DCPP -- called the Plaintiffs about two girls being removed from a foster home and asked if Plaintiffs would take them in.  *Id.*, ¶ 8.  The girls were ages 13 ("Foster Child 1 ") and 10 ("Foster  Child 2").  *Ibid*.  Foster Child 1 was the oldest of five siblings placed in foster care.  Plaintiffs agreed to the placement.  *Ibid*.

In September 2017, Higgins allegedly advised the Lasches that the girls' cases were moving towards adoption and that the natural father's rights had already been terminated.  *Id.*, ¶ 9.  The next month, Higgins allegedly advised the Lasches that the

---

[1] Given that this is a motion to dismiss on the pleadings, Defendants are required to state the facts as alleged in the Complaint, and the Court must accept the factual allegations of the Complaint (but not any conclusory statements unsupported by facts) in the light most favorable to the Plaintiffs.  *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).  By setting forth the facts below for purposes of this motion, Defendants do not concede the truth of those allegations, many of which the Defendants would take issue with, if the claims against Defendants are not dismissed. As will be demonstrated in the future, if necessary, the claim that decisions regarding the children in Lasches' care were made because of religious discrimination are unfounded; rather, DCPP had valid concerns about the Lasches, and a court – not DCPP, ultimately decided that the best interest of the child at issue was served by removal of the child form the Lasches' foster care.

3

children's case was still moving towards adoption and that the Lasches would have the first choice to adopt the girls.  *Id.*, ¶ 10.   In November 2017, Plaintiffs were allegedly informed that the children's natural mother had surrendered her parental rights and that the children were now free for adoption, and in December 2017, Higgins allegedly met with the Lasches and informed them that they were in consideration as potential adoptive parents for the children.  *Id.*, ¶ 11, 12.

Three weeks after the December meeting, Higgins allegedly informed the Lasches that a family in Illinois was interested in adopting all five children and that a plan to arrange that adoption was proceeding.  *Id.*, ¶ 13.  The Lasches and Foster Child 1 and Foster Child 2 allegedly asked Higgins and Epperly questions about the potential adoptive family in Illinois (the Complaint does not state what questions were asked), but defendants allegedly claimed to "not know the answers."  *Id.*, ¶ 14.

The Lasches learned from the foster parents of the siblings of Foster Child 1 and Foster Child 2 that the potential adoptive family "were two wealthy gay men with lots of family around to support them and the adoption."  *Ibid.*   A few days thereafter, Higgins visited the Lasches' home and stated that she had heard that the children "were anxious to have their questions answered about the adoptive home," and during Higgin's discussion with Foster Child 1, Higgins allegedly questioned the child about her religious beliefs concerning homosexuality and asked her if she would change her religious beliefs if she went with another family.  *Id.*, ¶ 15. Although the Lasches assert that this question was based on a religious bias against

them, it is plain that, to the extent the question was asked of Foster Child 1, it was a perfectly sensible and necessary question to ask, given the Foster Child 1 and her four siblings were in the process of being evaluated for placement with a homosexual couple. Foster Child 1's feelings on this topic obviously had to be taken into account when any decision was to be made as to her adoption, in light of the statutory directive that such decisions must be made taking into account the "best interest of the child." CITATION.

In April 2018, at the Lasches' request, and by agreement with DCPP, Foster Child 2 was removed from Plaintiffs home for confidential reasons unique to Foster Child 2. *Id.*, ¶16.

On May 22, 2018, Mrs. Lasche met with Higgins and the therapist for the Foster Child 1, at which time the participants in that meeting allegedly agreed not to discuss adoption with Foster Child 1 because it was too soon after Foster Child 2's removal. The participants in that meeting also discussed the possibility of Foster Child 1 exploring time with her siblings to see if she wanted to be adopted with them, and Mrs. Lasche indicated that she "was not opposed to letting Foster Child 1 explore that."

During that meeting, Higgins indicated that a court hearing would be held on June 4, 2018, at which a judge would be presented with information about the placement options for all five foster children and then make a determination about what would be best for the children. Those placement options included: (1) having

the five foster Children adopted by the families with which they were currently placed; or (2) adoption of all five children by the Illinois family.  On June 4, 2018, the Plaintiffs received a text from Foster child 1's law guardian that the Illinois couple was "off the table" and that the judge wanted psychiatric evaluations of all of the children before a permanent plan was put into place.

In June 2018, Foster Child 1 appeared upset after returning home from a regularly-scheduled therapy session and stated she was upset because "the therapist kept bringing up religion and told her she should not feel pressured to follow her foster family's religious beliefs."   Mrs. Lasche subsequently asked Foster Child 1's therapist why the therapist asked if the child was "being pressured" to follow [the Lasches'] religion," and the therapist allegedly first responded that "it was normal to discuss how people have different beliefs, ethics, religion, etc."  Mrs. Lasche claims that she "pressed" the therapist, who then said she had received a call from Higgins before the session that brought to the therapist's attention the possible placement of the children "out of state with a homosexual couple" in which call Higgins had informed the therapist about the Lasches' "ideas about same-sex couples."   Higgins also supposedly asked the therapist to discuss Foster Child 1 possibly being placed with her brothers.

On June 19, 2018. Higgins called Mrs. Lasche to discuss transitioning Foster Child 1 to her foster brother's home, and Mrs. Lasche expressed confusion, given that she had believed that the plan under consideration at that time involved

adoption of all the children by those children's then-current foster parents.  Mrs. Lasche called the "law guardian" for Foster Child 1, who expressed surprise and confusion about this information and said she would investigate.

On or about June 21, 2018, Higgins and another woman (not identified in the complaint) picked up Foster Child 1 for the ostensible purpose of taking Foster Child 1 to visit a sibling.  The Lasches claim that it was "very rare" for Higgins to transport Foster Child 1 to such visits.  The Lasches allege "on information and belief" (without specifying how they came to believe these facts to be true) that Foster Child 1 and the two women instead stopped at a Dunkin' Donuts, where the Lasches allege that the woman "interrogated Foster Child 1," including about her religious beliefs, and "lied to her in an effort to intimidate her into agreeing that she did not want to be adopted by Plaintiffs" and allege that Higgins told the child that the Lasches "would not be able to meet her needs."  Foster Child 1 was then taken to the home in which her foster brothers were living, rather than to visit her sister.

When Higgins returned with Foster Child 1, she allegedly told the Lasches that she understood that Foster Child 1 wanted to stay with the Lasches and that DCPP wanted "to work with" the Lasches because DCPP wanted what was in Foster Child 1's best interests, and Higgins indicated DCPP's interest in arranging a meeting with the Lasches.  In a subsequent telephone call in anticipation of the meeting, Epperly supposedly told the Lasches that "DCPP was concerned that both Foster Child 1 and Foster Child 2 indicated that same-sex relationships were against their religion,"

which belief the DCPP believed that the children had gotten that belief from the Lasches.

That meeting occurred on Friday, June 29, 2018, and was attended by the Lasches; their attorney; an attorney for the State of New Jersey; one or two employees of the DCPP whose identities the Lasches do not know; and defendants Higgins, Epperly, Lippencot and Clark.  The DCPP representatives "expressed concern that the Plaintiffs believed homosexuality was a sin" concern regarding whether the Lasches would reject Foster Child 1 if she ever "decided to explore her sexuality" and sought assurance from the Lasches that they would not reject the child.  As the complaint noted, Foster Child 2's prior placement with the Lasches had been terminated by mutual agreement between the Lasches and DCPP.  The complaint does not provide the Lasches' response to that request for assurances that they would not reject Foster Child 1 if she "decided to explore her sexuality." The Complaint states that some unidentified defendant at that meetingindicated that Foster Child 1 would "require therapy to deal with her belief that homosexuality was a sin to avoid possible future harm."

On July 2, 2018, a hearing was held in New Jersey family court, at which  the Lasches claim that DCPP, over the objection of Foster Child 1's law guardian, sought the removal of Foster child 1 from their custody.  The complaint does not  alleged that they were unaware that the hearing would be held, and claim only that they were not given "notice that they had a right to be heard at the hearing."  As a result

of the decision at that hearing, Foster Child 1 was removed from the Lasches' home the next day.

On October 12, 2018, a representative of the DCPP performed a yearly inspection that is necessary for renewal of a New Jersey license to serve as a foster parents. At the conclusion of the inspection, the inspector asked the Lasches if they knew that their license had been suspended by the Monmouth County DCPP office, and the Lasches replied that they were not aware of the suspension. The inspector said that the Lasches should have received notice of the suspension, and the reasons for it, from DCPP's Monmouth County office. The Lasches hypothesize that their religious belief that homosexuality is a sin was the bases for the suspension, because they contend that is the "only apparent basis" for the suspension.

## STANDARD OF REVIEW

### A.     Motion to dismiss the complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(1), a District Court must distinguish between facial and factual challenges to its subject matter jurisdiction. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "In a facial attack a Defendant argues that the Plaintiff did not properly plead jurisdiction . . . [whereas] a 'factual attack' asserts that jurisdiction is lacking on the basis of facts outside of the pleadings." *Smolow v. Hafer*, 353 F. Supp. 2d 561, 566 (E.D. Pa. 2005). If the court is considering a "factual" attack, where a challenge is based on the

9

sufficiency of the jurisdictional facts, the court is free to weigh the evidence and satisfy itself whether it has the power to hear the case. *Brown v. U.S. Steel Corp.*, 2010 U.S. Dist. LEXIS 115503, at *6 (W.D. Pa. Oct. 29, 2010). In doing so, the court should "consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the Plaintiff." *Gould Elecs., Inc. v. U.S.*, 220 F.3d 169, 176 (3d Cir. 2000) (citations omitted). Nevertheless, for either a facial or factual attack, the burden is on the plaintiff to prove jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936).

### B.   Motion to dismiss the complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a reviewing court must accept the plaintiff's factual allegations as true; however, a plaintiff's conclusory allegations and legal conclusions are not entitled to the same assumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Anspach v. City of Philadelphia*, 503 F.3d 256, 260 (3d Cir. 2007) (quoting *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (holding conclusory allegations or legal conclusions masquerading as factual allegations will not suffice to prevent dismissal)).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 678. Where the claims asserted are fatally defective and the plaintiff cannot plead any facts to support claims, it is appropriate for the court to dismiss a complaint without permitting the plaintiff to make a curative amendment of

his pleading. *Oran v. Stafford*, 34 F. Supp. 2d 906, 913-14 (D.N.J. 1999), *aff'd*, 226 F.3d
275 (3d Cir. 2000). Thus, dismissal for failure to state a claim is justified where there is
an "insuperable barrier" to a claim, such as an immunity. *See Flight Sys., Inc. v. Elec. Data
Sys.*, 112 F.3d 124, 127-28 (3d Cir. 1997); *Camero v. Kostos*, 253 F. Supp. 331, 338 (D.N.J.
1966).

## ARGUMENT

### POINT I

### DEFENDANTS HAVE SOVEREIGN IMMUNITY FROM PLAINTIFF'S CLAIMS UNDER § 1983 AND THE NJCRA.

The Eleventh Amendment bars federal jurisdiction over private lawsuits against
a state:

> The Judicial power of the United States shall not be
> construed to extend to any suit in law or equity, commenced
> or prosecuted against one of the United States by Citizens of
> another State, or by Citizens or Subjects of any Foreign
> State.
>
> [U.S. Const. Amend. XI.]

The Eleventh Amendment prohibits suits against a state not only by citizens of another
state, but also by its own citizens. *Fla. Prepaid Postsecondary Educ. Expense Bd. v. College
Sav. Bank*, 527 U.S. 627, 669-70 (1999). In addition, Eleventh Amendment immunity
extends to state departments and agencies that are arms of the State. *Bowers v. Nat'l*

11

*Collegiate Athletic Ass'n*, 475 F.3d 524, 545 (3d Cir. 2007) (citing *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 429 (1997)).

Undeniable, DCPP is a state agency, and other courts in this Circuit have so held. *Howard v. N.J. Div. of Youth & Family Servs.*, 398 F. App'x 807, 811-12 (3d Cir. 2010).

The Eleventh Amendment also prohibits a federal lawsuit against a state official who is sued for damages in that person's "official capacity," *Kentucky v. Graham*, 473 U.S. 159 (1985).  Therefore, the Lasches' federal law claims against Higgns, Epperley, Lippencott and Clark are precluded by the Eleventh Amendment.

Because sovereign immunity bars the Lasches' federal law claims, it likewise bars their claims under the NJCRA.  *Lopez-Siguenza v. Roddy*, 2014 WL 1298300 at *5 (D.N.J. March 31, 2014)  (noting "courts in the District of New Jersey have held that Eleventh Amendment sovereign immunity applies to claims under the NJCRA.") (citing *Slinger v. New Jersey*, Civ. 07-5561 (DMC), 2008 WL 4126181, at *5 (D.N.J. Sept. 4, 2008), *rev'd in part*, 366 Fed.Appx 357 (3d Cir. 2010) (dismissing all NJCRA claims against State because "[t]raditional common law principles, contemporary principles of statutory construction and common sense all demonstrate that the NJCRA does not pierce the State's sovereign immunity."); *Estate of Lydia Joy Perry ex rel. Kale v. Sloan*, Civ. 10-4646 (AET), 2011 WL 2148813, at *2 (D.N.J. May 31, 2011); *Green v. Corzine*, Civ. 09-1600, 2011 WL 735719, at *7 (D.N.J. Feb. 22, 2011)).

Thus, sovereign immunity bars all claims that the Lasches have asserted brought under § 1983 or the NJCRA against DCPP and the individual defendants in their

"official capacity."

## POINT II

### PLAINTIFF'S §1983 AND NJCRA CLAIMS SHOULD BE DISMISSED AGAINST DCPP AND DEFENDANTSS SUED IN THEIR "OFFICIAL CAPCITY" BECAUSE THOSE DEFENDANTS ARE NOT "PERSONS" UNDER § 1983 OR THE NJCRA.

42 U.S. § 1983 permits suits against "persons" for alleged violations of constitutional rights.  However, DCPP and the individual defendants in their "official capacity" are not "persons" under § 1983.

The Supreme Court has plainly stated that a state agency is not a "person" for purposes of § 1983.  *Hafer v. Melo*, 502 U.S. 21, 25-27 (1991).  The Court has likewise unequivocally held that state officials "are not 'persons' within the meaning of § 1983 and, therefore, cannot be among those held liable for violations of the civil rights statute." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989); *see also Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 697 (3d Cir. 1995).

Likewise, claims under the NJCRA may also only be brought against a "person," and the same definition of "person" used for purposes of § 1983 applies to claims brought under the NJCRA.   The New Jersey State Legislature intended the NJCRA to serve as an analog to § 1983 and to incorporate existing § 1983 jurisprudence. *See Ramos v. Flowers*, 56 A.3d 869, 874-75 (N.J. App. Div. 2012).  Therefore, because a state, a state agency or an official in his or her official capacity is not a "person" subject to suit under § 1983, the same state, agency or state official is not a "person" who can be sued under

13

the NJCRA.  *Didiano v. Balicki*, 488 Fed. Appx. 634, 637-38 (3d Cir. July 17, 2012).

Therefore, all purported claims against DCPP and Higgins, Epperly, Lippencott and Clark in their "official capacities" should be dismissed.

**POINT III**

**FOSTER PARENTS DO NOT HAVE PROTECTED CONSTITUTIONAL RIGHTS WITH RESPECT TO DECISIONS REGARDING THE PLACEMENT OF FOSTER CHILDREN**

The Lasches claim that defendants have violated some protected constitutional interest in actions that the Lasches alleged led to the removal of Foster Child 1 from their foster care and because the Lasches assert they were not informed about a "right to be heard" at the July 2, 2018 court hearing.   As a necessary component of such a claim, the Lasches are required to demonstrate that  a foster parent has constitutional rights to assert with respect to placement decisions in circumstances similar to their case, in which Foster Child 1, a non-relative, had been placed with them for approximately nine or ten months at the time of the court hearing.  No court has ever held that a foster parent in these circumstances has constitutional rights with respect to a placement decision.  Instead, as shown below, numerous courts have held that foster parents lack any protected rights in such placement determinations.   As one author of a comprehensive review on this issue observed, "[A]ttempt[s] to establish a due process liberty interest between foster parents and children have continued to fail."  Kevin B.

14

Frankel, *The Fourteenth Amendment Due Process Right to Family Integrity Applied to Custody Cases Involving Extended Family Members*, 40 Colum. J.L. & Soc. Probs. 301, 333 (2007).

For example, in *Huk v. Cty. of Santa Barbara*, 650 Fed. Appx. 365 (9th Cir. 2016), the court dismissed foster parents' claims that their procedural due process rights were violated when a foster child was removed from their custody and that their substantive due process rights were violated when officials allegedly fabricated evidence and made misrepresentations during a custody hearing. Although California state law required pre-removal notice to a foster parent and provided for a grievance process for foster parents to contest the removal of a foster child, but the Ninth Circuit found that these procedures did not create any constitutional rights in the foster parents, because the laws in question did not establish substantive predicates or mandate any outcomes in such proceedings and instead provided that removal authority was highly discretionary. Id. at 367. Additionally, the Ninth Circuit held that, even if the foster parents in that case did establish that they were deprived of custody through deceptive means and without any opportunity to contest the grounds for removal, they had not demonstrated that their custody rights in a foster child was a liberty interest that is protected by the due process clause of the United States Constitution. *Ibid.*

Courts within the Sixth Circuit have likewise concluded that the foster-parent/foster-child relationship does not give create any constitutionally-protected liberty interests for the foster parents. *Zak v. Pilla*, 698 F.2d 800, 801 (6th Cir. 1982); *Ballard v. Johnson*, 2017 WL 1151166 at * (E.D. Mich. March 28, 2017) No. 15-11039,

15

2017 U.S. Dist. LEXIS 45215, at *6 ("[F]oster parent-foster child relationship does not give rise to a constitutionally protected liberty interest."); *Renfro v. Cuyahoga County Dept. of Social Services*, 884 F.2d 943 (6th Cir. 1989) (finding that foster parents had no due process interest in six-year relationship with foster child).

Similarly, the Second Circuit rejected claims that a foster family had a constitutionally protected liberty interest in their relationship with a foster child and therefore rejected a claim that their constitution rights were violated when the state allegedly removed the foster child without adequate justification and without providing them with notice and an opportunity to be heard.  *Rodriguez v. McLoughlin*, 214 F.3d 328, 339-41 (2d Cir. 2000).

In a similar matter, the Seventh Circuit held foster parents did not have a constitutional right, under Illinois law, to notice and an opportunity to be heard before a foster child was removed and custody transferred in *Procopio v. Johnson*, 994 F.2d 325, 328 (7th Cir. 1993).  The Court in *Procopio* further noted that same circuit court had found that foster parents also lacked any constitutionally-protected interest in the relationship with a foster child under Indiana law in *Kyees v. Cty. Dep't of Public Welfare*, 600 F.2d 693 (1979).

Likewise, the Eleventh Circuit reached an identical conclusion in *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 814 (11th Cir. 2004); the Fifth Circuit reached the same conclusion under Georgia law in *Drummond v. Fulton Cty. Dep't of Family & Children's Servs.*, 563 F.2d 1299, 1206-07 (5th Cir. 1977 (en banc); and the Fourth

16

Circuit likewise has held that foster parents do not possess any constitutionally protected interest in a continuing relationship with foster children in *Wildauer v. Frederick Cty.*, 993 F.2d 369, 373 (4th Cir. 1993).

Defendants expect that the Lasches will point to certain New Jersey statues that indicate that a foster parent (referred to in New Jersey statutory law as a "resource parent") have certain statutory rights to written notice of an anticipated review or hearing and of the resource parent's "opportunity to be heard" at such review or hearing.  *See, e.g.*, N.J. Stat. Ann. 9:6-8.19a, and that the Lasches will claim that the existence of such statutory rights demonstrate the existence of a constitutional right. That is not the case, and several federal appeals courts have held that the existence of a statutory requirement for notice of a hearing to foster parents and provision of an opportunity to be heard – without a statutory provision that mandates a result of a placement hearing or mandates a particular decision based on such information -- does not create any constitutional rights for a foster parent.  *See Elwell v. Byers*, 699 F.3d 1208, 1214-15 (10th Cir. 2012), and *Rodriguez*, 214 F.3d at 339-41.

New Jersey's adoption of procedures related to hearings or reviews involving child custody or placement does not create a liberty interest. "Process is not an end in itself," and if "state law creates a mandatory procedure but does not guarantee a particular substantive outcome, it does not confer a protected liberty interest."  *Elwell*, 699 F.3d at 1214 (citing *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983), *abrogated on other grounds*, *Sandlin v. Conner*, 515 U.S. 472, 483-84 & n.5 (1995)).  "[T]he State may choose

17

to require procedures for reasons other than protection against deprivation of substantive rights," and if the state does no more than put certain procedures in place, "the State does not create an independent substantive right." *Stephany v. Wagner*, 835 F.2d 497, 500 (3d Cir. 1987) (quoting *Olim*, 461 U.S. at 250)).   Nothing in the New Jersey statutory scheme requires a particular outcome based on a foster parent's input, and a final decision on custody remains at the discretion of a judge, who has discretion to make a determination on custody based on the "best interests of the child."

Thus, the vast weight of authority makes clear that foster parents cannot assert any constitutional claims in connection with custody determinations regarding children who were in their foster care.

## POINT IV

### THE INDIVIDUAL DEFENDANTS HAVE ABSOLUTE IMMUNITY WITH RESPECT TO ANY ACTIVITIES RELATED TO THE JUDICIAL PROCEEDING AT WHICH THE CLURT MADE THE DISPUTED CUSTODY DETERMINATION

Accepting as true the allegations of the Complaint, the individual defendants gathered information concerning the Lasches' views about same-sex relationships, discussed this issue with Foster Child 1, and then presented information on this issue to a family court judge, who then made a determination as a part of a judicial proceeding that Foster Child 1 should be removed from the Lasches' custody.    Although Defendants would contest that this is a full and accurate representation of the facts, even the facts as alleged by the Lasches lead inexorably to the conclusion that the

18

individual defendants – Higgins, Epperly, Lippencott and Clark – have absolute prosecutorial immunity with respect to such claims.

In *Imbler v. Pachtman*, 424 U.S. 409, 418, 47 L. Ed. 2d 128, 96 S. Ct. 984 (1976), the Court set forth the public policy considerations for granting absolute immunity to prosecutors including.  Within the Third Circuit, that same type of immunity has been extended to social welfare caseworkers for actions related to preparing for, initiating, and prosecuting proceedings related to child placement.  *Ernst v. Child and Youth Services of Chester County*, 108 F.3d 486 (3d Cir.1997).   As noted by the Third Circuit in *Ernst*, like prosecutors, "social workers must make a quick decision based on perhaps incomplete information as to whether or not to commence investigations and initiate proceedings against [those] parents who may have abused . . . children."  108 F.3d at 496 (3d Cir. 1997) (quoting *Meyers v. Contra Costa Cnty. Dep't of Soc. Servs.*, 812 F.2d 1154, 1157 (9th Cir. 1987).

The Third Circuit held that caseworkers' judgment should not be compromised by exposing them to the chilling effect of potential §1983 liability and that absolute immunity should be provided to child welfare workers in connection with the formulation and presentation of recommendations to a state court regarding a child's status and disposition.  *Ernst*, 108 F.3d at 496-97.  The Third Circuit recognized the inherent risks of the exposure to retaliatory lawsuits, the likelihood that numerous such suits might be filed, and that such lawsuits result in a "significant diversion of the energies of child welfare workers away from their official duties to the defense of § 1983

19

litigation" and that "defending against § 1983 actions would likely be as difficult for child welfare workers as it would be for prosecutors because child welfare workers, like prosecutors, must make quick decisions on the basis of limited information."   The Third Circuit has also made clear that that absolute immunity protections extend beyond action taken by caseworkers in a courtroom, *B.S. v. Somerset Cty.*, 704 F.3d 250 (3d. Cir. 2013), and extends to actions when a child care worker "formulates and presents recommendations to the court" with regard to a child's custody determination, *Ernst*, 108 F.3d at 495.

Thus, even crediting the Lasches' representation of the facts, the individual defendants actions involved formulation of a recommendation to the court and the presentation of such information – activities that the Third Circuit has plainly held are protected by absolute prosecutorial immunity.   Therefore, the claims against the individual in their personal capacity that might remain after previous immunities and defenses are considered, should be dismissed.

## POINT V

### AT MINIMUM, DEFENDANTS HAVE QUALIFIED IMMUNITY AS TO THE LASCHES' CLAIMS.

As shown herein, the individual Defendants are, at minimum, entitled to qualified immunity with respect to Plaintiff's claims.   Qualified immunity is designed to accommodate the competing values between providing a cause of action for the deprivation of constitutional rights and the need for public officials to discharge their

20

discretionary powers without undue fear of personal liability. *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007) (citations omitted). Moreover, the doctrine applies regardless of whether the official's error is a mistake of law, a mistake of fact or a mistake based on mixed questions of law and fact. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The immunity is necessarily "broad in scope and protects" public officials except those who are "plainly incompetent" or "knowingly violate the law." *Curley*, 499 F.3d at 206 (citations omitted).

When a defendant in a § 1983 action claims qualified immunity, a two-part inquiry must be undertaken. *See Pearson*, 555 U.S. at 232; *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court is required to consider whether the plaintiff's allegations assert that the defendant's conduct violated a constitutional right at all. *Pearson*, 555 U.S. at 232. The court is also required to determine whether the constitutional right at issue was "clearly established" at the time of the alleged misconduct. *Id.* "[W]hether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury." *Curley*, 499 F.3d at 211 (citing *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004)).

Whether an official is shielded from liability by qualified immunity for alleged unlawful official action turns on the "objective legal reasonableness" of the action assessed in light of the "clearly established" law at the time the action was taken. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Plumhoff v. Rickard*, ___ U.S. ___, 134 S. Ct. 2012, 2023 (2014).

21

To determine whether a right was "clearly established," the question is whether, "at the time of the challenged conduct, the contours of a right [we]re sufficiently clear that every reasonable official would have understood that what he [wa]s doing violate[d] that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation and quotes omitted); *Harlow v. Fitzgerald*, 457 U.S. 800, 817-19 (1982).   The Supreme Court has held that absent "controlling authority," a "robust consensus of cases of persuasive authority" must have placed the statutory or constitutional question confronted by the officials "beyond debate." *al-Kidd*, 563 U.S. at 741.

To overcome the Defendants' claim of qualified immunity, the Lasches must show the existence of clearly established law that provided that consideration of a foster parent's or potential adoptive parent's views on sexuality in making recommendations regarding custody or adoption violates a clearly established constitutional right.  To Defendants' knowledge, no precedent exists that has held that making a recommendation about custody that takes into account a foster parent's/potential adoptive parent's views on sexuality violates a constitutional right (and certainly not in a factual context like the present matter, in which a same-sex couple were prospective adoptive parents, which plainly made necessary a discussion with Foster Child 1 about same-sex relationships).

Moreover, as shown at length in Point III of this brief, an overwhelming amount of judicial authority exists for the proposition that foster parents lack any constitutional rights with respect to custody determinations regarding foster children in their care, so

that a failure to advise the Lasches of their right to be heard at a judicial hearing, or the presentation of information regarding the Lasches' view on same-sex relationships that may have influenced the court's final custody determination, certainly did not contravene any "clearly established" authority that would have made plain that these defendants were depriving the Lasches of any constitutionally-protected rights.

Therefore, at minimum, Defendants are entitled to qualified immunity from the Lasches' claims.

**POINT VI**

**DEFENDANTS DID NOT REMOVE FOSTER CHILD 1 FROM THE LASCHES' CARE – A COURT DID -- AND DEFENDANTS ARE NOT LEGALLY LIABLE FOR THE COURT'S DECISION**

As the Complaint notes, a court hearing was held on July 2, 2018, in which a court accepted information relative to the placement of Foster Child 1 and made a determination that the child should be removed from the Lasches' foster care. Thus, the entire factual premise of this lawsuit – that Defendants removed the child from the Lasches, based on the Lasches' religious beliefs regarding homosexuality – is wrong. The family court judge made any determination about custody, apparently based on the view that this decision was in the best interest of Foster Child 1. Because the ultimate decision regarding Foster Child 1's custody was not made by the Defendants, they cannot be legally liable to the Lasches for the family court's judicial determination.

23

## POINT VII

## DCPP IS NOT A "PLACE OF PUBLIC ACCOMODATION," AND THERFORE, PLAINTIFF'S NJLAD CLAIM SHOULD BE DISMISSED.

The basis for the Lasches' claim under NJLAD is the plainly erroneous assertion that DCPP is a "public accommodation" under that statute.

N.J.S.A. 10:5-5(l) defines a "place of public accommodation" as follows:

> "A place of public accommodation" shall include, but not be limited to: any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodation of those seeking health, recreation, or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing with goods or services of any kind; any restaurant, eating house, or place where food is sold for consumption on the premises; any place maintained for the sale of ice cream, ice and fruit preparations or their derivatives, soda water or confections, or where any beverages of any kind are retailed for consumption on the premises; any garage, any public conveyance operated on land or water or in the air or any stations and terminals thereof; any bathhouse, boardwalk, or seashore accommodation; any auditorium, meeting place, or hall; any theatre, motion-picture house, music hall, roof garden, skating rink, swimming pool, amusement and recreation park, fair, bowling alley, gymnasium, shooting gallery, billiard and pool parlor, or other place of amusement; any comfort station; any dispensary, clinic, or hospital; any public library; and any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education or the Commissioner of Education of the State of New Jersey. Nothing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of

24

accommodation, which is in its nature distinctly private; nor shall anything herein contained apply to any educational facility operated or maintained by a bona fide religious or sectarian institution, and the right of a natural parent or one in loco parentis to direct the education and upbringing of a child under his control is hereby affirmed; nor shall anything herein contained be construed to bar any private secondary or post-secondary school from using in good faith criteria other than race, creed, color, national origin, ancestry, gender identity, or expression or affectional or sexual orientation in the admission of students.

DCPP, a state agency, plainly does not satisfy the above definition of a "place of public accommodation." Therefore, the Lasches' NJLAD claim should be dismissed.

## **CONCLUSION**

Based on the foregoing, Plaintiffs' Complaint should be dismissed as to the Prosecutor Defendants.

Respectfully submitted,

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By: /s/ Robert J. McGuire
Robert J. McGuire (046361992)
Deputy Attorney General

DATE: February 4, 2019

25