**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                              :
MICHAEL LASCHE and JENNIFER   :
 LASCHE,                                 :
                                 :    Civil Action No.: 18-17552 (FLW)(TJB)
               Plaintiffs,    :
                                 :         **OPINION**
  vs.                             :
                                 :
STATE OF NEW JERSEY, _et al_,     :
                                 :
              Defendants.   :
_____:

**WOLFSON, Chief Judge:**

Plaintiffs Michael and Jennifer Lasche, licensed foster parents, (collectively, "Plaintiffs" or "Lasches") allege that Defendants the State of New Jersey, the New Jersey Division of Child Protection and Permanency (the "DCPP"), DCPP employees Kyle Higgins, Katie Epperly, Mary Lippencot, Janelle Clark ("Individual Defendants"), in their official and individual capacities (collectively, "Defendants"), violated their constitutional rights when Defendants removed a foster child from their home and suspended Plaintiffs' foster parent license. In the instant matter, Defendants move to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(1), based on Eleventh Amendment Sovereign Immunity, and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Plaintiffs oppose the motion.

For the reasons set forth below, Defendants' Motion to Dismiss is **GRANTED,** with the right for Plaintiffs to amend certain claims, as set forth herein**.**

## I.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

For the purposes of this motion, the relevant facts are derived from Plaintiffs' Complaint and assumed as true.

In September 2017, the DCPP contacted Plaintiffs, who are "devout Christians who hold to traditional values and beliefs about family, marriage and sex," regarding the potential placement of two foster children. ECF No. 1, Compl. ¶¶1,8. The DCPP informed Plaintiffs that two sisters, ages 13 ("Foster Child 1") and 10 ("Foster Child 2"), were in need of a foster home and asked if Plaintiffs would be willing to care for them. *Id.* at ¶8. Plaintiffs, experienced foster parents, agreed to foster the two girls. *Id.* at ¶¶1,8.

Kyle Higgins ("Higgins"), the DCPP case worker assigned to the foster children, informed Plaintiffs that the girls' cases were proceeding toward adoption and that the biological father's parental rights had already been terminated. *Id.* at ¶¶2,9. Throughout October and November 2017, Higgins allegedly advised Plaintiffs that the cases were still moving toward adoption and that they would be given "first choice" to adopt the girls. *Id.* at ¶11. During that time period, the biological mother surrendered her rights and the children became eligible for adoption. *Id.* At that time, Plaintiffs were informed that they were still in consideration as adoptive parents. *Id.* at ¶12. However, in December 2017, Higgins informed Plaintiffs that a family in Illinois was interested in adopting Foster Child 1 and 2, as well as their three siblings. *Id.* at ¶13. When Plaintiffs and the children asked Higgins, and her supervisor Katie Epperly ("Epperly"), for information about the prospective adoptive family, they purportedly "claimed not to know the answers." *Id.* at ¶14.

Thereafter, during a conversation with the foster parents of Foster Child 1 and 2's siblings, the Lasches learned that the potential adoptees "were two wealthy gay men with lots of family around to support them and the adoption." *Id.* at ¶14. Plaintiffs were "baffled" as to why the DCPP withheld that information from them, but chose to share it with the other foster parents. *Id.* A few

days later, Higgins allegedly questioned Foster Child 1 about her religious beliefs concerning homosexuality and asked if her beliefs would change if she were living with another family. *Id.* at ¶15.

In April 2018, Foster Child 2 was removed from Plaintiffs' home "for confidential reasons unique to Foster Child 2," pursuant to an agreement between Plaintiffs and the DCPP. *Id.*

On May 22, 2018, Mrs. Lasche met with Higgins and Foster Child 1's therapist. *Id.* at ¶17. At that meeting, Mrs. Lasche, Higgins, and the therapist agreed not to discuss adoption with Foster Child 1 for the foreseeable future because it was too soon after Foster Child 2's removal. *Id.* They also discussed the possibility of Foster Child 1 spending additional time with her siblings to determine if she would like to be adopted by the same family as them, and Mrs. Lasche indicated that she "was not opposed to letting Foster Child 1 explore that and allowing her to make the decision without any questions or resentment." *Id.* During that meeting, Higgins indicated that a court hearing would be held on June 4, 2018, and a judge would make a determination as to whether all of the children should be adopted by their current foster families, or if it would be in the children's best interest for the Illinois couple to adopt all five siblings. *Id.* at ¶18.

The morning of the scheduled court hearing, Plaintiffs purportedly received a text message from Foster Child 1's Law Guardian[1] informing them that the Illinois couple was "off the table" and that a New Jersey family court judge had ordered psychiatric evaluations of the five children before a permanent placement decision was made. *Id.* at ¶19.

---

[1] The Court takes judicial notice that the Law Guardian Program is a component of the New Jersey Office of the Public Defender that is responsible for providing legal representation to children in family court matters involving adoption, allegations of abuse and neglect, and the termination of parental rights. *See* New Jersey Office of the Public Defender *Structure: Office of the Law Guardian*, https://www.state.nj.us/defender/structure/olg/ (last visited September 10, 2019).

Thereafter, Higgins allegedly contacted Plaintiffs to discuss transitioning Foster Child 1 to another foster home, where her younger brother resided, and Mrs. Lasche expressed confusion, because she was under the impression that since the Illinois family was no longer pursuing the adoption, the DCPP's intention was to allow each of the siblings to be adopted by their then- foster families. *Id*. at ¶21. To obtain more information, Mrs. Lasche contacted Foster Child 1's Law Guardian, and the Law Guardian was allegedly surprised and offered to investigate the situation. *Id*. at ¶22.

A few weeks later, Foster Child 1 came home from a regularly scheduled therapy session and informed Plaintiffs that she was upset because her "therapist kept bringing up religion and told her she should not feel pressured to follow her foster family's religious beliefs." *Id*. at ¶20. On another occasion, while Foster Child 1's therapist was at Plaintiffs' home for a therapy session, Mrs. Lasche asked the therapist why the therapist had inquired whether Foster Child 1 was "being pressured" to follow Plaintiffs' religion." *Id*. at ¶23. Initially, the therapist allegedly responded that "it was normal to discuss how people have different beliefs, ethics, religion, etc." *Id*. After further questioning from Mrs. Lasche, however, the therapist eventually divulged that Higgins had called before the session and had relayed to the therapist Plaintiffs' "ideas about same-sex couples." *Id*. Higgins also purportedly asked the therapist to discuss the possibility of relocating Foster Child 1 to another foster home with her brothers. *Id*.

On or about June 21, 2018, Higgins picked up Foster Child 1, ostensibly for the purpose of visiting one of her siblings. *Id*. at ¶24. Plaintiffs allege that it was "very rare" for Higgins to transport Foster Child 1 to such visits. *Id*. While on the way to the visit, Higgins allegedly stopped at a Dunkin Donuts with Foster Child 1 and informed her that Plaintiffs would not be able to "meet her needs." *Id*. at ¶25. Plaintiffs assert that during the visit, Higgins "interrogated Foster Child 1

about her religious beliefs" and "lied to her in an effort to intimidate her into agreeing that she did not want to be adopted by Plaintiffs." *Id*. at ¶¶24-25.

Upon returning from the visit, Higgins met with Plaintiffs and informed them that the DCPP intended to meet with them to "work with" Plaintiffs in order to reach a result that was in Foster Child 1's best interest. *Id*. at ¶26. When Plaintiffs inquired about the purpose of the meeting, they were allegedly informed by Epperly that the DCPP "was concerned that both Foster Child 1 and Foster Child 2 indicated that same-sex relationships were against their religion," a belief which the DCPP regarded as coming from Plaintiffs. *Id*. at ¶27.

On Friday June 29, 2018, the Lasches, their attorney, an attorney for the State of New Jersey, Higgins, Epperly, Epperly's supervisor Mary Lippencott, Janelle Clark, and one or two other DCPP employees whom Plaintiffs did not identify, attended a meeting at the DCPP's Monmouth County Office. *Id*. at ¶28. During the meeting, the DCPP representatives allegedly expressed concern about Plaintiffs' belief that homosexuality is a sin and its potential impact on Foster Child 1. *Id*. at ¶29. The DCPP officials allegedly discussed the possibility that Plaintiffs might reject Foster Child 1 if she "decided to explore her sexuality" and sought assurances to the contrary from Plaintiffs.[2] *Id*. One individual purportedly expressed the belief that in order to avoid possible future harm, Foster Child 1 might need therapy to address her belief that homosexuality was a sin. *Id*.

A few days later, on July 2, 2018, a hearing was held before a New Jersey family court judge, and the DCPP sought to remove Foster Child 1 from Plaintiffs' home. *Id*. at ¶30. Plaintiffs allege that they were not given notice that they had a right, pursuant to New Jersey law, to be heard at

---

[2]      The Complaint does not identify whether such assurances were provided by Plaintiffs or how Plaintiffs responded to the DCPP's questioning, if at all.

the hearing. *Id*. at ¶31. At the hearing, Foster Child 1's Law Guardian objected to the removal. *Id*. Nonetheless, the next day, presumably pursuant to a court order, the DCPP removed Foster Child 1 from Plaintiffs' home and Plaintiffs have not seen the child since. *Id*. at ¶32.

On October 12, 2018, a DCPP representative visited Plaintiffs' home in order to conduct a yearly inspection which was necessary for Plaintiffs to renew their foster parent license. *Id*. at ¶35. The representative asked Plaintiffs if they knew that their foster parent license had been suspended, and Plaintiffs stated that they were unaware of the suspension. *Id*. The representative allegedly informed Plaintiffs that they should have been notified of the suspension and the bases for the suspension. *Id*.

On November 19, 2018, Plaintiffs filed a four-count complaint against Defendants in New Jersey state court, alleging violations of the New Jersey Law Against Discrimination ("NJLAD"), the New Jersey Civil Rights Act ("NJCRA"), 42 U.S.C §1983, and 42 U.S.C §1985.[3] Plaintiffs allege that the DCPP took retaliatory actions against Plaintiffs' religious beliefs, violating the first Amendment of the United States Constitution and the New Jersey Law Against Discrimination. *Id*. at ¶¶39-40, 45. Furthermore, Plaintiffs contend that the Individual Defendants removed Foster Child 1 from Plaintiffs' home and suspended their foster parent license without giving them notice and an opportunity to be heard in violation of Plaintiffs' Fourteenth Amendment rights. *Id*. at ¶46.

On December 24, 2018, Defendants removed the matter to this Court, and thereafter, filed the instant motion to dismiss, for lack of subject matter jurisdiction based on sovereign immunity grounds, and for failure to state a claim. *See* ECF No. 6, Def. Br.

---

[3] Counts II-IV of Plaintiffs' complaint combine violations of different constitutional rights under the same count. It is better practice to separate each alleged constitutional violation in a different count, for the convenience of both the Court and the litigants when addressing the potential dismissal or amendment of certain claims.

## II.  STANDARD OF REVIEW

### A.  Federal Rule of Civil Procedure 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) permits the Court to dismiss a proceeding for lack of subject-matter jurisdiction.  *See* Fed. R. Civ. P. 12(b)(1).  This includes cases where Eleventh Amendment immunity bars the plaintiff's claims, as the Court of Appeals for the Third Circuit has noted that "the Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693 n.2 (3d Cir. 1996) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–100, 1 (1984)).

### B.  Federal Rule of Civil Procedure 12(b)(6)

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted).  While Federal Rule of Civil Procedure do not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  Thus, to survive a Rule 12(b)(6) motion to dismiss, the Complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To determine whether a plaintiff has met the facial plausibility standard mandated by *Twombly* and *Iqbal*, courts within this Circuit engage in a three-step progression. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "outline the elements a plaintiff must plead to state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the Court "peel[s] away those allegations that are no more than conclusions and thus not entitled to the assumption of trust. *Id.* Finally, where "there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## III.   ANALYSIS

### A.  Eleventh Amendment Sovereign Immunity

As a threshold matter, this Court must determine whether the DCPP, the State of New Jersey, and the Individual Defendants, sued in their official capacity, may invoke sovereign immunity. The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const. amend. XI. The Amendment affords states and state agencies immunity from suits brought by citizens in federal court, regardless of whether legal or equitable relief is sought. *See Pennhurst State School & Hosp.*, 465 U.S. at 89,100-101; s*ee also Thorpe v. New Jersey*, 246 F. App'x 86, 87 (3d Cir. 2007) ("The Eleventh Amendment of the U.S. Constitution protects a state or state agency from a suit brought in federal court by one of its own citizens regardless of the relief sought. . . ."). Eleventh Amendment immunity also extends to state agencies and departments, such as the

DCPP. *Alabama v. Pugh*, 438 U.S. 781, 781 (1978); *Pa. Fed'n of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 323 (3d. Cir. 2002); *Chisolm v. McManimon*, 275 F.3d 315, 323 (3d Cir. 2001). The Third Circuit has long held that the DCPP, formerly known as DYFS, is an arm of the state for sovereign immunity purposes. *Howard v. N.J. Div. of Youth & Family Servs.*, 398 F. App'x 807, 811-12 (3d Cir. 2010) ("DYFS is immune from suit under the Eleventh Amendment"); *Rich v. New Jersey*, No. 14-2075, 2015 WL2226029, at *7 (D.N.J. May 12, 2015) ("[New Jersey Department of Children and Families] is an arm of the state for sovereign immunity purposes."). Officers employed by DCPP, sued in their official capacity, are also entitled to immunity under the Eleventh Amendment when sued for money damages. *Id*.

However, "[a] state may waive its immunity from suit by invoking federal court jurisdiction voluntarily." *Lombardo v. Pa. Dep't. of Pub. Welfare*, 540 F.3d 190, 198 (3d Cir. 2008). By voluntarily invoking federal court jurisdiction, such as by removing a case from state court, the State "waives [its] immunity from suit in a federal forum." *Id*. at 198. However, "the removing State retains all defenses it would have enjoyed had the matter been litigated in state court, including immunity from liability" *Id*. at 200. Furthermore, under the *Ex Parte Young* doctrine, Eleventh Amendment immunity is waived when officers of a state are sued for prospective injunctive relief to end an ongoing violation of federal law. *Pa Fed'n of Sportsmen's Clubs, Inc.*, 297 F.3d at 323; *see also Ex Parte Young*, 209 U.S. 123, 159-60 (1908). In order for the *Ex Parte Young* exception to be applicable, "[t]he relief sought must be prospective, declaratory, or injunctive relief governing an officer's future conduct and cannot be retrospective, such as money damages." *MCI Telecomm. Corp. v. Bell Atl. Pa.*, 271 F.3d 491, 506 (3d Cir. 2001). To determine whether application of the doctrine is appropriate, "a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law

and seeks relief properly characterized as prospective." *Pa. Fed'n of Sportsmen's Clubs, Inc.*, 297 F.3d at 323 (quoting *Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 5353 U.S. 635, 645 (2002)).

Here, the doctrine of sovereign immunity does not bar this Court from hearing this case. While sovereign immunity can operate as a bar to jurisdiction, "voluntary removal waives a State's immunity from suit in a federal forum." *Lombardo,* 540 F.3d at 198. Although the State, the DCPP, and the Individual Defendants, in their official capacities, would generally be entitled to immunity in this context, Defendants removed this matter from state to federal court and voluntarily invoked the jurisdiction of this Court in the process.[4] Accordingly, this Court has subject matter jurisdiction over the instant action. However, Defendants' removal waives only sovereign immunity from suit; they retain any state sovereign immunity affirmative defenses which would be available to them under New Jersey state law. Furthermore, to the extent Plaintiffs seek injunctive relief – in the form of reinstatement of their foster parent license[5] – against state officials, such claims would fall within the *Ex Parte Young* exception.

---

[4] Although Defendants raised sovereign immunity as a basis for dismissal in their moving brief, in their reply brief, they concede that "defendants have waived immunity from suit in this court as to Plaintiffs' claims." *See* ECF No. 13, Def. Reply Br. at 3.

[5] On each count of their complaint, Plaintiffs seek "injunctive relief, damages, punitive damages, attorney fees and costs of suit" without clarifying the specific injunctive relief sought. *See generally* Pl. Compl. However, Plaintiffs' briefing avers that they are "not seeking to overturn any determinations made regarding the Foster Child . . . . The injunctive relief that the [Plaintiffs] seek is to be re-instated as Foster Parents and to participate in the system going forward without being subject to religious discrimination and prejudice by the employees of the [DCPP]." *See* Pl. Br. at 3. Accordingly, Plaintiffs' Complaint seeks to remedy an "ongoing violation of federal law and seeks relief properly characterized as prospective" as required by the *Ex Parte Young* exception. *Pa. Fed'n of Sportsmen's Clubs, Inc.*, 297 F.3d at 323.

Although Eleventh Amendment sovereign immunity does not prevent this Court from exercising subject matter jurisdiction over the present case, nonetheless, Plaintiffs' NJCRA claims against the State of New Jersey, the DCPP, and the Individual Defendants in their official capacity, and Plaintiffs' Section 1983 and Section 1985 claims against the Individual Defendants in their official capacity, must be dismissed, because those defendants are immune from liability.[6]  *See Lombardo,* 540 F.3d at 194  ("We can discern two distinct types of state sovereign immunity: immunity from suit in federal court and immunity from liability.").

Both Section 1983 and the NJCRA provide a plaintiff with a cause of action for certain violations of constitutional rights, under the Federal and state constitutions, respectively.  Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C §1983.  To state a claim under Section 1983, a plaintiff must allege the violation of a right secured by the Constitution or laws of the United States and that the alleged deprivation was committed or caused by a person acting under color of state law.  *See Harvey v. Plains Twp. Police Dep't*, 635 F.3d 606, 609 (3d Cir. 2011); *see also West v. Atkins*, 487 U.S. 42, 48 (1988).

Similarly, the NJCRA provides:

---

[6]     Although Plaintiffs have alleged an NJCRA claim against all Defendants, *see* Compl., ¶42, Plaintiffs' Section 1983 and Section 1985 claims are only against the Individual Defendants, in both their official and individual capacities, *see* Compl. ¶¶44-46, 50.

Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J. Stat. Ann. § 10:6-2(c). To establish an NJCRA violation, a plaintiff must show that (1) the New Jersey Constitution or laws of New Jersey conferred a substantive right; (2) the defendant deprived the plaintiff of this right; and (3) the defendant was acting under color of law when doing so. *Tumpson v. Farina*, 95 A.d3 210, 223 (N.J. 2014). However, the NJCRA "is interpreted as analogous to § 1983." *Szemple v. Corr. Med. Servs.*, Inc., 493 F. App'x 238, 241 (3d Cir. 2012); *Ianuale v. Borough of Keyport*, No. 16-9147, 2018 WL 5005005, at *11 (D.N.J. Oct. 16, 2018) ("The NJCRA was modeled after § 1983, and, thus, courts in New Jersey have consistently looked at claims under the NJCRA "through the lens of § 1983."); *Perez v. Zagami*, 94 A.3d 869, 877 (N.J. 2014) (stating that "[t]he legislative history is replete with references that the [NJ]CRA was intended to provide New Jersey citizens with a state analogue to Section 1983 actions.").

Neither the State, the DCPP, or the Individual Defendants are "persons" in their official capacity. It is well-established that both the state itself, and an arm of the state, such as a state agency like the DCPP, are not "persons" for purposes of Section 1983. *See Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71(1989)("We hold that neither a State nor its officials acting in their official capacities are 'persons' under §1983"); *Indep. Enterprises Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1173 (3d Cir. 1997)("the most important inquiry in determining whether a governmental entity is a 'person' within the meaning of § 1983 is whether the entity is an 'arm[ ] of the State' for Eleventh Amendment purposes'"(quoting *Will*, 491 U.S. at 70)).

Similarly, because the NJCRA is analogous to Section 1983, none of the Defendants are a "person" under the NJCRA. *See Didiano v. Balicki*, 488 F. App'x 634, 638 (3d Cir. 2012) (holding that "[n]othing in the language or subject matter of the NJCRA compels [the] conclusion that the State is a person."); *Brown v. State*, 124 A.3d 243, 55 (N.J. App. Div. 2015)("likewise, because the State is not a 'person' under the Civil Rights Act, it is equally immune from suits from damages as it is for suits seeking injunctions and other equitable relief"), *rev'd on other grounds*, 165 A.3d 735 (2017). Thus, the NJCRA and Section 1983 claims against the State, the DCPP, and the DCPP employees acting in their official capacity are dismissed with prejudice because they are not "persons" within the meaning of either civil rights statute.

However, Plaintiffs have also alleged civil rights claims against the DCPP employees acting in their individual capacity. Those claims are not precluded by sovereign immunity, as state employees, agents or officials, when sued in their individual capacities are "persons" within the meaning of Section 1983 and the NJCRA. *Hafer v. Melo*, 502 U.S. 21, 31 (1991)("the Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983").

### B. Failure to State a Claim

Plaintiffs' NJLAD claim is the sole remaining claim against the State, the DCPP, and the Individual Defendants, in their official capacity. Plaintiffs also assert following four claims against the Individual Defendants in their personal capacities: (1) violations of the NJLAD as a result of the Individual Defendants "deny[ing] Plaintiffs the ability to adopt/and or foster a child because of Plaintiffs' religious beliefs," Compl. ¶39; (2) violations of the NJCRA; and (3) violations of Section 1983 and Section 1985 based on the infringement of Plaintiffs' First and Fourteenth Amendment rights.

Defendants have moved to dismiss those claims for failure to state a claim. Further, the Individual Defendants have also raised the doctrines of absolute and qualified immunity as a defense to Plaintiffs' claims.

### i. Absolute Immunity

State officials, sued in their individual capacities, may assert the defense of absolute immunity. Here, the Individual Defendants have asserted that they are entitled to absolute prosecutorial immunity with respect to all of Plaintiffs' claims.

Prosecutorial immunity is a form of immunity applicable to officials "functioning as integral parts of the judicial process." *McArdle v. Tronetti*, 961 F.2d 1083, 1084 (3d Cir. 1992). Absolute immunity depends on whether the challenged "actions [are] 'intimately associated with the judicial phase of the criminal process.'" *Burns v. Reed*, 500 U.S. 478, 486 (1991) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Id.* at 486.

The Third Circuit has previously addressed the scope of absolute immunity in the context of government social workers involved in child removal actions on two occasions. *See Ernst v. Child & Youth Servs. of Chester Cty.,* 108 F.3d 486, 488–89 (3d Cir. 1997)(holding that "child welfare workers and attorneys who prosecute dependency actions on behalf of the state are entitled to absolute immunity from suit for all of their actions in preparing for and prosecuting such dependency proceedings"); *B.S. v. Somerset Cty.*, 704 F.3d 250, 256 (3d Cir. 2013)(holding that state child welfare caseworkers are "absolutely immun[e] ... from liability with respect to their actions on behalf of the state in preparing for, initiating, and prosecuting dependency proceedings").

In *B.S.*, a mother sued DYFS employees who removed her child from her home pursuant to a family court order, and proceeded with an investigation of alleged child abuse. 704 F.3d at 265. In determining whether the DYFS employees were entitled to absolute immunity, the Third Circuit examined the actions taken by the social workers which gave rise to each of the plaintiff's claims, and determined whether those acts were prosecutorial in nature. *Id*. at 265-69. The court found that the actions underlying the plaintiff's procedural due process claim stemmed from the social workers' "solicitation of information from [the child's] doctor and the compilation of her findings into an abuse report" prior to the judicial proceeding, and thus, such actions "were fundamentally prosecutorial." *Id*. at 266. Turning to plaintiff's substantive due process claims, the court examined whether the social worker's investigation and child abuse report, after the initial removal proceeding could be considered legal advocacy. *Id*. at 269-270. The court noted that typically, "investigating potential child abuse and preparing a report required under state law does not approximate legal advocacy," however, in the case before it "the further investigation that [the social worker] undertook after [the removal order], and the subsequent [abuse] report that [the social worker] filed, were part of an ongoing judicial proceeding throughout which she served as an advocate for the state." *Id*. at 269. Therefore, the social worker was entitled to absolute immunity with respect to the Plaintiff's substantive due process claims, as well. *Id*.

Based on the foregoing, in determining whether absolute immunity applies, I must assess whether the DCPP employees "'function[ed] as the state's advocate when performing the action(s)' that gave rise to the due process violations [plaintiff] seeks to redress, or whether those claims instead arose from unprotected 'administrative or investigatory actions.'" *B.S.*, 704 F.3d at 265 (quoting *Odd v. Malone*, 538 F.3d 202, 208 (3d Cir. 2008)). "The key to the absolute immunity determination is not the timing of the investigation relative to a judicial proceeding, but rather the

underlying function that the investigation serves and the role the caseworker occupies in carrying it out." *B.S.*, 704 F.3d at 270.

Here, Plaintiffs' claims are premised on two distinct factual allegations: 1) the Individual Defendants' investigation of Foster Child 1's beliefs on homosexuality and the removal of Foster Child 1 and 2) the Individual Defendants' suspension of Plaintiffs' foster parent license based on their alleged hostility towards Plaintiffs' religious beliefs. It is not clear, at this juncture, that the Individual Defendants are entitled to absolute immunity for either set of actions.

Unlike in *B.S.* and *Ernst*, it is not clear whether the Individual Defendants' roles in removing Foster Child 1 fell within the scope of their duties as "state advocates." Based on the Complaint, the Individual Defendants' actions involved collecting information regarding Plaintiffs' views on homosexuality and the potential impact of these views on Foster Child 1, formulating a recommendation, and presenting that information to the New Jersey Family Court for the judge to make a placement determination. However, the precise nature of the DCPP employees' role when they first met with the Lasches and Foster Child 1 is not clear from the face of the Complaint. Indeed, the Complaint is silent as to whether the meeting took place in connection with a family court removal proceeding or whether the Individual Defendants were acting in an administrative capacity. Although the process culminated in a proceeding before the New Jersey Family Court, it does not appear that the DCPP employees were "preparing for, initiating, [or] prosecuting [the removal] proceedings" when they initially began questioning Foster Child 1 regarding her views on homosexuality. *Ernst*, 108 F.3d at 495. Rather, those meetings likely fell within the scope of the social workers' administrative functions, as part and parcel of their daily workload.

Similarly, it is unclear what role, if any, the Individual Defendants played in the suspension of Plaintiffs' foster parent license. The Complaint is devoid of facts indicating the process by which Plaintiffs' foster parent license was suspended, such as whether the suspension occurred as part of a judicial proceeding, so that the Individual Defendants could be said to have been acting in a prosecutorial capacity.

At this juncture, based on the pleadings, the Court cannot rule with certainty that the Individual Defendants are entitled to absolute immunity on any of Plaintiffs' claims. This defense is more appropriately raised in a summary judgment motion.

### ii. Plaintiffs' Fourteenth Amendment Claims

It appears Plaintiffs' Complaint alleges violations of both the Equal Protection and the Due Process clauses of the Fourteenth Amendment. Specifically Plaintiffs allege the following: Defendants "deprived the Plaintiffs of their substantive due process, equal protection rights, privileges or immunities secured by the Constitution," Compl. ¶42; "the individual Defendants took actions adversely affecting the Plaintiffs without giving them notice and an opportunity to be heard in violation of Plaintiffs' rights pursuant to the 14th Amendment to the Constitution," *Id*. at ¶46; "Plaintiffs have a constitutionally protectable interest in Foster Child 1 . . . and that interest was arbitrarily denied them in violation of the 5th and 14th Amendments to the Constitution," *Id*. at ¶47; and "[t]he individual Defendants conspired for the purpose of depriving Plaintiffs . . . the equal protection of the laws, and/or of the equal privileges and immunities under the laws . . . . As a result of said conspiracy Plaintiffs have been deprived of having and exercising the rights or privilege of a citizen of the United States, granted pursuant to the 1st, 5th and 14th Amendment. " *Id*. at ¶¶50-51.

However, Plaintiffs' briefing addresses only the First Amendment violation and the denial of procedural due process, without expanding on the alleged Equal Protection violation. Nonetheless, since the Complaint is ambiguous as to the type of Fourteenth Amendment violation alleged, I will consider the Complaint as alleging both equal protection and due process claims.

### 1. The Procedural Due Process Claim

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., Amend. XIV, § 1. "A constitutionally protected liberty or property interest may arise directly from the Constitution or from federal or state statutes or regulations." *Baldwin v. Hous. Auth. of City of Camden, NJ*, 278 F. Supp. 2d 365, 378 (D.N.J. 2003). "Essentially, due process requires that a person be given notice and an opportunity to be heard prior to an adverse action." *Id*. (citing *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970)). When a plaintiff alleges that state actors have failed to provide procedural due process, a court must determine "whether the asserted individual interests are encompassed within the fourteenth amendment's protection of 'life, liberty, or property.'" *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000) (citing *Robb v. City of Philadelphia*, 733 F.2d 286, 292 (3d Cir. 1984)). If a protected interest is implicated, a court must then "decide what procedures constitute 'due process of law.'" *Id*. Here, the Court need not reach the second step of that inquiry, because Plaintiffs have failed to allege the deprivation of any interest protected under the Due Process Clause, a threshold inquiry.

Here, Plaintiffs' Complaint alleges that the interests at issue are both their liberty interest in pursuing a familial relationship with Foster Child 1, as well as their property interest in the form of their foster parent license. Specifically, Plaintiffs' Complaint alleges that "the individual Defendants took actions adversely affecting the Plaintiffs without giving them notice and an

opportunity to be heard in violation of Plaintiffs' rights pursuant to the 14th Amendment to the Constitution," Compl., ¶46 and that "Plaintiffs have a constitutionally protectable interest in Foster Child 1 in that . . . they had a close familial relationship with said Foster Child 1 and that interest was arbitrarily denied them in violation of the 5th and 14th Amendments to the Constitution." *Id*. at ¶47. However, Plaintiffs' Opposition brief concedes that they do not, in fact, have a constitutionally protectable liberty interest in their relationship with Foster Child 1, despite the allegations in Paragraph 47 of the Complaint, and that Plaintiffs' only focus in this litigation is the revocation of their foster parent license.[7]  *See* Pl. Br. at 1("While there may not be a right to be a

---

[7]     Even if Plaintiffs had not conceded that their relationship to Foster Child 1 does not give rise to a fundamental liberty interest protected under the Fourteenth Amendment, such a claim could not survive.  Although parents have "constitutionally protected liberty interests" in the "custody, care and management of their children," *Croft v. Westmoreland Cty. Children & Youth Servs.*, 103 F.3d 1123, 1125 (3d Cir. 1997), courts have generally held that absent special circumstances foster parents do not possess similar liberty interests regarding foster children. *Rodriguez v. McLoughlin*, 214 F.3d 328, 339-41 (2d Cir. 2000)("any liberty interest arising in the preservation of a biologically unrelated foster family would arise, if at all, only under state law and not under the Due Process Clause itself."); *Renfro v. Cuyahoga Cty. Dep't of Human Servs.*, 884 F.2d 943, 944 (6th Cir. 1989) (holding that "[t]he nature of the foster care relationship is distinctly different from that of the natural family; namely, it is a temporary arrangement created by state and contractual agreements," thus it does not give rise to a constitutionally protected liberty interest.); *Drummond v. Fulton Cty. Dep't of Family & Children's Servs.*, 563 F.2d 1200, 1207 (5th Cir. 1977)(holding that in cases "in which a child placement agency charged with the custody of a child, places that child [with a foster family] for temporary care" the foster parents do not have a constitutionally protected liberty interest in the relationship with the child); *but see Elwell v. Byers*, 699 F.3d 1208, 1217 (10th Cir. 2012) (finding that foster parents who had received court approval for their adoption plan possessed a protectable liberty interest because they had a "reasonable expectation of developing a permanent relationship with the child"); *Rivera v. Marcus*, 696 F.2d 1016 (2d Cir. 1982) (recognizing protectable liberty interest of foster parent who was biologically related to her foster children).  As the Supreme Court has explained,  the liberty interest that families possess is rooted in "intrinsic human rights, as they have been understood in 'this Nation's history and tradition.'" *Smith v. Org. of Foster Families For Equal. & Reform*, 431 U.S. 816, 845 (1977) (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977)).  By contrast, "[w]hatever emotional ties may develop between foster parent and foster child have their origins in an arrangement in which the State has been a partner from the outset." *Id*. When the State interferes with the relationship between foster parents and foster children, the State is not interfering "with a relationship having its origins entirely apart from the power of the State," but rather with a family unit that "has its source in state law and contractual arrangements." *Id*. Thus,

foster parent, or to adopt a child, there is a constitutional right to participate in the system free from discrimination because of one's religious beliefs"); Pl. Br. at 7 ("Whatever the opportunity to adopt is labeled, a court cannot disqualify someone from adopting on religious grounds without violating that person's rights to free exercise of his religious beliefs."). Accordingly, any claims related to an alleged violation of Plaintiffs' due process rights on the basis of an alleged liberty interest in their familial relationship with Foster Child 1 is dismissed.

As refined by their briefing on this motion, Plaintiffs' focus is on the suspension of their foster parent license. They contend that they were not given notice or an opportunity to be heard regarding the suspension of their foster parent license. Pl. Br. at 7. They also contend that they were denied procedural due process, because they were not advised of their statutory right, pursuant to New Jersey state law, to appear and make a statement at the hearing regarding the placement of Foster Child 1. *Id.*

Under certain circumstances, a statutory right may rise to the level of a protected interest under the Due Process Clause. A protected liberty interest "may arise directly from the Constitution or from federal or state statutes or regulations," whereas "[p]roperty interests are not created by the Constitution, but 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *Baldwin,*

---

the extent of any liberty interests possessed by foster parents, is derived from "the expectations and entitlements of the parties" under state law, rather than the Due Process Clause. *id.* at 845-46; *see also N.J. Div. of Youth & Family Servs. v. D.P.*, 422 N.J. Super. 583, 593 (App. Div. 2011) ("The legal relationship between the resource parent[ ] and the child emanates through a contract with the Division sanctioned by state law."). Accordingly, to the extent Plaintiffs have not abandoned their due process claim based on the alleged interference with their liberty interest in their relationship with Foster Child 1, it fails as a matter of law.

278 F. Supp. 2d at 378 (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571(1972)). However, "an expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause." *Olim v. Wakinekona,* 461 U.S. 238, 250 n.12 (1983).

In order for a statute to give rise to a constitutionally protectable property interest, the statute must contain "explicitly mandatory language, i.e. specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow," *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 463 (1989), or the complainant "must show that particularized standards or criteria guide the [government's] decisionmakers." *Olim*, 461 U.S. at 249. Ultimately, in order to have a constitutionally protected property interest "a person clearly must have 'more than an abstract need or desire' and 'more than a unilateral expectation of'" the benefit sought, rather the person "must instead, have a legitimate claim of entitlement to it.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756, (2005) (quoting *Bd. of Regents of State Colleges*, 408 U.S. at 564).

As an initial matter, Plaintiffs' foster parent license is not, itself, a constitutionally protected property interest. Indeed, Plaintiffs do not have a right to their foster parent license. Whether a benefit granted by the state rises to the level of a protected property interest for purposes of procedural due process is determined by looking to the state law that created the benefit. *Larsen v. Senate of Commw. of Pa.*, 154 F.3d 82, 92 (3d Cir. 1998); *Kelly v. Borough of Sayreville*, N.J., 107 F.3d 1073, 1077 (3d Cir. 1997). Under the Resource Family Parent Licensing Act, prospective foster parents are required to submit to an assessment by DCPP and obtain a license to act as a foster parent. *See* N.J. Stat. Ann. §30:4C-27.3 to 27.12. As part of the licensing scheme, prospective foster parents are required to submit an application, possess good moral character, consent to a background check, and participate in both pre- and in- service foster parent training.

*See* N.J. Stat. Ann. § 30:4C-27.6. The license is valid for three years, and each year, the foster parents must undergo a yearly home inspection and interview in order to maintain the license. N.J. Admin. Code § 3A:51-2.2 to 2.3. Clearly, nothing in the statutory scheme suggests that Plaintiffs had a "legitimate claim of entitlement" to their foster parent license. A foster parent license is not a "property interest" protected by the Due Process Clause, but rather, a temporary contract with the State, which is subject to renewal every three years. *See e.g.*, *Lockhart v. Matthew*, 83 F. App'x 498, 500 (3d Cir. 2003) (holding Plaintiff did not have a constitutionally protected property interest in EMT license which expired every two years). Thus, Plaintiffs' foster parent license is not a constitutionally protected property interest.

Furthermore, although the statutory scheme conveys certain procedural protections upon Plaintiffs, those procedural requirements are not constitutionally required. In other words, while Plaintiffs undeniably possessed – and were allegedly denied -- a statutory right to be informed of, and to be provided an opportunity to contest the suspension of their foster parent license, DCPP's alleged failure to abide by the state statute, does not give rise to a constitutional violation. Since Plaintiffs' foster parent license is not, itself, a constitutionally protected interest, and the statute does not create a constitutionally protected interest or right, Plaintiffs were not entitled to the protections of the due process clause.

Pursuant to state law, the DCPP may deny, revoke, or suspend a foster parent license at any time "for good cause," including but not limited to, "[a]ny conduct, engaged in or permitted, which adversely affects or presents a serious hazard to the education, health, safety, general well-being or physical, emotional and social development of the child." N.J. Stat. Ann. § 30:4C-27.9. "Before denying, suspending or revoking a license, the [DCPP] shall give notice to a . . . resource family parent personally or by mail to the last known address of the resource family parent

applicant or resource family parent with return receipt requested. The notice shall afford the resource family parent applicant or resource family parent the opportunity to be heard and to contest the [DCPP's] action." N.J. Stat. Ann. § 30:4C-27.10. Any appeal from the DCPP's final decision may be filed in the New Jersey Appellate Division. N.J. Stat. Ann. § 30:4C-27.11. Thus, the statutory scheme does not establish "substantive predicates" or "mandatory outcomes" as to the ultimate result of a hearing. *Thompson*, 490 U.S. at 463. Rather, the statute simply provides the process by which Plaintiffs may challenge the revocation of their foster parent license. The mere existence of the state statute prescribing a specific procedure does not create a due process interest because "[p]rocess is not an end in itself." *Olim,* 461 U.S. at 250-51. As the United States Supreme Court has noted states "may choose to require procedures for reasons other than protection against deprivation of substantive rights, of course, but in making that choice the State does not create an independent substantive right." *Id.*; *see also Steele v. Cicchi*, 855 F.3d 494, 508 (3d Cir. 2017) (dismissing Plaintiff's procedural due process claim premised on correction center's failure to abide by disciplinary procedures set forth in the correction center's manual because "there is no standalone protected liberty interest in those procedures"); *D.O. ex rel. C.O. v. Borden*, 804 F. Supp. 2d 210, 220 (D.N.J. 2011) (explaining that "the Constitution does not assure a plaintiff that he or she will receive the process conceived by a state law or regulation"); *Toolasprashad v. Williams*, No. 07-5860, 2009 WL 1228430, at *7 (D.N.J. Apr. 28, 2009) ("The Due Process Clause does not require the government to follow its own regulations, procedures or laws if there is no underlying liberty or property interest"). Furthermore, the statutory scheme, provides Plaintiffs the opportunity to challenge the suspension in the New Jersey Appellate Division --- a procedure they do not appear to have utilized.

Similarly, Plaintiffs' statutory right to be heard regarding the removal of Foster Child 1 does not give rise to a constitutionally protected property or liberty interest. The DCPP possesses "the discretionary authority to remove a child in placement for a resource family home at any time with or without the consent of the resource family parent." N.J. Admin. Code § 3A:17-1.1. However, the New Jersey Family Court must determine that the DCPP's placement plan "ensures the safety and health and serves the best interest of the child." N.J. Stat. Ann. § 30:4C-51. To that end, the New Jersey Family Court may schedule hearings to assess the appropriateness of a foster child's placement and, if such a hearing is scheduled, notice shall be provided to the child's foster parent. *See* N.J. Stat. Ann. § 30:4C-61(c). Further, the foster parents "shall have a right to be heard at the hearing, but the caretaker shall not be made a party to the hearing solely on the basis of the notice and right to be heard." N.J. Stat. Ann. § 30:4C-61. Thus, New Jersey foster parents possess a circumscribed, statutory right to be heard during a child placement proceeding.

Again, the statutory scheme does not mandate a specific outcome; it simply outlines the procedure to be followed when making placement determinations. Moreover, even if Plaintiffs had been informed of their right to be heard regarding the placement of Foster Child 1, their participation would have been extremely limited, and the ultimate determination as to the placement of Foster Child 1 would be left to the discretion of the New Jersey Family Court. As the Supreme Court has recognized "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock*, 545 U.S. at 756. Notably, when faced with similar due process challenges, other courts have generally held that statutes which provide foster parents notice and an opportunity to be heard regarding the placement of a foster child do not give rise to a protected property interest. *See Elwell v. Byers*, 699 F.3d 1208, 1214 (10th Cir. 2012) (holding that statutory requirements which required notice and an opportunity to

be heard prior to removal of a foster child "are plainly procedural rather than substantive" because they do not guarantee a particular outcome."); *Huk v. Cty. of Santa Barbara*, 650 F. App'x. 365 (9th Cir. 2016) (finding that although California state law requires "pre-removal notice and a grievance process for foster parents to contest the removal of a foster child" those laws "do not entitle foster parents, as a matter of federal constitutional right, to the notice and grievance procedures required by California law. . . . as there is no entitlement, there is no constitutional interest to protect with process."). Ultimately, although Plaintiffs had a statutory right to be heard regarding both the revocation of their foster parent license and the placement of Foster Child 1, the procedures provided for by the New Jersey state statutes do not, in and of themselves, create a constitutionally protected interest. Accordingly, Plaintiffs have failed to allege the deprivation of an interest protected under the Due Process Clause; thus their procedural due process claims are dismissed with prejudice.

### 2. The Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction, the equal protection of the laws." U.S. Const. Amend. XIV, § 1. To state a claim under the Equal Protection Clause, a plaintiff must show that he received "different treatment from that received by other individuals similarly situated." S*human v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005). Generally, parties may bring two types of equal protection claims: class of one claims and selective enforcement claims. *See Patterson v. Strippoli*, 639 F. App'x 137, 142 (3d Cir. 2016). Both theories require a plaintiff to demonstrate that he or she was treated differently from similarly situated individuals. *Id.* A selective enforcement claim requires a plaintiff to demonstrate that the different treatment was the result of an "unjustifiable standard" such as race, or religion or in order to prevent an individual from

exercising a fundamental right. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005). In contrast, a "class of one" claim requires the plaintiff to sufficiently allege that he or she " 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.' " *Zitter v. Petruccelli*, 744 F. App'x 90, 97 (3d Cir. 2018)(quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

Although Plaintiffs have not specifically identified which theory underlies their Equal Protection claim, Plaintiffs allege that they were subject to different treatment as a result of their religious beliefs, which amounts to a selective enforcement claim. However, that claim fails as Plaintiffs have not alleged that the DCPP treated similarly situated foster parents, who did not share their religious beliefs, differently than Plaintiffs. Plaintiffs' Complaint merely summarily alleges that Plaintiffs were denied equal protection of the law. Their opposition brief provides no further clarity, but simply argues that they were subject to "governmental discrimination because of their [religious] beliefs." Pl. Br. at 9. Because Plaintiffs have not identified any comparable or similarly situated individuals who were treated differently, Plaintiffs' equal protection claim fails to state a claim. *See Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) ("An essential element of a claim of selective treatment under the Equal Protection Clause is that the comparable parties were similarly situated. Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects."); *Bradley v. United States*, 299 F.3d 197, 206 (3d Cir. 2002) (explaining that differential treatment may be demonstrated "by naming similarly situated members of an unprotected class who were not selected for the same search or, in some cases, by submitting statistical evidence of bias.").

Accordingly, Plaintiffs' Equal Protection claim against Individual Defendants is dismissed without prejudice.

### iii. Plaintiffs' First Amendment Claims

Plaintiffs allege that they were discriminated against on the basis of religion in violation of their First Amendment rights. Pl. Br. 7. Again, Plaintiffs' Complaint fails to elucidate the precise nature of the alleged First Amendment violation, or address the specific elements; however, Plaintiffs allege that they are "devout Christians who hold to traditional values and beliefs about family, marriage and sex," Compl. ¶¶1,8, and that the "[t]he only apparent basis for suspending Plaintiffs as Foster Parents and for the removal of Foster Child 1 from Plaintiffs home was because of the Plaintiffs' religious belief that homosexuality is a sin," Compl., ¶36. Those factual underpinnings suggest that Plaintiffs are alleging retaliatory conduct by the DCPP employees.

To plead a retaliation claim under the First Amendment, a plaintiff must allege "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)); *accord Falco v. Zimmer*, 767 F. App'x 288, 310 (3d Cir. 2019) (distinguishing between First Amendment retaliation claims by public employees and those by private individuals). "[T]he key question in determining whether a cognizable First Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)).

Plaintiffs allege that both the removal of Foster Child 1 and the revocation of their foster parent license were discriminatory actions taken by the Individual Defendants because of Plaintiffs' religious beliefs. As previously noted, Plaintiffs' Complaint does not specifically

address any of the specific elements of a First Amendment claim; however, Plaintiffs allege that the removal of Foster Child 1 was based on Plaintiffs' religious belief regarding homosexuality. While Plaintiffs paint the constitutionally protected conduct with a broad brush, the facts, as alleged, suggest, two possible theories of retaliation: Plaintiffs were retaliated against for simply holding the religious belief that homosexuality is a sin and/or Plaintiffs were retaliated against for sharing their religious beliefs with Foster Child 1 while she resided in their home. Neither theory, as currently alleged, clearly presents a viable claim of First Amendment retaliation.

To the extent Plaintiffs allege that the constitutionally protected conduct in which they engaged is having held a particular religious belief, that clearly constitutes "constitutionally protected conduct." *Emp't Div. v. Smith,* 494 U.S. 872, 877 (1990)("The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires"); *Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940)("The Free Exercise Clause "embraces two concepts,—freedom to believe and freedom to act. The first is absolute[.]"). Thus, Plaintiffs have arguably satisfied the first element. However, Plaintiffs have not demonstrated the requisite causal connection between their religious beliefs and the adverse actions they suffered. In order to establish a causal connection, "the plaintiff usually must allege one of two things: (1) an unusually suggestive time proximity between the protected activity and the allegedly retaliatory action; or (2) a pattern of antagonism coupled with timing to establish a causal link." *DeFranco v. Wolfe*, 387 F. App'x 147, 155 (3d Cir. 2010) (citing *Luren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). In the absence of such an allegation, "the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of fact should infer causation." *DeFlaminis,* 480 F.3d at 267 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir.2000)). As the Third Circuit has explained, at the motion to dismiss phase, the plaintiff

must only allege some evidence, direct or circumstantial, of this element that is "enough to raise a right to relief above the speculative level." *Falco*, 767 F. App'x at 310 (quoting *Twombly*, 550 U.S. at 555). However, Third Circuit has also cautioned that "[a] court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him [or her], particularly in his [or her] individual capacity, could be chilled from taking action that he [or she]deemed appropriate and, in fact, was appropriate." *Id*. Here, Plaintiffs have not pled evidence of a causal link between Plaintiffs beliefs and the alleged retaliatory conduct.

The order of events, as currently pled, belies Plaintiffs' position that the Individual Defendants' actions were in retaliation for Plaintiffs' religious beliefs. Plaintiffs Complaint alleges that in December 2017, the foster parents of Foster Child 1's siblings were informed that the potential adoptive parents were a same-sex couple, yet when Plaintiffs inquired about the potential adoptive family, Defendants Higgins and Epperly claimed not to know any information about the potential adoptive family. Thus, Plaintiffs factual allegations suggest that the Individual Defendants were aware of Plaintiffs' religious beliefs regarding homosexuality, as early as December 2017. However, the alleged retaliatory actions – the removal of Foster Child 1 and the suspension of Plaintiffs' foster parent license – did not occur until July 2018, seven months later.[8] Seven months is not "unusually suggestive." *Falco*, 767 F. App'x at 314 (finding close temporal proximity where there were two instances of protected activity and retaliatory conduct, with nine months between first instance of protected activity and retaliatory conduct and one month between

---

[8] Plaintiffs allegedly did not discover the suspension of their foster parent license until October 12, 2018. It is unclear at precisely what point in time Plaintiffs' license was suspended; however Foster Child 1 resided with them until July3, 2018 – ostensibly, Plaintiffs were still licensed to act as foster parents until that date.

second instance of protected activity and allege retaliatory conduct); *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003)(finding lack of causal connection for First Amendment retaliation claim where three weeks passed between protected conduct, filing of sexual harassment complaint, and retaliatory action, Plaintiff's termination); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989)(finding unusually suggestive temporal proximity where two days passed between the protected activity and the alleged retaliation).

Although "timing plus other evidence" may be sufficient to establish causation "where the temporal proximity is not so close as to be 'unduly suggestive,'" Plaintiffs have not alleged any facts from which a fact finder could reasonably discern that the Individual Defendants acted out of hostility towards Plaintiffs' religious beliefs. *Farrell*, 206 F.3d at 280. Plaintiffs' Complaint identifies various instances in which the DCPP employees questioned *Foster Child 1* about *her* beliefs. Notably, DCPP is required by regulation to "work with the resource parent to provide the child in placement with reasonable opportunities to attend religious activities and services in accordance with the child's preference and the wishes of the child's own parents." N.J. Admin. Code § 3A:14-4.1(a). Defendants' questioning of Foster Child 1 regarding her religious beliefs was appropriate in light of the DCPP's regulatory obligations, and the imminent possibility that Foster Child 1 might be adopted by a same-sex couple. Plaintiffs identify only one occasion on which the Individual Defendants inquired about Plaintiffs' religious beliefs, and in that respect, the inquiry appears to have been a limited one in which the Individual Defendants queried whether Plaintiffs would "reject Foster child 1 if she ever decided to explore her sexuality" and "sought assurance from the Plaintiffs that would not be the case." Compl. ¶29. Such questioning is not indicative of hostility towards Plaintiffs' particular religious beliefs, but rather, the Individual Defendants' exercise of their administrative functions as employees of the entity prescribed with

the duty of safeguarding Foster Child 1's well-being. In light of the temporal chasm between the Individual Defendants discovery of Plaintiffs' religious beliefs and the alleged retaliatory conduct, and the lack of other circumstantial evidence from which causation could be inferred, Plaintiffs fail to state a claim premised on retaliation for their religious beliefs.

Furthermore, to the extent the alleged right at issue is more narrowly construed as the right to share their religious beliefs with Foster Child 1 while she was residing in their home, it is unclear whether such conduct is constitutionally protected. Although Plaintiffs have an absolute right to practice whatever religious beliefs they choose, their right to free exercise does not, necessarily, permit them  to engage in religious practice and share their beliefs with Foster Child 1, who was not Plaintiffs' adoptive child and Plaintiffs were not her legal guardian.  Regardless, Plaintiffs have not clearly pled such a theory nor has either party adequately discussed it.  Ultimately, Plaintiffs' have not pled their factual allegations with adequate specificity to properly apprise Defendants of the basis of their First Amendment retaliation claim, particularly since Plaintiffs have not specified the nature of the constitutionally protected conduct. Accordingly, Plaintiffs'  First Amendment retaliation claim is dismissed without prejudice.

### iv.  Civil Rights Conspiracy, 42 U.S.C. §1985

Plaintiffs allege that the Individual Defendants conspired for the purpose of denying Plaintiffs' First, Fourteenth, and Fifth Amendment rights. In order to assert a violation of Section 1985, a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the

United States." *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (quoting *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828–29 (1983)).

Plaintiffs' Section 1985 conspiracy claim fails, as well. To the extent Plaintiffs' 1985 claim is premised on the same factual underpinnings as their Equal Protection claim, the Section 1985 claim fails for similar reasons. Plaintiffs have not sufficiently alleged that they were treated differently than any comparable or similarly situated individuals. Plaintiffs' "mere conclusory allegations of deprivations of constitutional rights are insufficient to state a § 1985(3) claim." *Carpenter v. Ashby*, 351 F. App'x 684, 687 (3d Cir. 2009) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993)).

Furthermore, Plaintiffs have not alleged any facts suggesting an agreement or concerted action amongst the Individual Defendants. *See Startzell,* 533 F.3d at 205 ("To constitute a conspiracy, there must be a 'meeting of the minds.' " (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970))); *Aulisio v. Chiampi*, 765 F. App'x 760, 764 (3d Cir. 2019) (dismissing conspiracy claim against state prison officials because inmate-prisoner "offered nothing more than conclusory statements that Defendants conspired to deprive him of his constitutional rights; no evidence suggests that they agreed, plotted, or even discussed doing so").

Plaintiffs' Section 1985 conspiracy claim is dismissed without prejudice.

### v. Violation of NJLAD

Plaintiffs have asserted a claim against all Defendants under the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. § 10:5-12(f), for discrimination in a place of public accommodation. NJLAD provides that it shall be unlawful: "[f]or any . . . employee of any place of public accommodation directly or indirectly ... to discriminate against any person in the furnishing thereof." N.J. Stat. Ann. § 10:5-12(f)(1).

The threshold issue at this juncture is whether the DCPP constitutes a place of public accommodation. The NJLAD provides a non-exhaustive list of places of public accommodation:

> A "place of public accommodation" shall include, but not be limited to: any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodation of those seeking health, recreation, or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing with goods or services of any kind; any restaurant, eating house, or place where food is sold for consumption on the premises; any place maintained for the sale of ice cream, ice and fruit preparations or their derivatives, soda water or confections, or where any beverages of any kind are retailed for consumption on the premises; any garage, any public conveyance operated on land or water or in the air or any stations and terminals thereof; any bathhouse, boardwalk, or seashore accommodation; any auditorium, meeting place, or hall; any theatre, motion-picture house, music hall, roof garden, skating rink, swimming pool, amusement and recreation park, fair, bowling alley, gymnasium, shooting gallery, billiard and pool parlor, or other place of amusement; any comfort station; any dispensary, clinic, or hospital; any public library; and any kindergarten, primary and secondary school, trade or business school, high school, academy, college and university, or any educational institution under the supervision of the State Board of Education or the Commissioner of Education of the State of New Jersey. Nothing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of accommodation, which is in its nature distinctly private; nor shall anything herein contained apply to any educational facility operated or maintained by a bona fide religious or sectarian institution, and the right of a natural parent or one in loco parentis to direct the education and upbringing of a child under his control is hereby affirmed; nor shall anything herein contained be construed to bar any private secondary or post-secondary school from using in good faith criteria other than race, creed, color, national origin, ancestry, gender identity, or expression or affectional or sexual orientation in the admission of students.

N.J. Stat. Ann. § 10:5-5.

There is no dispute that the DCPP is not one of the enumerated places of public accommodation. Nonetheless, Plaintiffs contend that the New Jersey Appellate Division has

previously held that government agencies are places of public accommodation under the NJLAD. Pl. Br. at 11 (citing T*homas v. Cty of Camden*, 902 A.2d 327 (App. Div. 2006)). In response to Plaintiffs' reliance on *Thomas*, Defendants urge this Court to follow the reasoning of the district court in *Doe v. Div. of Youth & Family Servs*., 148 F. Supp. 2d 462 (D.N.J. 2001), and conclude that the DCPP is not a place of public accommodation. Def. Reply Br. at 10. Further, Defendants contend that even if the DCPP were a place of public accommodation, Plaintiffs have not alleged a nexus between Plaintiffs' religious beliefs and the DCPP's decision to revoke Plaintiff's foster parent license or the removal of Foster Child 1. Def. Reply. Br. at 12.

In ascertaining whether a non-listed place constitutes a public accommodation, both New Jersey State courts and courts of this Districts look to "whether the entity engages in broad public solicitation, maintains close relationships with the government or other public accommodations, or whether it is similar to enumerated or other previously recognized public accommodations." *Dale v. Boy Scouts of Am.*, 734 A.2d 1196, 1210 (N.J. 1999), *rev'd on other grounds*, 530 U.S. 640 (2000); *Doe,* 148 F. Supp 2d 462 (analyzing whether DYFS is similar to other statutorily enumerated places of public accommodation).

In *Doe v. Div. of Youth & Family Servs.*, 148 F. Supp. 2d 462, 496 (D.N.J. 2001), the court assessed whether the Division of Youth and Family Services, the DCPP's predecessor, constituted a place of public accommodation under NJLAD. Looking first to the statute, the court in *Doe* noted that "[a] brief review of the listed entities leads to the inescapable conclusion that none of the listed entities even remotely resemble DYFS or any other State agency" and explained that if the "the legislature intended to include State agencies within NJLAD's public accommodation provision, it would have included at least one term reflecting that intent." *Id.* at 496. Further, the court found that DYFS did not constitute a place of public accommodation under the "broad

solicitation test" because "[i]t cannot be said that a State child welfare agency charged with enforcing anti-child abuse laws broadly solicits the public to partake in its services." *Id*. at 495.

Subsequent to the district court's decision in *Doe*, the New Jersey Appellate Division has addressed whether other state entities are places of public accommodation within the scope of NJLAD. *See Ptaszynski v. Uwaneme*, 853 A.2d 288, 291, 295–97 (N.J. App. Div. 2004) (holding that "a municipal police department and the individual officers qualify as a 'place of public accommodation' to support an LAD claim . . . . As a public entity, by its very nature a police force is a place of public accommodation."); *Thomas v. Cnty. of Camden*, 902 A.2d 327, 332–334 (N.J. App. Div. 2006) (holding that the County of Camden and its executive units are "places of public accommodation" for purposes of the NJLAD).

In *Thomas*, the Appellate Division was faced with the issue of whether the Camden County Communications Center (CCCC), a dispatch agency for police, fire and emergency medical services, constituted a place of public accommodation. *Thomas*, 902 A.2d at 333. The court explained that, in its view, it was not "required to analyze the extent of public solicitation or the closeness of the relationship with government simply because the Camden defendants are public entities and, by their very nature, constitute a place of public accommodation." *Id*. The court rejected the CCCC's argument that it could not constitute a public accommodation, in light of the limited public access to the facility "which is "locked down 24 hours per day, 7 days per week." *Id*. The court reasoned that the "CCCC is a division of the Department of Public Safety, an executive unit of county government" and it would lead "'to an anomalous result if private organizations with close ties to government agencies were places of public accommodation because of those ties, while the government agency itself was not.'" *Id*. (quoting *Ptaszynski,* 853 A.2d 297.).

I am not persuaded that the DCPP constitutes a place of public accommodation. As an initial matter, this Court is not bound by the Appellate Division's decisions in *Thomas* or *Ptaszynski*. Importantly, those cases did not specifically address the DCPP and although, the decisions ostensibly extend the ambit of NJLAD to all governmental entities, I find there is no indication that the New Jersey Legislature intended NJLAD to extend to governmental entities such as the DCPP. Notably, while the Appellate Division in *Thomas* relied on cases involving public school and police stations in reaching its conclusion, the court also cited *Doe* for the proposition that "state agency DYFS was not [a] place of public accommodation because it is not included on the list of public accommodations and it does not engage in broad public solicitation," suggesting that that the decision in *Thomas* did not extend to DYFS and thus, would not extend to the DCPP. 902 A.2d at 333.

Regardless, the DCPP inarguably plays a different role in the governmental regime than entities which provide essential public services, such as police departments or public schools. The DCPP is an arm of the state government, and it does not provide general services to the public at large, nor does it engage in "broad public solicitation." *Dale*, 734 A.2d at 1210. Rather, it provides discrete services to a limited subset of the population: children whose safety, permanency, and well-being are at risk. Thus, I find, consistent with prior decisions of this district, that the DCPP does not constitute a place of public accommodation. *See Doe,* 148 F. Supp 2d at 496 ; *see also K.J. ex rel. Lowry v. Div. of Youth & Family Servs.*, 363 F. Supp. 2d 728, 750 (D.N.J. 2005)(holding that the Division of Youth and Family Services, is not a place of public accommodation because "[t]he definition of a place of public accommodation is not so broad as to include the services provided by a state agency within the meaning of public accommodation. Instead it refers to facilities maintained for the use of the general public.").

Accordingly, Plaintiff's NJLAD claims against Defendants is dismissed with prejudice.

### C. Qualified Immunity

Government officials enjoy qualified immunity so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997); *Mammaro v. N.J. Div. of Child Protection & Permanency*, 814 F.3d 164, 168-169 (3d Cir. 2016).

The Supreme Court has established a two-part test for determining whether a state actor is entitled to a defense of qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This test asks "(1) whether the facts alleged by the plaintiff show the violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct." *James v. City of Wilkes Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (citing *Saucier*, 533 U.S. at 201).

Because Plaintiffs have failed to state a claim as to a violation of their constitutional or statutory rights, I need not address whether the Individual Defendants are entitled to qualified Immunity on any of Plaintiffs' claims.

### IV.   <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED**. Plaintiffs' NJLAD claim against all Defendants and Plaintiffs' NJCRA, Section 1985, Section 1983 claims against the State, the DCPP, and the DCPP employees acting in their official capacity are **dismissed with prejudice**. Plaintiffs' NJCRA, Section 1983, and Section 1985 claims against the Individual Defendants, premised on an alleged violation of the Due Process Clause of the Fourteenth Amendment are dismissed **with prejudice.** Plaintiffs' NJCRA claim, Section 1983, and Section 1985 claims against the Individual Defendants, premised on an alleged violation of the Equal Protection Clause of the Fourteenth Amendment, and violations of the First Amendment,

are **dismissed without prejudice**, and Plaintiff may file an amended complaint within thirty (30)

days consistent with this Opinion.

Date: September 26, 2019

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge
