**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| _____ | : | |
| MICHAEL LASCHE and JENNIFER | : | |
|  LASCHE, | : | |
|  | : | Civil Action No.: 18-17552 (FLW)(TJB) |
| Plaintiffs, | : | |
|  | : | **OPINION** |
| vs. | : | |
|  | : | |
| STATE OF NEW JERSEY, *et al*, | : | |
|  | : | |
| Defendants. | : | |
| _____ | : | |

**WOLFSON, Chief Judge:**

Plaintiffs Michael and Jennifer Lasche (collectively, "Plaintiffs"), formerly licensed foster parents, allege that defendants Kyle Higgins, Katie Epperly, Mary Lippencott, and Janelle Clark ("Defendants"), who are all employees of the New Jersey Division of Child Protection and Permanency (the "DCPP")[1], violated their constitutional rights when the DCPP removed a foster child from their home and suspended Plaintiffs' foster parent license.  In an Opinion dated September 26, 2019 ("prior Opinion"), I granted Defendants' motion to dismiss the original complaint and gave Plaintiffs leave to amend their New Jersey Civil Rights Act, Section 1983, and Section 1985 claims premised on alleged violations of the First Amendment and the Equal Protection clause of the Fourteenth Amendment.  Plaintiffs filed an Amended Complaint asserting

---

[1] Plaintiffs' Amended Complaint does not specifically identify whether their claims are brought against Defendants in their official or individual capacities, however, I previously found that Defendants were entitled to sovereign immunity and dismissed the official capacity claims against them with prejudice.  *See* Prior Opinion at 11-12.  Accordingly, the Court presumes these claims are brought solely against the DCPP employees acting in their individual capacities.

claims under Sections 1983 and 1985. Now, Defendants, once again, move to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(1) and (6).[2] Plaintiffs oppose the motion.

For the reasons set forth below, Defendant's motion is **GRANTED**.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

For the purposes of this motion, the relevant facts are derived from Plaintiffs' Amended Complaint and assumed as true.

In September 2017, the DCPP contacted Plaintiffs, who were then-licensed foster parents and "devout Christians who hold to traditional values and beliefs about family, marriage and sex" about potential foster children. ECF No., 16, Am. Compl. ("AC") ¶¶1,8. The DCPP informed Plaintiffs that two sisters, ages 13 ("Foster Child 1") and 10 ("Foster Child 2"), were in need of a foster home placement and asked if Plaintiffs would be willing to care for them. *Id.* ¶8. Plaintiffs, experienced foster parents, agreed to foster the two girls. *Id.* ¶¶1,8.

Kyle Higgins ("Higgins"), the DCPP case worker assigned to the foster children, informed Plaintiffs that the girls' cases were proceeding toward adoption and that the biological father's rights had already been terminated. *Id.* ¶¶3,9. Throughout October and November 2017, Higgins allegedly advised Plaintiffs that the cases were still moving toward adoption and that they would be given "first choice" to adopt the girls. *Id.* ¶10. During that time period, the biological mother surrendered her rights and the children became eligible for adoption, and Plaintiffs were allegedly informed that they were still in consideration. *Id.* at ¶¶11-12. However, in late December 2017, Higgins informed Plaintiffs that a family in Illinois was interested in adopting Foster Child 1 and 2, as well as their three siblings. *Id.* at ¶13. When Plaintiffs and the children asked Higgins and

---

[2]   Although Defendants purportedly move to dismiss under both Rules 12(b)(1) and (6), Defendants' briefing does not proffer any arguments regarding dismissal based on a lack of subject matter jurisdiction.

her supervisor Katie Epperly ("Epperly") for additional information about the prospective adoptees, Higgins and Epperly purportedly claimed not to know the answers to the Lasches' questions. *Id*. at ¶14.

Thereafter, during a conversation with the other foster parents of Foster Child 1 and 2's siblings, the Lasches learned that the potential adoptees "were two wealthy gay men with lots of family around to support them and the adoption." *Id*. Plaintiffs were "baffled" as to why the DCPP withheld that information from them, but chose to share it with the other foster parents. *Id*. A few days later, Higgins visited the Lasches' home and allegedly questioned Foster Child 1 about her religious beliefs concerning homosexuality and asked if she would change her religious beliefs if she were living with another family. *Id*. ¶15.

In April 2018, Foster Child 2 was removed from Plaintiffs' home "for confidential reasons unique to Foster Child 2," pursuant to an agreement between Plaintiffs and the DCPP. *Id*. at ¶16. On May 22, 2018, Mrs. Lasche met with Higgins and Foster Child 1's therapist. *Id*. at ¶17. At that meeting, Mrs. Lasche, Higgins, and the therapist agreed not to discuss adoption with Foster Child 1 for the foreseeable future because it was too soon after Foster Child 2's removal. *Id*. They also discussed the possibility of Foster Child 1 spending additional time with her siblings to determine if she would like to be adopted by the same family as them, and Mrs. Lasche indicated that she "was not opposed to letting Foster Child 1 explore that and allowing her to make the decision without any questions or resentment." *Id*. at ¶¶16-17. During that meeting, Higgins indicated that a court hearing would be held on June 4, 2018, and a judge would decide whether all of the children should be adopted by their current foster families, or if it would be in the children's best interest for the Illinois couple to adopt all five siblings. *Id*. at ¶18. The morning of the scheduled court hearing, Plaintiffs purportedly received a text message from Foster Child 1's Law Guardian

informing them that the Illinois couple was "off the table" and that a New Jersey family court judge had ordered psychiatric evaluations of the five children before a permanent placement decision was made. *Id*. at ¶19.

Plaintiffs contend that after the adoption with the Illinois couple fell through, "the attitude of the case worker toward the Plaintiffs' radically changed." *Id*. Thereafter, Higgins allegedly contacted Plaintiffs to discuss transitioning Foster Child 1 to another foster home, where her younger brother resided, and Mrs. Lasche expressed confusion, because she was under the impression that since the Illinois family was no longer pursuing the adoption, the DCPP's intention was to allow each of the siblings to be adopted by their then- foster families. *Id*. at ¶21. To obtain more information, Mrs. Lasche contacted Foster Child 1's Law Guardian, and the Law Guardian was allegedly surprised and offered to investigate the situation. *Id*. at ¶22.

A few weeks later, on or about June 31, 2018, Foster Child 1 came home from a regularly scheduled therapy session and informed Plaintiffs that she was upset because her "therapist kept bringing up religion and told her she should not feel pressured to follow her foster family's religious beliefs." *Id*. at ¶20. On another occasion, while Foster Child 1's therapist was at Plaintiffs' home for a therapy session, Mrs. Lasche asked the therapist why the therapist had inquired whether Foster Child 1 was "being pressured" to follow Plaintiffs' religion. *Id*. at ¶23. Initially, the therapist allegedly responded that "it was normal to discuss how people have different beliefs, ethics, religion, etc." *Id*. After further questioning from Mrs. Lasche, however, the therapist eventually divulged that Higgins had called before the session and mentioned the potential adoption with the Illinois counsel and they had discussed Plaintiffs' "ideas about same-sex couples." *Id*. Higgins also purportedly asked the therapist to discuss the possibility of relocating Foster Child 1 to another foster home with her brothers. *Id*. Plaintiffs aver that at that

4

point, "Higgins conduct and the [c]onduct of the other Defendants became even more hostile." *Id*. at ¶24.

On another occasion, on or about June 21, 2018, Higgins picked up Foster Child 1, ostensibly for the purpose of visiting one of her siblings. *Id*. at ¶25. Plaintiffs allege that it was "very rare" for Higgins to transport Foster Child 1 to such visits. *Id*. While on the way to the visit, Higgins allegedly stopped at a Dunkin Donuts with Foster Child 1 and informed her that Plaintiffs would not be able to "meet her needs." *Id*. at ¶25. Plaintiffs assert that during the visit, Higgins "interrogated Foster Child 1 about her religious beliefs" and "lied to her in an effort to intimidate her into agreeing that she did not want to be adopted by Plaintiffs." *Id*. at ¶¶2-26.

Upon returning from the visit, Higgins met with Plaintiffs and informed them that the DCPP intended to meet with them to "work with" Plaintiffs in order to reach a result that was in Foster Child 1's best interest. *Id*. at ¶28. When Plaintiffs inquired about the purpose of the meeting, they were allegedly informed by Epperly that the DCPP "was concerned that both Foster Child 1 and Foster Child 2 indicated that same-sex relationships were against their religion," a belief which the DCPP regarded as coming from Plaintiffs. *Id*. at ¶29. In that regard, Plaintiffs acknowledge that they took their foster children to church and "freely shared their religious beliefs with the children," but believe "the Foster Children had picked up their religious beliefs regarding homosexuality prior to coming to Plaintiffs' home." *Id*. at ¶32.

On Friday, June 29, 2018, the Lasches, their attorney, an attorney for the State of New Jersey, Higgins, Epperly, Epperly's supervisor Mary Lippencott, Janelle Clark, and one or two other DCPP employees whom Plaintiffs did not identify, attended a meeting at the DCPP's Monmouth County Office. *Id*. at ¶33. During the meeting, the DCPP representatives allegedly expressed concern about Plaintiffs' belief that homosexuality is a sin and its potential impact on

Foster Child 1.  *Id.* at ¶34.  The DCPP officials allegedly discussed the possibility that Plaintiffs might reject Foster Child 1 if she "ever decided to explore her sexuality" and sought assurances to the contrary from Plaintiffs.  *Id.*  Plaintiffs assert that one of the Defendants purportedly expressed the belief that in order to avoid possible future harm, Foster Child 1 might need therapy to address her belief that homosexuality was a sin.  *Id.*  Plaintiffs allege that "[a]lmost the entire meeting was about Plaintiffs' belief that homosexuality was a sin."  *Id.*

A few days later, on July 2, 2018, a hearing was held before a New Jersey family court judge, and the DCPP sought to remove Foster Child 1 from Plaintiffs' home.  *Id.* at ¶35. At the hearing, Foster Child 1's Law Guardian purportedly objected to the removal.  *Id.*  Nonetheless, the next day, presumably pursuant to a court order, the DCPP removed Foster Child 1 from Plaintiffs' home, and placed her in the same foster home as Foster Child 2.  *Id.* at ¶38.  Plaintiffs allege that a therapist had previously advised the DCPP that it was in Foster Child 1's best interest to be adopted alone, rather than with her siblings, due to trauma she experienced while the children were residing with their biological parents.  *Id.* at ¶39.  Plaintiffs contend that, despite that advice, the DCPP sought to have Foster Child 1 adopted along with her siblings due to Defendants' "hostility to Plaintiffs' religious beliefs."  *Id.*  Additionally, Plaintiffs assert that they were not given notice that they had a right to be heard at the meeting, and, in their view, the lack of notice is further indicative of bad faith and hostility by Defendants.  *Id.* at ¶36.

On October 12, 2018, a DCPP representative visited Plaintiffs' home in order to conduct a yearly inspection which was necessary for Plaintiffs to renew their foster parent license.  *Id.* at ¶41.  The representative asked Plaintiffs if they knew that their foster parent license had been suspended by the Monmouth County DCPP office, and Plaintiffs stated that they were unaware of the suspension.  *Id.*  The representative allegedly informed Plaintiffs that they should have been

notified of the suspension and the bases for the suspension.  *Id*.  Plaintiffs allege that the only viable reason for the suspension "was Defendants hostility to Plaintiffs' religious belief that homosexuality is a sin."  *Id*. at ¶42.

On November 19, 2018, Plaintiffs filed a four-count complaint against Defendants in New Jersey state court, alleging violations of the New Jersey Law Against Discrimination ("NJLAD"), the New Jersey Civil Rights Act ("NJCRA"), 42 U.S.C §1983, and 42 U.S.C §1985. On December 24, 2018, Defendants removed the matter to this Court and thereafter, moved to dismiss Plaintiffs' Complaint.  In my prior Opinion, I dismissed the State of New Jersey and the DCPP from the case, and dismissed all the claims against Defendants in their official capacities and Plaintiffs' NJLAD claim with prejudice.  In addition, I dismissed Plaintiffs' Equal Protection and First Amendment claims without prejudice.  On October 24, 2019, Plaintiff filed an Amended Complaint re-asserting the Equal Protection and First Amendment claims under Section 1983 and their Section 1985 conspiracy claim.  On November 21, 2019, Defendants filed the instant Motion to Dismiss.

II.    **STANDARD OF REVIEW**

A. **Federal Rule of Civil Procedure 12(b)(6)**

In reviewing a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted). While Federal Rule of Civil Procedure 8(a)6 does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of

a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).   Thus, to survive a Rule 12(b)(6) motion to dismiss, the Complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To determine whether a plaintiff has met the facial plausibility standard mandated by Twombly and Iqbal, courts within this Circuit engage in a three-step progression. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010).   First, the court must "outline the elements a plaintiff must plead to state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).   Next, the Court "peel[s] away those allegations that are no more than conclusions and thus not entitled to the assumption of trust.   *Id.*   Finally, where "there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

### III.   **ANALYSIS**

#### A.  **The Equal Protection Claim**

The Equal Protection Clause of the Fourteenth Amendment commands that no state shall "deny to any person within its jurisdiction, the equal protection of the laws."   U.S. Const. Amend. XIV, § 1.   In other words, "[t]he Equal Protection Clause requires that all people similarly situated be treated alike." *Whitehead v. Wetzel*, 720 F. App'x 657, 662 (3d Cir. 2017) (per curiam) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).   Thus, to state a claim under the Equal Protection Clause, Plaintiffs must show that they received "different treatment from that

8

received by other individuals similarly situated." *Shuman v. Penn Manor Sch. Dist.*, 422 F.3d 141, 151 (3d Cir. 2005); *Keenan v. City of Philadelphia*, 983 F.2d 459, 465 (3d Cir. 1992) ("To bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. They must demonstrate that they received different treatment from that received by other individuals similarly situated."). Furthermore, Plaintiffs must allege "discriminatory intent or purpose." *Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, 782 F. App'x 148, 154 (3d Cir. 2019) (quoting *City of Cuyahoga Falls, Ohio v. Buckeye Cm*ty. *Hope Found.*, 538 U.S. 188, 195 (2003)).

Here, Defendants argue that the Amended Complaint does not remedy the previously identified deficiencies in Plaintiffs' Equal Protection Claim. Def. Br. at 18- 19. Defendants assert that Plaintiffs have only proffered "bald assertions" that they were discriminated against on the basis of their religious beliefs, and have not alleged any facts sufficient to establish that they were treated differently than similarly situated foster parents. *Id*. at 19.

In my prior Opinion, I explained that Plaintiffs' Equal Protection claim failed because "Plaintiffs have not alleged that the DCPP treated similarly situated foster parents, who did not share their religious beliefs, differently than Plaintiffs. Plaintiffs' Complaint merely summarily alleges that Plaintiffs were denied equal protection of the law." Prior Opinion at 26. The Amended Complaint is similarly deficient. In their Amended Complaint, Plaintiffs assert that "Defendants have discriminated against [Plaintiffs] on the basis of their religious beliefs and treated them differently than similarly situated people who do not hold those religious beliefs." AC. ¶52. Although I previously directed Plaintiffs to allege *facts* suggesting that they were treated differently than similarly situated foster parents, Plaintiffs have not done so. Instead, Plaintiffs assert in their opposition brief that

9

> they could name people who did not hold the same religious beliefs
> as they do, that when the Court ordered an evaluation for adoption
> they were actually evaluated and allowed to proceed with the
> adoption.  They could also name people who don't hold the same
> religious beliefs as they do who were not suspended without being
> advised why they were suspended or even notified that they were
> suspended as required by the rules.  In short they could specifically
> name every other foster parent they have ever personally known . .
> . but in the context of this particular case that would add nothing to
> Plaintiffs' claim.

ECF No. 22, Pl. Br. at 12.  I disagree.  First, these additional factual allegations are not included

in the Amended Complaint which is, itself, fatal to Plaintiffs' claims.  *See Commonwealth of Pa.*

*ex rel. Zimmerman v. PepsiCo*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the

complaint may not be amended by the briefs in opposition to the motion to dismiss."); *Gundlach*

*v. Reinstein*, 924 F. Supp. 684, 688 n.4 (E.D. Pa. 1996) (refusing to consider factual allegation that

was not in complaint but appeared for the first time in plaintiff's legal memoranda regarding a

12(b)(6) motion).  Moreover, even if the types of factual allegations asserted in Plaintiffs'

opposition brief had been incorporated into the Amended Complaint, they would not satisfy

Plaintiffs' burden of alleging an Equal Protection claim.  In order to sustain an equal protection

claim, Plaintiffs must, at the very least, allege specific facts suggesting that they were subject to

"different treatment from that received by other individuals similarly situated." *Shuman*, 422 F.3d

at 151.  Here, Plaintiffs have not pled any specific instances of differential treatment.  Absent

supporting factual allegations, the Court is not required to credit Plaintiffs' boilerplate and

conclusory assertion that other foster parents were treated in a dissimilar manner.  *See Young v.*

*New Sewickley Twp.,* 160 F. App'x 263, 266 (3d Cir. 2005) (dismissing plaintiff's equal protection

claim because plaintiff failed to allege any specific instances of other employees being treated in

different matter and plaintiff's "bald assertion that other police officers were treated in a dissimilar

manner did not provide the defendants with the notice required to frame a responsive pleading to

[plaintiff's] Equal Protection claim"); *Guevara v. Elizabeth Pub. Sch.*, No. 18-15728, 2019 WL 3244592, at *4 (D.N.J. July 18, 2019) (dismissing plaintiff's equal protection claim because "[b]are allegations that the Individual Defendants actively participated and engaged in the discriminatory conduct, . . .  or that the ESD treated other employees not in the protected class more favorably than Plaintiff. . . without more, are insufficient to state a discrimination claim under the Equal Protection Clause"(internal citations and quotation marks omitted)); *Knox v. Union Twp. Bd. of Educ.*, No. 2:13-5875, 2015 WL 769930, at *13 (D.N.J. Feb. 23, 2015) (dismissing claims of race-based discrimination under the Equal Protection Clause because the plaintiff did "not allege specific instances of similarly situated employees being treated differently"); *Young v. Delaware Cty. Cmty. Coll.,* No. 08- 2023, 2008 WL 4347621, at *3 (E.D. Pa. Sept. 22, 2008) (explaining that "when a plaintiff is alleging that he was treated differently than others outside his class, he cannot use conclusory, boilerplate language or bald assertion[s] that other [s] ... were treated in a dissimilar manner to survive dismissal" (internal citations and quotation marks omitted) (alteration in original)).   Ultimately, Plaintiffs' "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to survive a motion to dismiss.  *Fowler*, 578 F.3d at 210 (citing *Twombly*, 550 U.S. at 570).  Accordingly, Plaintiffs' Equal Protection claim is dismissed without prejudice.[3]

### B.  The First Amendment Retaliation Claim

To plead a retaliation claim under the First Amendment, Plaintiffs must allege "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary

---

[3]      Furthermore, Plaintiffs have failed to allege that Defendants' actions were motivated by discriminatory intent. *Rittenhouse Entm't, Inc. v. City of Wilkes-Barre*, 782 F. App'x at 154.  For reasons explained more fully, *infra*, in the discussion of Plaintiffs' First Amendment claim, Plaintiffs have not alleged circumstantial evidence sufficient to raise an inference of discrimination.

firmness from exercising his [or her] constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)); *accord Falco v. Zimmer*, 767 F. App'x 288, 310 (3d Cir. 2019) (distinguishing between First Amendment retaliation claims by public employees and those by private individuals).  In order to establish a causal connection, "the plaintiff usually must allege one of two things: (1) an unusually suggestive time proximity between the protected activity and the allegedly retaliatory action; or (2) a pattern of antagonism coupled with timing to establish a causal link." *DeFranco v. Wolfe*, 387 F. App'x 147, 155 (3d Cir. 2010) (citing *Luren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)); *see also Ambrose v. Township of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002) (a plaintiff must "show that his protected activity was a substantial or motivating factor in the alleged retaliatory action.").  In the absence of such allegations, "the plaintiff must show that from the 'evidence gleaned from the record as a whole' the trier of fact should infer causation." *DeFlaminis*, 480 F.3d at 267 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). Ultimately, "the key question in determining whether a cognizable First Amendment claim has been stated is whether 'the alleged retaliatory conduct was sufficient to deter a person of ordinary firmness from exercising his [or her] First Amendment rights.'" *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)).

Plaintiffs' Amended Complaint proffers two potential theories of First Amendment retaliation: Plaintiffs were retaliated against for simply holding the religious belief that homosexuality is a sin and/or Plaintiffs were retaliated against for sharing their religious beliefs with Foster Child 1 while she resided in their home. *See* Am. Compl. ¶¶48-49.  I will address the second theory first.

In my prior Opinion, I explained that to the extent Plaintiffs sought to assert a retaliation claim based on the alleged right to share their religious beliefs with Foster Child 1 in their home,

> it is unclear whether such conduct is constitutionally protected. Although Plaintiffs have an absolute right to practice whatever religious beliefs they choose, their right to free exercise does not, necessarily, permit them to engage in religious practice and share their beliefs with Foster Child 1, who was not Plaintiffs' adoptive child and Plaintiffs were not her legal guardian.

Prior Opinion at 31.  On this motion, Plaintiffs have not proffered any legal support for the proposition that they possessed such a First Amendment right, nor has the Court's own research revealed such a right.   To the contrary, the Free Exercise clause of the First Amendment indisputably protects an individual's right to control the religious upbringing of his or her children. *See Pierce v. Soc'y of Sisters*, 268 U.S. 510, 532-535  (1925) (recognizing parents' rights to send their children to religious schools); *Wisconsin v. Yoder*, 406 U.S. 205, 231 (1972) (recognizing that the Free Exercise clause protects "traditional concepts of parental control over the religious upbringing and education of their minor children.").   Consistent with the Free Exercise clause, various federal courts have held that that the state should make some effort to accommodate the child and parents' religious needs when making foster care placements.  *See Pfoltzer v. Fairfax Cty. Dep't of Human Dev.*, 966 F.2d 1443 (4th Cir. 1992) ("With respect to children in foster care, a state is required to make reasonable efforts to accommodate the parent's religious preferences."); *Wilder v. Bernstein*, 848 F.2d 1338, 1341–2 (2d Cir. 1988) ("So long as the state makes reasonable efforts to assure that the religious needs of the children are met during the interval in which the state assumes parental responsibilities, the free exercise rights of the parents and their children are adequately observed"); *Walker v. Johnson*, 891 F.Supp. 1040, 1049 (M.D.Pa.1995) (recognizing parents' "limited rights to control the religious upbringing" of a child in foster care).  In that regard, there is no legal support for Plaintiffs' assertion of a First Amendment right to share their religious

beliefs with their foster child, who was neither their biological child nor their adoptive child.  In fact, finding that foster parents have an unfettered constitutional right to share their religious beliefs with a foster child would seemingly conflict with the free exercise rights of the foster children and his or her biological parents.  Accordingly, I do not find that Plaintiffs can assert a First Amendment retaliation claim based on such a theory.

Plaintiffs also assert that they were retaliated against for holding the religious belief that homosexuality is a sin.  In my prior Opinion, I found that, although Plaintiffs clearly alleged constitutionally protected conduct, they had "not demonstrated the requisite causal connection between their religious beliefs and the adverse actions they suffered" or "pled evidence of a causal link between Plaintiffs' beliefs and the alleged retaliatory conduct."  Prior Opinion at 28-29. Specifically, I found:

> [t]he order of events, as currently pled, belies Plaintiffs' position that the Individual Defendants' actions were in retaliation for Plaintiffs' religious beliefs.  Plaintiffs' Complaint alleges that in December 2017, the foster parents of Foster Child 1's siblings were informed that the potential adoptive parents were a same-sex couple, yet when Plaintiffs inquired about the potential adoptive family, Defendants Higgins and Epperly claimed not to know any information about the potential adoptive family.  Thus, Plaintiffs factual allegations suggest that the Individual Defendants were aware of Plaintiffs' religious beliefs regarding homosexuality, as early as December 2017.  However, the alleged retaliatory actions – the removal of Foster Child 1 and the suspension of Plaintiffs' foster parent license – did not occur until July 2018, seven months later.  Seven months is not "unusually suggestive."  . . . . Although "timing plus other evidence" may be sufficient to establish causation "where the temporal proximity is not so close as to be 'unduly suggestive,'" Plaintiffs have not alleged any facts from which a fact finder could reasonably discern that [Defendants] acted out of hostility towards Plaintiffs' religious beliefs. . . . Plaintiffs' Complaint identifies various instances in which the DCPP employees questioned Foster Child 1 about her beliefs.  Notably, DCPP is required by regulation to "work with the resource parent to provide the child in placement with reasonable opportunities to attend religious activities and

14

services in accordance with the child's preference and the wishes of the child's own parents." N.J. Admin. Code § 3A:14-4.1(a). Defendants' questioning of Foster Child 1 regarding her religious beliefs was appropriate in light of the DCPP's regulatory obligations, and the imminent possibility that Foster Child 1 might be adopted by a same-sex couple. Plaintiffs identify only one occasion on which [Defendants] inquired about Plaintiffs' religious beliefs, and in that respect, the inquiry appears to have been a limited one in which the Individual Defendants queried whether Plaintiffs would "reject Foster child 1 if she ever decided to explore her sexuality" and "sought assurance from the Plaintiffs that would not be the case." Compl. ¶29. Such questioning is not indicative of hostility towards Plaintiffs' particular religious beliefs, but rather, the Individual Defendants' exercise of their administrative functions as employees of the entity prescribed with the duty of safeguarding Foster Child 1's well-being. In light of the temporal chasm between [Defendants] discovery of Plaintiffs' religious beliefs and the alleged retaliatory conduct, and the lack of other circumstantial evidence from which causation could be inferred, Plaintiffs fail to state a claim premised on retaliation for their religious beliefs.

*Id*. at 28-29 (citations omitted). The Amended Complaint does not remedy those deficiencies. I find, as I did before, that Plaintiffs' Amended Complaint has not adequately alleged temporal proximity or any other circumstantial evidence of causation. *See Mash v. Twp. of Haverford*, No. 06-4479, 2007 WL 2254417, at *8 (E.D. Pa. Aug. 3, 2007), *aff'd sub nom*, 298 F. App'x 169 (3d Cir. 2008) (quotations omitted) (dismissing First Amendment retaliation claim when plaintiff did "not present any evidence demonstrating either an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory act" or "a pattern of antagonism coupled with timing to establish a causal link").

Here, Plaintiffs assert that the removal of Foster Child 1 in July 2018, and the subsequent suspension of their foster parent license, were both acts of retaliation spurred by Plaintiffs' expression of their religious beliefs regarding homosexuality.[4] Plaintiff has not established

---

[4]    I previously found that Plaintiffs could not assert a procedural due process claim based on the revocation of their license because their foster parent license is not a constitutionally protected

causation as to either action.  On this motion, it appears that Plaintiffs do not argue that there existed "unusually suggestive temporal proximity" between the DCPP's discovery of Plaintiffs' religious beliefs and either adverse action, nor can they reasonably do so.  As I noted in my previous opinion, the seven-month gap between discovering Plaintiffs' religious views, the removal of Foster Child, and the suspension of the foster parent license, defeats any finding of temporal proximity.[5]  *See* Prior Opinion at 29-30; *see also Rink v. Northeastern Educ. Intermediate Unit*, 717 F. App'x 126, 134 (3d Cir. 2017) (explaining that unusually suggestive temporal proximity must be "on the order of days or weeks").

Rather, Plaintiffs argue that Defendants' hostility toward them was triggered by the possibility that the Lasches might be viable adoptive parents for Foster Child 1, and thereafter, the DCPP employees engaged in a pattern of actions demonstrating their hostility toward Plaintiffs' religious beliefs.  Plaintiffs assert that "[t]he first indication that [the DCPP] may have been aware of the Plaintiffs' religious beliefs is in late December 2017" when the caseworkers allegedly concealed that the potential adoptive family was a same sex couple, and that from that point onward, "[e]ach and every time the Defendants tried to convince [Foster Child 1] to be adopted by someone else they also raised the issue of Plaintiffs and the child's religious beliefs about homosexuality," ultimately culminating in the late June meeting and the subsequent removal of Foster Child 1.  Pl. Br. at 7.  Plaintiffs maintain that the DCPP worker's comment  during the June

property interest.  *See* Prior Opinion at 20-24.  While the foster parent license, itself, is not a constitutionally protected property interest, its revocation could theoretically constitute a "retaliatory action" within the context of a First Amendment retaliation claim.

[5]      It is unclear precisely when the suspension of Plaintiffs' foster parent license came into effect.  Plaintiffs allegedly became aware of the suspension sometime in October 2018, several months after Foster Child 1 was removed from their care on July 3, 2018.  Ostensibly, Plaintiffs were still licensed to act as foster parents until, at minimum, July 2018.

29, 2018 meeting evidences the DCPP's animus as it effectively suggested that anyone who shares Plaintiffs' beliefs "is suffering from a mental affliction." Pl. Br. at 7. Further, Plaintiffs contend that DCPP has never offered an alternative explanation for either the removal of Foster Child 1 or the suspension of Plaintiffs' foster parent license and the fact that the DCPP did not follow "normal procedures" in suspending Plaintiffs' license is sufficient to establish that Plaintiffs were discriminated against because of their religious beliefs. *Id*.

Plaintiffs' allegations present a close-question regarding causality, nonetheless, I find that Plaintiffs have failed to allege facts demonstrating "a pattern of antagonism," or other circumstantial evidence from which retaliatory or discriminatory motives can be inferred. *De Franco*, 387 F. App'x at 155. On this point, the Amended Complaint is largely unchanged; like in the prior complaint, the only acts of alleged hostility leading up to the alleged acts of retaliation are the June 21, 2018 meeting between Higgins and Foster Child 1, and the June 29, 2018 meeting between Plaintiffs, their attorney, an attorney for the State of New Jersey, and the DCPP employees. From these two incidents – one of which involved a conversation with Foster Child 1 rather than an act of discrimination directed toward Plaintiffs – Plaintiffs seek to infer a discriminatory intent. However, a plaintiff's supposition that a defendant's conduct was motivated by discriminatory or retaliatory intent is not sufficient to allege a retaliation claim, absent supporting factual allegations. *See Kundratic v. Thomas,* 407 F. App'x. 625, 628 (3d Cir. 2011); *Mitchell v. Miller,* 884 F. Supp. 2d 334, 359 (W.D. Pa. 2012) ("[t]he issue of causation pertaining to a First Amendment claim against a particular defendant generally turns on his or her 'specific intent' *at the time of the alleged retaliatory action).* As pled, it appears that in both instances Defendants were exercising their administrative functions as employees of the entity

prescribed with the duty of safeguarding Foster Child 1's well-being and attempting to assess, as required by statute, whether adoption by the Lasches would serve Foster Child 1's best interests.

As I previously noted, the DCPP is required by regulation to "work with the resource parent to provide the child in placement with reasonable opportunities to attend religious activities and services in accordance with the child's preference and the wishes of the child's own parents." *See* Prior Opinion at 30 (quoting N.J. Admin. Code § 3A:14-4.1(a)). Moreover, the New Jersey statutes and regulations governing adoptions specifically directs the DCPP to "make an informed, objective judgment based on a full and careful assessment of each factor which may affect the child's ability to benefit physically, socially and emotionally from the adoptive placement, in particular, and the community in general" and prohibit the DCPP from "discriminat[ing] in a child's adoptive placement based on the child's or the adoptive parent's race, color, national origin, age, gender, disability, marital status, sexual orientation, state of residence, or religion." N.J. Admin. Code § 3A:22-4.1(b),(c); *see also* N.J. Stat. Ann. §30:4C-51 (declaring that Child Placement Review Act is necessary to "establish procedures for both administrative and judicial review of each child's placement in order to ensure that such placement ensures the safety and health and serves the best interest of the child."); N.J. Stat. Ann. § 9:3-37 (declaring that adoption statute "shall be liberally construed to the end that the best interests of children be promoted and that the safety of children be of paramount concern.").

On their face, each of the allegedly discriminatory acts identified by Plaintiffs seems calculated to serve that goal; Plaintiffs have not alleged any other facts suggesting that there was, in fact, a retaliatory motive behind those actions. For example, Plaintiffs highlight the unidentified caseworker's comment, at the June 29, 2018 meeting that in the future Foster Child 1 might need therapy to resolve her views on homosexuality, as evidence of DCPP's alleged animus. However,

in the context of discussing Foster Child 1's sexuality and the failed adoption by the same-sex couple in Illinois, that comment, alone, is not sufficient to raise an inference of discriminatory intent such that this Court can infer a retaliatory motive to Defendants' facially neutral actions. Plaintiffs have merely proffered conclusory allegations regarding Defendants' intent.   Indeed, Plaintiffs allege that "[i]t was clear to the Plaintiffs from [the June 29th] meeting that the Defendants were hostile to the Plaintiffs' religious beliefs regarding homosexuality, AC ¶34, and "[b]ased on the issues that were raised and the comments that made at the meeting just prior to the Court hearing Plaintiffs allege that the reason for the Defendants seeking removal [of] Foster Child 1 from their home was hostility to their religious beliefs."   AC ¶37.   Plaintiffs largely seek to attribute retaliatory and discriminatory motives to conduct obligated by statute; however, these conclusory allegations are insufficient to survive a motion to dismiss.   In *Kundratic v. Thomas,* 407 F. App'x. 625, 628 (3d Cir. 2011), the plaintiff alleged that defendants, police officers, arrested him on assault and harassment charges in retaliation for an incident one month earlier, where he called 911 to expel one of the defendants from his driveway.   *Id*. at 628.   The Third Circuit concluded that plaintiff's allegations regarding causation were "too flimsy to warrant credence." *Id*.   The Court noted that the police reports documented circumstances leading up to plaintiff's arrest, and plaintiff had not alleged any specific facts suggesting defendants "conduct was propelled by a retaliatory impulse or anything other than their duty to enforce Pennsylvania law." *Id*.   Thus, the Third Circuit affirmed the district court's dismissal of plaintiff's First Amendment retaliation claim.   *Id*.   Similarly, here, Plaintiffs' hypothesis that Defendants questioning regarding Foster Child 1 and Plaintiffs' religious beliefs evidence religious animus is unavailing considering the DCPP's statutory and regulatory obligations.

Moreover, the specific adverse actions identified by Plaintiffs pose their own additional issues for the causation analysis.  Turning first to Plaintiffs' claims regarding the removal of Foster Child 1, it appears from Plaintiffs' allegations that Foster Child 1 was removed from the Lasches's home on July 3, 2018, pursuant to a court order following the July 2, 2018 family court hearing[6] where the DCPP allegedly sought removal.  *See* AC ¶¶35-36.   Judicial authorization for the removal of Foster Child 1 may preclude a finding of causation .  "Like a tort plaintiff, a § 1983 plaintiff must establish both causation in fact and proximate causation. A superseding cause breaks the chain of proximate causation." *Lamont v. New Jersey*, 637 F.3d 177, 185 (3d Cir. 2011) (holding that suspect's threatening conduct was a superseding cause which broke the chain of causation between officer's violation of police procedures and suspect's shooting).   In other contexts, courts have held that the actions of a judicial officer may sever the chain of causation. *See Egervary v. Young*, 366 F.3d 238, 250 (3rd Cir. 2004) (explaining that "the actions of the defendants, while clearly a cause of the plaintiff's harm, do not create liability because of the intervention of independent judicial review, a superseding cause"); *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir.1999) (reversing district court's denial of motion to dismiss § 1983 claim, based on Fourth Amendment violations,  against police officers and explaining that "[i]t is well settled that the chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment ... [a]t least ... in the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment." (citations omitted)); *Toevs v. Quinn*, No. 15-

---

[6]     New Jersey statutes provide for court review and approval of the DCPP's placement plans for foster children. *See* N.J. Stat. Ann. 30:4C-61.2 (providing for court review and approval of permanent placement decisions); N.J. Stat. Ann. 30:4C-58 (proving for court review and approval of placement determinations within 60 days of an initial placement and periodic review every 12 months thereafter).

02838, 2017 WL 1055314, at *5 (D. Colo. Mar. 21, 2017) (finding that affirmance of allegedly retaliatory actions, "by impartial bodies, such as courts or an Administrative Law Judge ("ALJ"), effectively 'breaks' the causal connection needed for a retaliation claim").

Here, even assuming that Plaintiffs had alleged facts sufficient to infer religious animus on the part of Defendants, judicial authorization for the removal of Foster Child 1 would break the causal connection, if any, between Plaintiffs' religious beliefs and the alleged retaliatory conduct -- the removal of Foster Child 1. The ultimate decision approving or denying the DCPP's placement decision was made by the New Jersey family court judge following the placement hearing. Moreover, Plaintiffs have not alleged that Defendants misrepresented facts or withheld any relevant information from the Family Court judge approving the placement decision, such that this Court can infer that Defendants' alleged animus was the cause of Plaintiffs' harm, despite judicial authorization for the removal of Foster Child 1. *C.f. Bowser v. Blair Cty. Children & Youth Servs.,* 346 F. Supp. 2d 788, 797 (W.D. Pa. 2004) (finding that court's issuance of an *ex parte* order, based on child welfare workers' false allegation that mother had violated a child safety plan, did not constitute a supervening cause sufficient to break the causal link between workers' actions and the child's removal because "the Plaintiffs have alleged a situation of misrepresentation upon which the doctrine of supervening causes, in regard to judicial actions, cannot apply"). Accordingly, Plaintiffs cannot trace the alleged First Amendment violation to Defendants' alleged animus.

Unlike the removal of Foster Child 1, it does not appear that the suspension of Plaintiffs' foster parent license was subject to judicial approval; nonetheless, Plaintiffs' claims regarding the revocation of their foster parent license suffer from their own causal deficiency. Plaintiffs seek to infer, based on Defendants' questions regarding Plaintiffs' religious views, that the revocation of

their foster parent license was spurred by religious animus.   While I find the revocation of Plaintiffs' foster parent license[7], which purportedly occurred without prior notice or a subsequent opportunity to be heard, may constitute an adverse action,  Plaintiffs have not alleged any facts specifically linking that action to Defendants' alleged animus towards their religious beliefs. As stated, *supra*, Plaintiffs merely point to Defendants' inquiries regarding their religious beliefs in connection with Foster Child 1, and assert that they must be indicative of animus, rather than being taken in connection with Defendants' obligations under the relevant statutes.   Furthermore, Plaintiffs' arguments regarding the non-renewal of their foster parent license are unavailing for yet another reason.  In order to hold an individual defendant liable under Section 1983, a plaintiff must establish that he or she was "personally involved" in the violation of the plaintiff's First Amendment rights.   *Evancho v. Fisher,* 423 F.3d 347, 353–354 (3d Cir. 2005) (dismissing plaintiffs' Section 1983 claim against the Attorney General where plaintiff failed to allege any action specifically taken by the Attorney General regarding plaintiff's transfer, the alleged retaliatory action); *see also Iqbal*, 556 U.S. at 676 ("[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs.... [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity").  Plaintiffs'

---

[7]      Plaintiffs have not pled whether they sought administrative or judicial review of that decision.  As I noted in my prior Opinion, the statutory scheme provides that "[a] person aggrieved by a final decision of the [DCPP] is entitled to seek judicial review in the Appellate Division of the Superior Court."  Prior Opinion at 23; *see also* N.J. Stat. Ann. § 30:4C-27.11.

allegations refer to the decision by the DCPP to suspend their license, but the DCPP has been dismissed as a party.  *See* Prior Opinion at 13.  Critically,  Plaintiffs have not alleged that any of the Defendants had a role in suspending Plaintiffs' license, or that their roles at the DCPP involve making such licensing determinations.[8]

For those reasons, Plaintiffs have failed to allege facts sufficient to infer a causal connection between either their constitutionally protected religious beliefs and either of the retaliatory actions they allegedly suffered. Accordingly, Plaintiffs' First Amendment retaliation claim is dismissed.  To the extent Plaintiffs believe they can allege additional facts to remedy the identified pleading deficiencies related to any actions taken by Defendants in connection with the non-renewal of Plaintiff's license, Plaintiffs may file a motion to amend their Complaint within thirty days.  If Plaintiffs do not file such a motion, this case will be closed.

### C.  The Section 1985 Claim

Plaintiffs allege that Defendants conspired for the purpose of denying Plaintiffs' First and Fourteenth Amendment rights. In order to assert a violation of Section 1985, a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (quoting *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828–29 (1983)).

---

[8]     Since the DCPP allegedly failed to provide reasons for Plaintiffs' suspension,  if Plaintiffs could in good faith allege personal involvement by Defendants in the decision to suspend Plaintiffs' license, they might be able to allege a First Amendment relation claim on that basis.

Here, Plaintiffs have not alleged any facts in support of the first element: the existence of a conspiracy.   Nothing in Plaintiffs' Amended Complaint suggests an agreement or concerted action amongst Defendants.  *See Startzell*, 533 F.3d at 205 ("To constitute a conspiracy, there must be a 'meeting of the minds.' " (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970))); *Aulisio v. Chiampi*, 765 F. App'x 760, 764 (3d Cir. 2019) (dismissing conspiracy claim against state prison officials because inmate-prisoner "offered nothing more than conclusory statements that Defendants conspired to deprive him of his constitutional rights; no evidence suggests that they agreed, plotted, or even discussed doing so").   Accordingly, Plaintiffs' Section 1985 conspiracy claim is dismissed without prejudice.

### D.  Qualified Immunity

Defendants also assert that Plaintiffs' Complaint should be dismissed because Defendants are entitled to qualified immunity.  *See* Def. Br.  at 25-26**.**  Because Plaintiffs have failed to state a claim as to a violation of their constitutional rights, I need not address whether the Individual Defendants are entitled to qualified Immunity on any of Plaintiffs' claims.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Defendant's Motion to Dismiss is granted in its entirety.

Date: June 4, 2020

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge
