# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MICHAEL LASCHE and JENNIFER LASCHE,<br><br>      Plaintiffs,<br><br>      v.<br><br>STATE OF NEW JERSEY, ET AL.,<br><br>      Defendants | Hon. Freda L. Wolfson, U.S.D.J.<br><br>CIVIL ACTION NO.<br>3:18-cv-17552-FLW-TJB |

## BRIEF IN SUPPORT OF MOTION
## TO DISMISS SECOND AMENDED COMPLAINT

MATTHEW J. PLATKIN
ACTING ATTORNEY GENERAL
OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 116
Trenton, NJ 08625
(609)376-2787
Attorney for Defendants,
State of New Jersey, the Division
of Child Placement and Protection, Kyle Higgins,
Mary Lippencot, Katie Epperly, and Janelle Clark

ROBERT J. McGUIRE (ID: 046361992)
DEPUTY ATTORNEY GENERAL
 On the Brief

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT.......................................................................... 1

STATEMENT OF FACTS .............................................................................. 3

STANDARD OF REVIEW............................................................................. 10

     A.    Motion to dismiss the complaint for failure to state a claim
          upon which relief can be granted pursuant to Fed. R. Civ. P.
          12(b)(6)................................................................................. 10

ARGUMENT .............................................................................................. 11

     POINT I

          QUALIFIED IMMUNITY REQUIRES DISMISSAL OF
          THE LASCHES' FEDERAL CLAIMS.................................... 11

     POINT II

          ANY CLAIMS FOR INJUNCTIVE RELIEF FAILS
          BECAUSE THE INDIVIDUAL DEFENDANTS, IN
          THEIR INDIVIDUAL CAPACITIES, ARE NOT
          CAPABLE OF EFFECTUATING ANY PROPOSED
          INJUNCTIVE RELIEF........................................................... 19

     POINT III

          PLAINTIFFS' STATE LAW CLAIMS SHOULD ALSO
          BE DISMISSED ..................................................................... 22

CONCLUSION ........................................................................................... 26

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Creighton,*
    483 U.S. 635 (1987) ................................................................................................... 13

*Anspach v. City of Philadelphia,*
    503 F.3d 256 (3d Cir. 2007) ..................................................................................... 10

*Ashcroft v. al-Kidd,*
    563 U.S. 731 (2011) ............................................................................................ 13, 14

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ................................................................................................. 10

*Blackhawk v. Pennsylvania,*
    381 F.3d 202 (3d Cir. 2004) ............................................................................... 16, 17

*Borough of W. Mifflin v. Lancaster,*
    45 F.3d 780 (3d Cir. 1995) ....................................................................................... 23

*Boy Scouts of America v. Wyman,*
    335 F.3d 80 (2d Cir. 2003) ....................................................................................... 17

*Camero v. Kostos,*
    253 F. Supp. 331 (D.N.J. 1966) ............................................................................... 11

*Carswell v. Borough of Homestead,*
    381 F.3d 235 (3d Cir. 2004) ..................................................................................... 12

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ............................................................................................ 15, 16

*City of Los Angeles v. Lyons,* 461 U.S. 95, 101-02 (1983) ..................................................... 20

*Combs v. Homer-Central School District,*
    540 F.3d 231 (3d Cir. 2008) ............................................................................... 17, 18

*County of Ocean v. Grewal,*
    475 F.Supp.3d 255 (D.N.J. 2020) ............................................................................ 23

ii

*Curley v. Klem,*
    499 F.3d 199 (3d Cir. 2007) ................................................................ 12

*Dixon v. Rutgers, The State Univ. of N.J.,*
    541 A.2d 1046 (1988) ............................................................... 24, 25

*EEOC v. Metal Serv. Co.,*
    892 F.2d 341, 347 (3d Cir.1990) .......................................... 25, 26

*Employment Divisions, Department of Human Ressources of Oregon v. Smith,*
    494 U.S. 872 (1990) ..................................................................... 14

*Ex Parte Young,* 209 U.S. 123 (1908) ....................................... 20

*Finberg v. Sullivan,* 634 F.2d 50 (3d Cir. 1980) .................... 21

*Flight Sys., Inc. v. Elec. Data Sys.,*
    112 F.3d 124 (3d Cir. 1997) ....................................................... 11

*Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark,*
    170 F.3d 359 (3d Cir. 1999) ...................................................... 16

*Furnco Constr. Corp. v. Waters,*
    438 U.S. 567 (1978) ..................................................................... 25

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ..................................................................... 13

*Hedges v. Musco,*
    204 F.3d 109 (3d Cir. 2000) ...................................................... 23

*Mandel v. UNS/PaineWebber, Inc.,*
    860 A.2d 945 (N.J. Sup. Ct. App. Div. 2004) ..................... 24

*McDonnell Douglas Corporation v. Green,*
    411 U.S. 792 (1973) ..................................................................... 24

*Mogull v. CB Commercial Real Estate Group, Inc.,*
    744 A.2d 1186 (2000) ............................................................ 25, 26

*Morse v. Lower Merion School Dist.,*
    132 F.3d 902 (3d Cir. 1997) ...................................................... 10

*Oran v. Stafford*,
  34 F. Supp. 2d 906 (D.N.J. 1999), *aff'd*, 226 F.3d 275 (3d Cir. 2000) ...................... 11

*Pearson v. Callahan*,
  555 U.S. 223 (2009) ................................................................................ 12

*Phillips v. Cty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ....................................................................... 3

*Plumhoff v. Rickard*,
  572 U.S. 765 (2014) ................................................................................ 13

*Quern v. Jordan*, 440 U.S. 332, 337 (1979) .......................................................... 20

*Saucier v. Katz*,
  533 U.S. 194 (2001) ................................................................................ 12

*St. Mary's Honor Ctr. v. Hicks*,
  509 U.S. 502 (1993) ................................................................................ 25

*Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002) .................................... 20

*Whole Woman's Health v. Jackson* 142 S.Ct. 522 (2021) ............................................... 21

## Statutes

28 U.S.C. § 1367 .......................................................................................... 23

## Other Authorities

U.S. Const. amend. I ...........................................................................*passim*

## PRELIMINARY STATEMENT

Although Plaintiffs Michael and Jennifer Lasche pursue claims under 42 U.S.C. §1983 and under the New Jersey Law Against Discretion against Defendants State of New Jersey Division of Child Placement and Protection ("DCPP") and four employees of that state agency (Kyle Higgins, Mary Lippencot, Katie Epperly, and Janelle Clark), those claims cannot proceed. On remand from the Third Circuit, just two claims remain live in this case—a §1983 action for damages alleging that the Individual Defendants violated First Amendment rights when they disrupted the Lasches' ability to serve as foster parents, and an action under the LAD against DCPP tied to the same. But the §1983 action is barred by established principles of qualified immunity, which protect the Individual Defendants from liability because no factually-analogous precedent from the Supreme Court or robust consensus of authority from the circuits makes clear that their conduct would violate federal constitutional law. And the LAD claim should not proceed in this court either, because this Court should decline to exercise supplemental jurisdiction and allow a state-law-only action to proceed in state court.

The §1983 action for damages, the only federal claim that the Third Circuit found required further analysis by this Court, cannot proceed. As the Individual Defendants previously explained in an earlier motion to dismiss, qualified immunity is a dispositive bar. According to the Amended Complaint, the Individual Defendants found that the Lasches were not suitable to continue as foster parents because they openly expressed

1

views antagonistic to homosexuality, which in turn led DCPP and its employees to have concerns about placing vulnerable children—including some who may ultimately come out as LGBTQ—in a home in which foster parents might inform a gay foster child that something was "wrong" with them or that their desire to have a same-sex relationship was not appropriate. Under well-worn qualified immunity rules, Plaintiffs must point to clearly established precedent that would have demonstrated to Individual Defendants that their conduct clearly violated the Lasches' free exercise rights. But the State is aware of no factually-analogous precedent from the Supreme Court or a robust consensus of authority from the circuits establishing any sort of rule that public employees cannot take hostility to homosexuality into account when evaluating foster parent eligibility or suitability, and certainly none at the time of the alleged actions. The mere assertion that discrimination based on religious beliefs violates the First Amendment operates at too high a level of generality to overcome qualified immunity—and in any event, there are no allegations suggesting that the Individual Defendants' actions turned on whether the applicant's hostility to homosexuality was based on religious or secular reasons.

Nor is there any basis for this Court to proceed with the LAD claim against the DCPP. The Third Circuit concluded that DCPP's offices qualify as a "place of public accommodation" under the LAD, but the Third Circuit did not hold that this would be the proper forum in which to evaluate the LAD claim. And it is not: if this Court rightly dismisses the only §1983 claims left in the case on the basis of qualified immunity, then

all that is left is a purely state-law claim, over which this Court should decline to exercise supplemental jurisdiction. And if this Court does retain jurisdiction over this state-law-only action, then it should still dismiss the LAD claim on the merits. Under the LAD, an agency that oversees the placement of foster children may seek to avoid a situation in which a foster child is placed in a home in which they are told that homosexuality is "wrong" given the serious concern that the child may eventually themselves come out as LGBTQ. This approach does not reflect hostility to the Lasches' religion, in violation of the LAD, but rather a legitimate, non-discriminatory interest in making foster child placements in the best interest of all foster children.

## <u>STATEMENT OF FACTS</u>[1]

Although Plaintiffs have now filed three versions of their Complaint, the core factual allegations in those pleadings are nearly identical, and the salient allegations are set forth herein.

The Plaintiffs are "devout Christians who hold to traditional values and beliefs about family, marriage and sex." *See* Second Amended Complaint, ¶ 1. In

---

[1] Given that this is a motion to dismiss, Defendants must rely on the facts as alleged in the Complaint, and the Court must accept the factual allegations of the Complaint (but not any conclusory statements unsupported by facts) in the light most favorable to the Plaintiffs. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). By setting forth the facts below for purposes of this motion, Defendants do not concede the truth of those allegations, many of which the Defendants would take issue with if the claims against Defendants are not dismissed.

the past, the Lasches had been licensed by DCPP and served as foster parents.  *Ibid.*

The events at issue in this lawsuit arise from a foster-child placement that commenced in 2017, during which the Lasches' disapproval of homosexuality came to light as a natural consequence of a potential adoption, by a same-sex couple, of children who had been placed into their foster care.  First, on or about September 1, 2017, Defendants Kyle Higgins and Katie Epperly -- employees of the DCPP -- called the Plaintiffs about two girls being removed from a foster home and asked if Plaintiffs would take them in.  *Id.*, ¶ 8.  The girls were ages 13 ("Foster Child 1 ") and 10 ("Foster Child 2").  *Ibid.*  Foster Child 1 was the oldest of five siblings placed in foster care.   Plaintiffs agreed to the placement.  *Ibid.*

In September 2017, Higgins allegedly advised the Lasches that the girls' cases were moving towards adoption and that the natural father's rights had already been terminated.  *Id.*, ¶ 9.  The next month, Higgins allegedly advised the Lasches that the children's case was still moving towards adoption and that the Lasches would have the first choice to adopt the girls. *Id.*, ¶ 10.  In November 2017, Plaintiffs were allegedly informed that the children's natural mother had surrendered her parental rights and that the children were now free for adoption, and in December 2017, Higgins allegedly met with the Lasches and informed them that they were in consideration to be adoptive parents for the children.  *Id.*, ¶ 11, 12.

Three weeks after the December meeting, Higgins allegedly informed the

Lasches that a family in Illinois was interested in adopting all five children and that a plan to arrange that adoption was proceeding. *Id.*, ¶ 13. The Lasches and Foster Child 1 and Foster Child 2 allegedly asked Higgins and Epperly questions about the potential adoptive family in Illinois (the Complaint does not state what questions were asked), but defendants allegedly claimed to "not know the answers." *Id.*, ¶ 14.

The Lasches learned from the foster parents of the siblings of Foster Child 1 and Foster Child 2 that the potential adoptive family "were two wealthy gay men with lots of family around to support them and the adoption." *Ibid.* Given that the potential permanent family for Foster Children 1 and 2 was a gay couple, DCPP employees made inquiries about the children's views on homosexuality, to gauge whether this potential placement would be in the children's best interest. *Id.*, ¶ 15.

In April 2018, at the Lasches' request, and by agreement with DCPP, Foster Child 2 was removed from Plaintiffs home for confidential reasons unique to Foster Child 2. *Id.*, ¶16.

On May 22, 2018, Mrs. Lasche met with Higgins and the therapist for Foster Child 1, at which time the participants allegedly agreed not to discuss adoption with Foster Child 1 because it was too soon after Foster Child 2's removal. *Id.*, ¶17. The participants also discussed the possibility of Foster Child 1 exploring time with her siblings to see if she wanted to be adopted with them, and Mrs. Lasche indicated that she "was not opposed to letting Foster Child 1 explore that." *Ibid.*

–5–

During that meeting, Higgins indicated that a court hearing would be held on June 4, 2018, at which a judge would be presented with information about the placement options for all five foster children and then make a determination about what would be best for the children. *Id.*, ¶18. Those options included: (1) having the five foster Children adopted by the families with which they were currently placed; or (2) adoption of all five children by the Illinois family. *Ibid.* On June 4, 2018, the Plaintiffs received a text from Foster child 1's law guardian that the Illinois couple was "off the table" and that the judge wanted psychiatric evaluations of all of the children before a permanent plan was put into place. *Id.*, ¶19.

In June 2018, Foster Child 1 appeared upset after returning home from a regularly-scheduled therapy session and stated she was upset because "the therapist kept bringing up religion and told her she should not feel pressured to follow her foster family's religious beliefs." *Id.*, ¶20. Mrs. Lasche subsequently asked Foster Child 1's therapist why the therapist had asked Foster Child 1 if the child was "being pressured" to follow [the Lasches'] religion," and the therapist allegedly responded that "it was normal to discuss how people have different beliefs, ethics, religion, etc." *Id.*, ¶23. Mrs. Lasche claims that she "pressed" the therapist, who then said she had received a call from Higgins before the session. *Ibid.*

The Second Amended Complaint alleges that Higgins then relayed the following, focused solely on the Lasches' views on "same-sex couples":

– 6 –

> The Therapist said that the Division brought to her attention that there had been a conversation that was had with Plaintiffs about the Foster Children being placed out of state *with a homosexual couple*[.]  The Therapist also stated that there was "a conversation with Defendant Kyle Higgins about the Illinois couple" and "discussion about "*Plaintiffs' ideas about same-sex couples*." She also said that in that conversation Defendant Kyle Higgins told the therapist that the therapist was to discuss with Foster child 1 being placed with her brothers.
>
> [*Ibid.* (emphasis added).]

This description of the alleged communications between Higgins and the therapist reemphasizes that the crucial topic for DCPP was the Lasches' views on *same-sex relationships*.  The Second Amended Complaint then contends as a legal conclusion that it was "clear from this conversation that the Defendant Kyle Higgins . . . felt the Plaintiffs religious beliefs had been passed on to the Foster Children and interfered with th[e] [proposed] placement." *Id.*, ¶24.

Plaintiffs allege that on or about June 21, 2018, Higgins and another woman (not identified in the complaint) picked up Foster Child 1 for the ostensible purpose of taking Foster Child 1 to visit a sibling, and that it was "very rare" for Higgins to transport Foster Child 1 to such visits. *Id.*, ¶25.  The Lasches allege "on information and belief" that Foster Child 1 and the two women instead stopped at a Dunkin' Donuts, where the Lasches allege that the woman "interrogated Foster Child 1," including about her religious beliefs, and "lied to her in an effort to intimidate her

into agreeing that she did not want to be adopted by Plaintiffs," and allege that Higgins told the child that the Lasches "would not be able to meet her needs." *Id.,* ¶25, 26.  Foster Child 1 was then taken to the home in which her foster brothers were living, rather than to visit her sister. *Id.,* ¶26.  Plaintiffs then include, as a legal conclusion, that the questioning of Foster Child 1 "about her religious belief in general and *regarding homosexuality in particular*" is supposedly "evidence that Higgins "wanted to separate the Foster child from Plaintiff . . . because of plaintiffs['] religious beliefs." *Id.,* ¶ 27 (emphasis added).

When Higgins returned with Foster Child 1, she allegedly told the Lasches that she understood that Foster Child 1 wanted to stay with the Lasches and that DCPP wanted "to work with" the Lasches because DCPP wanted what was in Foster Child 1's best interests, and Higgins indicated that DCPP was interested in arranging a meeting with the Lasches. *Id.,* ¶ 28.  In a subsequent telephone call in anticipation of the meeting, Epperly supposedly told the Lasches that "DCPP was concerned that both Foster Child 1 and Foster Child 2 indicated that same-sex relationships were against their religion," which belief the DCPP believed that the children had gotten from the Lasches. *Id.,* ¶ 29.

A meeting thereafter occurred on Friday, June 29, 2018, which was attended by the Lasches; their attorney; an attorney for the State of New Jersey; one or two employees of the DCPP whose identities the Lasches do not know; and defendants

Higgins, Epperly, Lippencot and Clark.  *Id.*, ¶ 33. During that meeting, the DCPP representatives expressed concern regarding whether the Lasches would reject Foster Child 1 if she ever "decided to explore her sexuality," which led the DCPP personnel to seek assurance from the Lasches that they would not reject the child if she did so.  *Id.*, ¶ 34.  The Second Amended Complaint does *not* indicate that the Lasches provided to DCPP personnel the required assurance not to reject Foster Child 1 if Foster Child 1 decided to explore her sexuality.

The Complaint states some unidentified defendant at that meeting indicated Foster Child 1 would "require therapy to deal with her belief that homosexuality was a sin to avoid possible future harm" that the belief that homosexuality was a sin was "some type of mental disorder."  *Id.*, ¶ 34.  According to the Lasches, "almost the entire meeting was about Plaintiffs belief that homosexuality was a sin," from which Plaintiffs draw the legal conclusion that Defendants were "hostile to the Plaintiffs[] religious beliefs regarding homosexuality."  *Ibid.*

After a court hearing on July 2, 2018, a judge issued an order that removed Foster Child 1 from the Lasches' home, reflecting a judicial determination that it was not in the child's best interests to remain in the Lasches' care.  *Id.*, ¶¶ 35-38.

On October 12, 2018, a representative of the DCPP (not one of the named employee defendants) performed a yearly inspection that is necessary for renewal of a New Jersey license to serve as a foster parents.  *Id.*, ¶ 40.  At the conclusion of the

inspection, the inspector asked the Lasches if they knew that their license had been suspended by the Monmouth County DCPP office, and the Lasches replied they were not aware of the suspension. *Id.*, ¶ 41. The inspector said the Lasches should have received notice of the suspension and reasons for it from the Monmouth County office. *Ibid.* The Lasches hypothesize that their religious beliefs were the bases for the suspension, because they contend that that is the "only apparent basis" for the suspension. *Id.*, ¶ 42. The Second Amended Complaint fails to alleged that any of the employee defendants (Higgins, Lippencot, Epperly, or Clark) have any personal involvement in decisions related to foster-home licensure or had personal involvement in the decision to pause foster placements into the Lasches' home.

## STANDARD OF REVIEW

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a reviewing court must accept the plaintiff's factual allegations as true; however, a plaintiff's conclusory allegations and legal conclusions are not entitled to the same assumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Anspach v. City of Philadelphia*, 503 F.3d 256, 260 (3d Cir. 2007) (quoting *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (holding conclusory allegations or legal conclusions masquerading as factual allegations will not suffice to prevent dismissal)).

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 678. Where the claims asserted are fatally defective and the

plaintiff cannot plead any facts to support claims, it is appropriate for the court to dismiss a complaint without permitting the plaintiff to make a curative amendment of his pleading. *Oran v. Stafford*, 34 F. Supp. 2d 906, 913-14 (D.N.J. 1999), *aff'd*, 226 F.3d 275 (3d Cir. 2000). Thus, dismissal is justified where there is an "insuperable barrier" to a claim, such as an immunity. *See Flight Sys., Inc. v. Elec. Data Sys.*, 112 F.3d 124, 127-28 (3d Cir. 1997); *Camero v. Kostos*, 253 F. Supp. 331, 338 (D.N.J. 1966).

## ARGUMENT

### POINT I

### QUALIFIED IMMUNITY REQUIRES DISMISSAL OF THE LASCHES' FEDERAL CLAIMS.

Plaintiffs cannot proceed with their § 1983 action for damages against individual Defendants in light of Defendants' well-established qualified immunity. No Supreme Court decision or robust consensus of other authority has clearly established that taking into account an individual's hostility to homosexuality in evaluating foster-care parent suitability or foster-care parent placements violates an established federal free exercise right. Merely stating that the First Amendment forbids discrimination against religion operates at too high level a generality to overcome qualified immunity. That is especially so where the allegations do not plausibly state that the Individual Defendants took or would take into account an individual's hostility to homosexuality when it was religious but not when it was secular in nature. Qualified immunity applies here.

The relevant legal framework is clear.  As the Third Circuit and the Supreme Court has repeatedly explained, qualified immunity is designed to accommodate the competing values between providing a cause of action for deprivation of constitutional rights and the need for public officials to discharge their discretionary powers without undue fear of personal liability.  *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007) (citations omitted).  To protect the latter critical interest, qualified immunity provides immunity that is "broad in scope and protects" all public officials except those who are "plainly incompetent" or "knowingly violate the law." *Id.* (citations omitted).  This immunity applies regardless even if the official's error relies on a mistake of law or a mistake of fact (or both).  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

When a defendant in a § 1983 action claims qualified immunity, a two-part inquiry must be undertaken.  *See Pearson*, 555 U.S. at 232; *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The court is required to consider whether the plaintiff's allegations assert that the defendant's conduct violated a constitutional right at all.  *Pearson*, 555 U.S. at 232.  The court is also required to determine whether the constitutional right at issue was "clearly established" at the time of the alleged misconduct.  *Id.*  "[W]hether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury." *Curley*, 499 F.3d at 211 (citing *Carswell v. Borough of Homestead*, 381 F.3d 235, 242 (3d Cir. 2004)).  Whether an official is shielded from liability by qualified immunity for alleged unlawful official

action thus turns on the "objective legal reasonableness" of the action assessed in light of the "clearly established" law at the time the action was taken. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014).

To determine whether a right was "clearly established," the question is whether, "at the time of the challenged conduct, the contours of a right [we]re sufficiently clear that every reasonable official would have understood that what he [wa]s doing violate[d] that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation and quotes omitted); *Harlow v. Fitzgerald*, 457 U.S. 800, 817-19 (1982). The Supreme Court has held that absent "controlling authority," a "robust consensus of cases of persuasive authority" must have placed the statutory or constitutional question confronted by the officials "beyond debate." *al-Kidd*, 563 U.S. at 741.

To overcome the Defendants' claim of qualified immunity, the Lasches therefore must show the existence of clearly established law that provided that consideration of a foster parent's views on sexuality in making recommendations regarding custody or foster parent licensure violates a clearly established constitutional right. However, no precedent appears to exist for the proposition that taking into account a foster parent's views on homosexuality (and the attendant possibility that such a foster parent may reject a child who later reveals that the child is gay) violates a constitutional right. Over the course of multiple years of litigation, at both the Third Circuit and this Court, And if no such case exists today, certainly none existed at the time of the alleged actions.

-13-

Nor would it be enough for Plaintiffs to baldly assert that the clearly-established right is to be free from state action that discriminates against religious belief. For one, that assertion of the right operates at far too high a level of generality—precisely what the Court has repeatedly warned is inappropriate in the qualified immunity context. *See, e.g., Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has 'repeatedly told courts . . . not to define clearly established law at a high level of generality.'") (quoting *City and County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1775–1776 (2015)); *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) ("[W]e have stressed the need to 'identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment.'" (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)); *al–Kidd*, 563 U.S. at 741 ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."); *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503–04 (2019) (reiterating that "a body of relevant case law is usually necessary" to determine if a legal principle is clearly established); *James v. New Jersey State Police*, 957 F.3d 165, 169–70 (3d Cir. 2020) (observing that "'settled law' must 'squarely govern' the specific facts at issue.") (citations omitted). For another, case law remains clear that policies which are *neutral and generally applicable* do not impermissibly discriminate against religion, even if they are inconsistent with a particular individual's religious practice. *See, e.g., Smith*, 494 U.S. at 877; *Fulton v. City of Philadelphia*, 141 S.Ct. 1868, 1876 (2021) (declining to overrule *Smith* or the proposition that a neutral and

-14-

generally applicable policy violates free exercise rights).  While a governmental policy that burdens religious practice and that is *not* neutral or generally applicable must withstand strict scrutiny, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 521 (1993), Plaintiffs point to no clearly established precedent from any analogous cases to show that the alleged actions taken by the Individual Defendants fall into this category.  And as noted above, the Attorney General is aware of none.

Indeed, Plaintiffs' own allegations undermine the notion that clearly established law would foreclose the Individual Defendants' actions and would support allowing any damages claims against them to proceed.  Plaintiffs do not plead facts that would show that their negative views about homosexuality would not have been explored by DCPP had the Lasches indicated they held those views for secular reasons, instead of those views being reflective of the views of a particular religion.  Said another way, the Lasches have failed to present any claim that a policy of considering a potential foster parent's views on homosexuality (whether derived from a religious or secular source) is anything other than a neutral policy to protect the possibility of a circumstance in which a gay child might be placed into a foster home and then rejected on the basis of their sexuality. That is, there is no suggestion in the Second Amended Complaint that a different policy exists for persons who express similar views on homosexuality, but based on personal ethics as opposed to religious doctrines.  No clearly established law demonstrates that the alleged conduct by the Individual Defendants violates the First Amendment.

-15-

This is a far cry from the facts of other free exercise precedents.  For example, in *Lukumi* the Court found that an ordinance that precluded animal sacrifices was not neutral because it was underinclusive on its face and "gerrymandered" to apply only to religious acts and did not apply to similar conduct by hunters or commercial meat processors.  508 U.S. at 539.  Similarly, in *Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999)*,* the court found a police department's prohibition on beards for officers was not generally applicable because it provided categorical exemptions for people with medical dermatological issues but did not give a Sikh officer an exemption for religious purposes.  *Ibid.*  That preference for secular motivations over religious motivations for the same conduct, whether that is through categorical or individual exemptions, was unconstitutional.  But neither decision would put the Individual Defendants on notice that taking into account a foster parent's views of homosexuality in making foster parent placement or licensure evaluations, no matter whether that view is held for religious or secular reasons, violates First Amendment rights such that they could be haled into court in a damages action.[2]

---

[2] Nor does this case resemble *Blackhawk v. Pennsylvania*, 381 F.3d 202, 204 (3d Cir. 2004), in which the court found that a Native American plaintiff had established a free exercise violation with respect to permits for the keeping of animals in captivity.  The plaintiff in that case alleged that he kept two bears for religious purposes, and challenged the ordinance, which included a general rule against keeping animals in captivity unless the activity provided a "tangible benefit," which the court found was vague enough to qualify as creating a system of individualized exemptions.  *Id.* at 211.  Moreover, the ordinance also provided categorical exemptions from the fee requirement for entities

-16-

Other cases by the Third Circuit and its sister circuits make clear how implausible it would be to find that the alleged conduct contravened clearly established precedents. *Boy Scouts of America v. Wyman*, 335 F.3d 80 (2d Cir. 2003) rejected a free exercise claim by the Boy Scouts of America ("BSA") with respect to its exclusion from participation in a Connecticut workplace charitable-contribution campaign based on BSA's then-existing policy of excluding gay persons from its leadership positions.  The Second Circuit upheld the exclusion of BSA from the program, holding that: (1) Connecticut's Gay Rights Law was neutral on its face as to persons who discriminated against gay citizens, and (2) the state statute was not being used as a façade for religious viewpoint discrimination.  In support of its conclusion, the Second Circuit noted the CGRL "was enacted in order to protect people from pervasive and invidious discrimination on the basis of sexual orientation" and not to suppress expressive content.  *Id.* at 95.  In other words, the *Wyman* case indicates that neutral policies regarding exclusions of or hostility to gay persons do not violate the constitution—which further undermines any claim that the Individual Defendants' alleged actions violated clearly established law.

In this circuit, *Combs v. Homer-Central School District*, 540 F.3d 231, 242 (3d Cir.

such as zoos and "nationally recognized circuses."  *Id.* at 210.  Because of existence of non-religious exemptions for the same conduct and the existence of a vague standard for potential exemptions, the Third Circuit held that the state action there was not "generally applicable."  *Ibid.*  But even leaving aside how sharply different that factual context was, there are no allegations that DCPP or the Individual Defendants maintained any sort of exemption to their alleged approach for "tangible benefit."

-17-

2008), makes it especially hard to argue clearly-established law subjects the Individual Defendants to liability for damages.  In *Combs*, the Third Circuit rejected a free exercise challenge to an education ordinance that required any parent homeschooling their child to submit regular reports showing compliance with various education requirements.  In rejecting the free exercise claim, the Third Circuit found that the law in question was applied to all parents in an equal fashion, whether they home schooled for religious reasons or not, and that no evidence had been presented that the state had discriminated against faith-based home-schooling programs.  *Ibid*.  The Third Circuit noted that a neutral policy—even one that burdens religious practices—does not *clearly* establish a parent's rights, let alone the rights of a foster parent applicant.

Indeed, the description in the Second Amended Complaint of the Lasches' conversations with DCPP employees, or the alleged conversation between Higgins and Foster Child 1's therapist, make clear that the focal point of such conversations was not what *religious denomination* the Lasches belong to, but rather what views the Lasches held about *homosexuality* and whether such views would lead the Lasches to reject a gay foster child who might be placed in their home.  Even as Plaintiffs describe the events, Higgins supposedly told the therapist "there had been a conversation that was had with Plaintiffs about the Foster Children being placed out of state with a homosexual couple" and a discussion about "Plaintiffs' ideas about same-sex couples."  *See* Ex. A to McGuire Decl., ¶ 23.  Likewise, Plaintiffs' description of the June 2018 meeting

with DCPP personnel indicates that "almost the entire meeting was about Plaintiffs

belief that homosexuality was a sin." *Id.*, ¶ 34. Even Plaintiffs' own pleading makes

clear that the focus of any inquiries by Defendants was based on the Lasches'

antipathy to homosexuality, and not on what particular religious group might hold

such views. Defendants here would not be on notice that their alleged actions in

taking into account the Lasches' views on homosexuality in assessing foster child

placements involved a violation of the Lasches' free exercise rights.

No factually analogous case would with sufficient clarity demonstrate to the

Individual Defendants that the alleged conduct was unconstitutional. The absence

of such authority requires a finding that these Defendants have qualified immunity from

the Lasches' claims against them.

**POINT II**

**ANY CLAIMS FOR INJUNCTIVE RELIEF FAILS
BECAUSE THE INDIVIDUAL DEFENDANTS, IN
THEIR INDIVIDUAL CAPACITIES, ARE NOT
CAPABLE OF EFFECTUATING ANY PROPOSED
INJUNCTIVE RELIEF.**

To the extent that Plaintiffs may suggest that a dismissal based on qualified

immunity does not dispose of their claims under § 1983 and § 1985 because the relief

they seek includes a request for injunctive that would not be subject to such immunity,

that argument also fails. The sole remaining claims in this case under those statutes are

asserted against the Individual Defendants in their personal capacities, and—as

observed previously—the Second Amended Complaint fails to plead facts that those defendants were personally involved in any decisions concerning the Plaintiffs' license or have any ability in their individual capacity to require the agency that employs them, DCPP, to issue a license to the Lasches, even if this Court were to grant injunctive relief.

It seems as if Plaintiffs are attempting to squeeze this case through the narrow window that allows certain federal suits for injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908), in which the Court carved out a limited exception to Eleventh Amendment immunity by sanctioning citizens to sue state officials when the litigation seeks prospective injunctive relief to end continuing violations of federal law. *Quern v. Jordan*, 440 U.S. 332, 337 (1979). Plaintiffs requesting prospective injunctive relief must allege a "real and immediate" threat of future injury, not a threat of injury that is "conjectural" or "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983). To determine whether the *Ex parte Young* exception applies, a court employs a two-part test: (1) does the complaint allege an ongoing violation of federal law; and (2) is the relief sought properly characterized as prospective as opposed to retrospective. *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002). Of most crucial importance as to this matter, the law is plain that such relief must be sought against appropriate defendants. As the Court in *Ex parte Young* noted, the official sued must have "some connection with the enforcement" of the challenged policy. 209 U.S. at 157.

-20-

For example, *Whole Woman's Health v. Jackson*, 142 S.Ct. 522 (2021), was a suit by parties who provided abortion care seeking various relief, including an injunction that would bar the Texas Attorney General from enforcing the provisions of a bill that authorized private citizens to file civil actions against persons who provided abortion care (other than in the case of a medical emergency) or abetted another person with respect to the performance of an abortion at a time after a fetal heartbeat was detectable. The Court dismissed the purported claims for injunctive relief against the Texas Attorney General because the performance of his official responsibilities did not include any power to enforce that statute, so there was no ability to enter any kind of effective injunctive relief to require that Attorney general to exercise, or not exercise, some power he actually held. *Id.* at 534. The Court also held that *Ex parte Young* did not provide a basis for a suit for injunctive relief against state judges or their clerks, who also were not the persons who be enforcing the statute in question. *Id.* at 532. The Court did find that it was possible to assert a claim for injunctive relief against executive directors of Texas state health agencies because those officials' powers under the challenged statute did include a right to pursue enforcement actions against abortion-care providers. *Id.* at 535-36.

Courts within this Circuit have made also clear that a plaintiff bears that same burden, as the Third Circuit observed in *Finberg v. Sullivan*, 634 F.2d. 50 (3d Cir. 1980), that the *Ex parte Young* exception to immunity for injunctive relief applies only if "a

particular official . . . 'by virtue of his office has some connection with the enforcement of the act.'" *Id.* at 53 (quoting *Ex parte Young*, 209 U.S. at 157).

As the Third Circuit made clear, the potential claims for potential retaliation as to free exercise rights pertain solely to actions taken with respect to a suspension of the Lasches' license. However, the Second Amended Complaint if bereft of any allegation, let alone a plausible one, that the Individual Defendants participate in decisions as to licensure in general and no allegations that the Individual Defendants specifically participated in any decisions related to the Lasches' license.

Thus, the Lasches cannot rescue the Second Amended Complaint from dismissal based on the contention they have sought injunctive relief.[3]

## POINT III

## PLAINTIFFS' STATE LAW CLAIMS SHOULD ALSO BE DISMISSED.

Plaintiff has asserted one non-federal claim in this case, a claim under the New Jersey LAD. If this Court accepts Defendants' arguments that the Court must dismiss Plaintiffs' federal claims because they fail as a matter of law, Defendants urge that this Court then decline to exercise supplemental jurisdiction over the LAD claim, as it has

---

[3] Aside from failing to satisfy the requirements of *Ex parte Young*, Plaintiffs' requests for injunctive relief also fail from a substantive standpoint because, as explained in Point I, Plaintiffs have failed plausibly to allege that a policy of taking into account potential foster parents' views regarding homosexuality in making placement decisions regarding foster children is not a neutral policy that was generally applied.

done in analogous cases.  Plaintiffs would have the opportunity to present their LAD claim in New Jersey's state courts, where resolution of a standalone claim involving the interpretation and application of that state statute is most appropriate.  If this Court does exercise jurisdiction, it should dismiss for failure to state a claim.

A.      This Court Should Decline To Exercise Supplemental Jurisdiction Over Plaintiffs' State-Law Claim.

Pursuant to 28 U.S.C. § 1367, a federal court may exercise supplemental jurisdiction over state-claims that "are so related to claims in the [federal action] that they form part of the same case or controversy."  However, the Third Circuit has stated that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Borough of W. wy v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis added); *see also Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000); *County of Ocean v. Grewal*, 475 F.Supp.3d 255 (D.N.J. 2020).  Indeed, this Court has repeatedly taken that approach in other cases in which it has found that the only federal claims in the case must be dismissed on a Rule 12(b)(6) motion.  *See, e.g., County of Ocean v. Grewal*, 475 F.Supp.3d 355, 382-86 (D.N.J. 2020).  The present matter has never progressed in this Court beyond the stage of motions to dismiss Plaintiffs' various attempts to plead claims that will survive a motion to dismiss, and no discovery has

been taken, and this Court should therefore abide by the general rule that this Court should decline to address any pendent state clams.

B.     If This Court Exercises Supplemental Jurisdiction Over Plaintiffs' State-Law Claim, That Claim Should Be Dismissed.

Plaintiffs' LAD claim arises in the unique factual context of licensure to serve as foster parents, when most LAD claims arise in the employment context. However, applying a framework similar to the one employed in evaluating religious-discrimination claims in the employment context leads to the conclusion that Plaintiffs' LAD claim -- which relies on the central notion that they were treated differently as potential foster parents only because of the religion that they practice, as opposed to being treated differently because they had expressed negative views about homosexuality (whatever the origin of that view) – plainly falls as a matter of law.

New Jersey courts assessing LAD claims employ the same three-step, burden-shifting analysis that was developed under federal law in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *Mandel v. UNS/PaineWebber, Inc.*, 860 A.2d 945 (N.J. Sup. Ct. App. Div. 2004).  Under that approach:

> (1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant then must show a legitimate non-discriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application.

*Dixon v. Rutgers, The State Univ. of N.J.*, 541 A.2d 1046, 1051 (1988) (citations omitted).

To establish a prima facie case for alleged unlawful disparate treatment in violation of the LAD, a plaintiff must show that a protected group has "been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion" under the anti-discrimination laws. *EEOC v. Metal Serv. Co.,* 892 F.2d 341, 347 (3d Cir.1990). The initial burden of showing a prima facie case is met when the plaintiff "shows that 'it is more likely than not' that the employer's actions were based on unlawful considerations." *Dixon,* 541 A.2d at 1051 (quoting *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577 (1978)). Even if a plaintiff establishes a prima facie case, it creates only a presumption of discrimination, and a defendant can rebut that resumption by demonstrating a legitimate, non-discriminatory reason for its actions against plaintiff. *Mogull v. CB Commercial Real Estate Group, Inc.,* 744 A.2d 1186, 1197 (2000). If the defendant can show a legitimate non-discriminatory reason for its actions, the presumption of discrimination disappears, so that the plaintiff must prove that the defendant's reasons were a pretext for discrimination and the real reason for the action was to discriminate against a member of a protected group. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993); *Mogull*, 744 A.2d at 1193.

Here -- where there was an alleged concern about potential placing children into the Lasches' home who may later identify as LGBTQ, after the Lasches had made clear their negative views about homosexuality and where the complaint conspicuously fails

to state that the Lasches provided assurances to DCPP that they would not reject a gay foster child – it is plain that the Lasches were not "singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion." *See EEOC*, 892 F.2d at 347. Plainly, the criterion of importance was disapproval of homosexuality, particular where those views might impact the ways in which the potential foster parents interacted with potential foster children. The fact that the Lasches' own disapproval happened to be grounded in their religious beliefs is immaterial, as there are no plausible allegations that other anti-gay foster parents whose views on sexuality are derived from a secular source would have been treated differently than the Lasches.

Likewise, the facts set forth even in the Lasches' pleading show that Defendants plainly had a legitimate, non-discriminatory reason any pause in placements with the Lasches – a well-founded concern that the Lasches might inform a vulnerable gay foster child entrusted to their temporary care of their criticisms of homosexuality, which a state agency could plainly find would cause emotional to the child. *See Mogull*, 744 A.2d at 1197. Thus, even assuming that the Lasches had pleaded facts sufficient to set forth a potentially viable prima facie LAD claim, the facts alleged unequivocally demonstrate the existence of a legitimate and non-discriminatory reason for suspending foster child placements with the Lasches, and there is no plausible suggestion that this reason was merely a "pretext" for discriminating against their religion.

-26-

Thus, to the extent that this Court is inclined to review the merits of Plaintiffs' LAD claim, notwithstanding the precedent from the Third Circuit and this Court making clear these claims are better heard in state court, that LAD claim plainly fails as a matter of law and should be dismissed.

### **<u>CONCLUSION</u>**

Plaintiffs' Second Amended Complaint should be dismissed.

Respectfully submitted,

MATTHEW J. PLATKIN
ACTING ATTORNEY GENERAL
OF NEW JERSEY

By: <u>/s/ Robert J. McGuire</u>
Robert J. McGuire (046361992)
Deputy Attorney General

DATE: July 5, 2022