# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MICHAEL LASCHE AND
JENNEFER LASCHE

          Plaintiffs,

          v.

STATE OF NEW JERSEY, ET. AL.

          Defendants.

Civil Action No. 3:18-cv-17552-FLW-TJB

BRIEF IN OPPOSITION TO MOTION TO
DISMISS SECOND AMENDED
COMPLAINT

MICHAEL P LAFFEY
222 HIGHWAY 35
2ND FLOOR
RED BANK, NJ 07701
(732) 642-674
mplaffeylaw@gmail.com
Attorney for Plaintiffs

## TABLE OF CONTENTS

Table of authorities…………………………………………………………………... ii

Preliminary Statement………………………………………………………...… 1

Statement of Facts……………………………………………………….………. 1

Standard of Review……………………………………………….………. 8

Legal Argument……………………………………………………….………. 8

Point I

The Defense of Qualified Immunity Is Not Available To The
Defendants Because Plaintiffs Are Seeking Injunctive Relief ………………………….…… 8

Point II

The Defense of Qualified Immunity Is Not Available To The
Defendants Because They Violated A Clearly Established Right…………………………...… 11

Point III

Should the Plaintiffs Federal Claims Be Dismissed The Court
Should Not Dismiss Plaintiffs State Claim But Should Remand It…………………………... 14

Point IV

Addressing the Lad Claim on Its Merits Is Premature ………………..……………....…… 14

Conclusion……………………………………………………………………… 16

# TABLE OF AUTHORITIES

## <u>CASES</u>

Ashcroft v. Iqbal, 556 U.S. 662, (2009)…………………………………………………. 8, 15

Behrens v. Pelletier, 516 U.S. 299, (1996)…………………………………………….... 9

Capogrosso v. Supreme Court of N.J., 588 F.3d 180, 185, (3d Cir. 2009),……..………..... 9

*Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 533, (1993)…………….... 12

In re "E", 59 N.J. 36, 53, 279 A.2d 785 (1971)………………………………………...… 12

Harlow v. Fitzgerald, 457 U.S. 800, (1982)………………………………….…………….. 11

Hope v. Pelzer, 536 U.S. 730, (2002) ……………………………………...…….. 11, 12, 13

*Kiesla v. Hughes* 138 S. Ct. 1148 (2018)……………………………………..……… 13

Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n, 138 S. Ct. 1719 (2018)……..... 12

MCI Telecomm. Corp. v. Bell Atl. Pennsylvania, 271 F.3d 491, 503 (3d Cir. 2001)……….. 8

Monell v. Dep't of Soc. Servs., 436 U.S. 658, 707, (1978)…………………………...……. 9

Obergefell v. Hodges, 135 S. Ct. 2584 (2015). ……………………………………….. 12

State. New Jersey Property-Liability Ins. Guaranty Asso. v. State,
 195 N.J. Super. 4, (App. Div. 1984)……………………………………………………… 15

Verizon Md. Inc. v. PSC, 535 U.S. 635, ( 2002)…..9

## <u>COURT RULES</u>

Under Fed. R. Civ. P. 8(a)(2)…………………………………….………………………… 8

## STATUTES

42 U.S.C.S. § 198……………………………………………………………………… 1

42 U.S.C.S.§ 1985……………………………………………………………...……… 1

## PRELIMINARY STATEMENT

It has been determined in the Third Circuit Court of Appeals that Plaintiffs have plead a viable cause of action against the Defendants Pursuant to 42 U.S.C.S.§ 1985 and §1983.

The Defendants now seek to dismiss Plaintiffs cause of action by asserting the defense of qualified immunity.

The Plaintiffs seek primarily injunctive relief against the Defendants. Qualified immunity does not shield the Defendants from being sued but only shields them from liability. Because Plaintiffs seek injunctive relief, the Defendants cannot assert the defense of qualified immunity as a basis to dismiss the complaint.

## STATEMENT OF FACTS

The Plaintiffs, Michael and Jennifer Lasche were Foster Parents licensed by the State of New Jersey.  They are devout Christians who hold to traditional values and beliefs about family, marriage and sex. Plaintiffs had Fostered children prior to the events set forth herein. Jennifer Lasche is also a former foster child who was adopted by her Foster Parents. *See* Second Amended Complaint ¶ 1

On or about September 1, 2017, the defendants Kyle Higgins and Katie Epperly called the Plaintiffs about two girls being removed from a foster home and asked if Plaintiffs would take them in. The girls were ages 13 (hereinafter referred to as "Foster child 1") and 10 (hereinafter referred to as "Foster child 2") (hereinafter collectively referred to as the "Foster children"). Plaintiffs agreed to the placement. Foster Child 1 was the oldest of five siblings placed in Foster Care. *Ibid* ¶ 8

During the placement, Kyle Higgins advised the Plaintiffs that the girls' cases were moving

1

towards adoption and that the natural father's rights were already terminated. *Ibid* ¶ 9

In October of 2017, during the monthly visit, Kyle Higgins advised Plaintiffs that the case is moving towards adoption and that they would have the first choice to adopt the girls. In November of 2017, Plaintiffs were advised that the natural mother had surrendered her parental rights and that the children were now free for adoption. In December of 2017, Kyle Higgins met with the Plaintiffs and informed them that they were in consideration for adoption. *Ibid* ¶ ¶ 10, 11, 12

Three weeks after the December meeting, Plaintiffs were informed by Kyle Higgins that a family in Illinois was interested in adopting all five children and Plaintiffs were told what the plan was for proceeding with that. *Ibid* ¶ 13

The Plaintiffs and the children both asked Defendants Kyle Higgins and Katie Epperly questions about the family. These defendants claimed to not know the answers.  It later came to the attention of Plaintiffs, that the foster parents of the two younger brothers and younger sister of the Foster child 1 and Foster child 2 had been given details about the Illinois family. One of the foster parents advised Plaintiffs that the potential adoptive family "were two wealthy gay men with lots of family around to support them and the adoption." Plaintiffs were baffled as to why the caseworker refused to share this information with them. *Ibid* ¶ 14

A few days thereafter Defendant Kyle Higgins came to Plaintiffs home and expressed she heard that the two Foster children were anxious to have their questions answered about the adoptive home.  During Defendant Kyle Higgin's discussion with the Foster Child 1 she questioned the child about her religious beliefs concerning homosexuality and asked her if she would change her religious beliefs if she went with another family. Ibid ¶ 15

On May 22, 2018 Plaintiff Jennifer Lasche met with Kyle Higgins and the therapist for the

Foster Child 1. At that meeting Plaintiff, Defendant Higgins and the therapist agreed not to discuss adoption with the foster child because it was too soon after Foster Child 2's removal and put too much pressure on Foster Child 1. The therapist said that she wanted Foster Child 1 to just be able to relax and be part of the family as they all got readjusted to the new living situation. Plaintiff agreed this was best for Foster Child 1. There was some discussion among the meeting participants of Foster Child 1 possibly exploring time with her siblings to see if she wanted to be adopted with them. Plaintiff was not opposed to letting Foster Child 1 explore that and allowing her to make the decision without any question or resentment. Ibid ¶ 17

At that meeting, Defendant Higgins discussed that there was going to be a Court date on June 4, 2018, where the options for all five Foster children would be presented to the Judge for a decision as to what would be best for the children. Those options would be for the Foster Children to be adopted by the families where they were currently placed or for all five Foster children to be adopted by the Illinois family. Defendant Higgins further represented that the Division was not going to take a position but instead would let the law guardians advocate for the Children. *Ibid* ¶ 18

On June 4, 2018, the Plaintiffs received a text from Foster child 1's law guardian that the Illinois couple was off the table and that the judge wanted psychiatric evaluations of all of the children before a permanent plan was put into place. It was at this point that the attitude of the case worker towards the Plaintiffs radically changed. *Ibid* ¶ 19

On or about June 31, 2018 Foster child 1 came home from her regularly scheduled therapy meeting and appeared very upset.  She stated she was upset because the therapist kept bringing up religion and told her she should not feel pressured to follow her foster family's religious beliefs. *Ibid* ¶ 20

On June 19, 2018 Plaintiff Jennifer Lasche received a phone call from Defendant Kyle Higgins who begins to discuss transitioning Foster child 1 to her foster brother's home. Plaintiff expressed confusion because she thought the plan was to move forward with adoption of all the children in their current foster placements.    The Plaintiff then called the law guardian for Foster child 1 who expressed surprise and confusion at what was said during the conversation and said she would investigate *Ibid* ¶ ¶ 21, 22

Shortly thereafter the therapist arrived at the house for Foster Child 1's therapy session. Plaintiff Jennifer Lasche confronted the therapist and asked why Foster child 1 was being asked if she was being pressured to follow their religion. She tried to cover by saying it was normal to discuss how people have different beliefs, ethics, religion etc., however, after being pressed the Therapist admitted getting a phone call from Defendant Higgins before the session. The Therapist said that the Division brought to her attention that there had been a conversation that was had with Plaintiffs about the Foster Children being placed out of state with a homosexual couple, The Therapist also stated that there was "a conversation with Defendant Kyle Higgins about the Illinois couple" and "discussion about "Plaintiffs' ideas about same-sex couples."  She also said that in that conversation Defendant Kyle Higgins told the therapist that the therapist was to discuss with Foster child 1 being placed with her brothers. *Ibid* ¶ 23

It is clear from this conversation that the Defendant Kyle Higgins wanted to place the Children with the Indiana Couple and that she felt the Plaintiffs religious beliefs had been passed on to the Foster Children and interfered with that placement. At this point the Defendant Kyle Higgins conduct and the Conduct of the other Defendants became even more hostile. Ibid ¶ 24

On or about June 21, 2018, Foster Child 1 was picked by Defendant Kyle Higgins and another woman ostensibly for her sibling visit. It was very rare for Defendant Kyle Higgins to

4

transport Foster Child 1 to this visit. On information and belief, they stopped at Dunkin Donuts where they interrogated Foster child 1 and lied to her in an effort to intimidate her into agreeing that she did not want to be adopted by Plaintiffs. For instance, Defendant Kyle Higgins asked the Foster child "So I hear that Mrs. Lasche tells you every time I call her" This statement was untrue and Defendant had no way of knowing if this was the case or not. While at the Dunkin Donuts, Defendant Kyle Higgins told Foster Child 1 that Plaintiffs would not be able to "meet her needs." They once again interrogated Foster Child 1 about her religious beliefs. At the conclusion of this interrogation instead of taking Foster Child 1 to the office for her sibling visit, as was usually the case, she was taken to the home where her foster brothers were living. *Ibid* ¶ 25.26

On return Defendant Kyle Higgins stated to Plaintiffs that she knew Foster Child 1 wanted to stay with them and that "we' (the DCP&P) understand that and "want to work with you because we want what's in her (foster Child 1's) best interests. Defendant Kyle Higgins then stated, "We (DCP&P) would like to have a meeting with you". *Ibid* ¶ 28

The next day, Plaintiffs spoke to Defendants Kyle Higgins and Katie Epperly on the telephone to schedule the meeting. When questioned about the purpose of the meeting, Defendant Katie Epperly indicated that the DCP&P was concerned that both Foster child 1 and Foster Child 2 indicated that same-sex relationships were against their religion. Defendant Katie Epperly stated that "they" felt the children had gotten that belief from the Plaintiffs. That the Defendant indicated that they were concerned that the Foster Children had adopted a religious belief of the Plaintiffs indicates a hostility to that religious belief.   *Ibid* ¶ 29

There are no regulations which prohibit Foster Pants sharing religious beliefs.  *Ibid* ¶ 30

Plaintiffs have been active Foster parents for over 10 years and have known numerous

Foster Parents and have never heard of parents or children being questioned about their religious beliefs or having a child removed on the basis of a parents religious beliefs. *Ibid* ¶ 31

On Friday, June 29, 2018, a meeting was held at the Monmouth County office of the DCP&P.  Present at that meeting were the Plaintiffs, their attorney, Defendants Kyle Higgins, Katie Epperly, Mary Lippincott and Janelle Clark, an attorney for the State of New Jersey, and one or two additional employees of the DCP&P. *Ibid* ¶ 33

At the June 29th meeting, the representatives of the DCP&P expressed concern that the Plaintiffs believed homosexuality was a sin.  They expressed concern that the Plaintiffs would reject Foster child 1 if she ever decided to explore her sexuality and sought assurance from the Plaintiffs that would not be the case. One of the individual defendants indicted that Foster child 1 would need therapy to deal with her belief that homosexuality was a sin to avoid possible future harm suggesting that a belief that homosexuality was a sin was some type of mental disorder that required treatment. Almost the entire meeting was about Plaintiffs belief that homosexuality was a sin.  It was clear to the Plaintiffs from this meeting that the Defendants were hostile to the Plaintiffs religious beliefs regarding homosexuality. *Ibid* ¶ 34

On Monday, July 2, 2018, the DCP&P went before the Family Court and sought the removal of Foster Child 1 from Plaintiffs' custody.  The law guardian appointed to represent the interests of Foster Child 1 told Plaintiffs that this was done over her objections.     Plaintiffs were not given notice that they had a right to be heard at the hearing. On information and belief case workers for the DCP&P do not usually ignore statutory mandates. This failure to give notice in accordance with the law is evidence that the Defendants were trying to hide something from Plaintiffs and were acting in bad faith. Defendant's bad faith was due to their hostility to the Plaintiffs Religious beliefs as expressed in the meeting the day before. *Ibid* ¶ 35

The next day the DCP&P removed Foster child 1 from Plaintiffs' home in spite of their wish to adopt said child and in complete disregard of the wishes of the child. Foster Child 1 was placed in the foster home where foster child 2 had been placed. Plaintiffs have not seen the child since July 3, 2018. *Ibid* ¶ 38

On information and belief, a therapist had advised the DCP&P that because, as the oldest child of the five siblings, Foster child 1 had become so "parentified" by her younger siblings as a result of trauma in the biological home. The therapist further opined that it was in Foster Child 1's best interests to be adopted alone. In spite of this the Defendants sought to have the child adopted with a sibling rather than by the Plaintiffs because their hostility to Plaintiffs religious beliefs were so strong. *Ibid* ¶ 39

On October 12, 2018, a representative of the DCP&P arrived at the Plaintiffs' house to perform the required yearly inspection that is necessary for a Foster Parents license to be renewed. When the inspection was completed, the inspector asked the Plaintiffs if they knew that their license was suspended by the Monmouth County DCP&P office.  Plaintiffs informed the inspector that they were not aware that they had been suspended. The inspector then informed them that the Monmouth County office should have notified Plaintiffs that they were suspended and told them what the reasons for the suspension were. *Ibid* ¶ ¶ 40, 41

Plaintiffs' qualifications to be foster parents had never been questioned and they had been relicensed as foster parents on a regular basis over a 10 year period with no complaints against them. It was not until the Defendants found out about Plaintiffs religious beliefs regarding homosexuality that they were suddenly found unfit to adopt a child or to be Foster Parents. Ibid ¶ 43

As of this date they have still not been given a reason by DCP&P for their suspension. Ibid

¶ 44

## **STANDARD OF REVIEW**

Under Fed. R. Civ. P. 8(a) (2), a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. The rule does not require detailed factual allegations be plead, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, *Ashcroft v. Iqbal*, 556 U.S. 662, 662, 129 S. Ct. 1937, 1939, 173 L. Ed. 2d 868, 868, 2009)

## **LEGAL ARGMENT**
## **POINT 1**
## **THE DEFENSE OF QUALIFIED IMMUNITY IS NOT AVAILABLE TO THE DEFENDANTS BECAUSE PLAINTIFFS ARE SEEKING INJUNCTIVE RELIEF.**

Defendants argue that Plaintiffs counts 2 and 3 of the Complaint should be dismissed because, no clearly defined right was violated and therefore, Defendants are entitled to assert the defense of qualified immunity.

The Eleventh Amendment to the United States Constitution protects a non-consenting state or state agencies from a suit brought in Federal Court. See *MCI Telecomm. Corp. v. Bell Atl. Pennsylvania,* 271 F.3d 491, 503 (3d Cir. 2001). This immunity does not extend to individual state officers sued in their individual capacities for prospective injunctive or

declaratory relief to remedy ongoing violations of federal law. <u>Capogrosso v. Supreme Court of N.J.</u>, 588 F.3d 180, 185, (3d Cir. 2009), see also *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 707, (1978). These cases make it clear that the Federal Courts have the power to enter injunctive relief against individual defendants who work for the State

 Further the qualified immunity right, not to be subjected to trial, <u>is eliminated</u>, so long as the complaint seeks injunctive relief. In that event, no "clearly established" right need be alleged. <u>Behrens v. Pelletier</u>, 516 U.S. 299, 301, 116 S. Ct. 834, 836, 133 L. Ed. 2d 773, 780, (1996).

 Because Plaintiffs seek injunctive relief, they are not required to make a showing that a "clearly established right" has been violated

Defendants next argue that Plaintiffs can not avail themselves to this exception to qualified immunity because, they are not entitled to injunctive relief.

 In addressing that issue it should first be noted that the 3rd Circuit Court of Appeals has already held that Plaintiffs have alleged a plausible claim that their foster parent license was suspended because of their religious beliefs and their exercise of their free speech rights (Exhibit A, p. 13-14).

 In arguing that Plaintiffs are not entitled to injunctive relief Defendants rely on an Eleventh Amendment Immunity case, *Verizon Md. Inc. v. PSC*, 535 U.S. 635, 122 S. Ct. 1753, 152 L. Ed. 2d 871, ( 2002). That case held that in determining whether a claim for injunctive relief avoids an Eleventh Amendment bar to suit, a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id.* at 645. As per the 3rd circuit Plaintiffs have alleged a violation of Federal civil rights laws.  It is an ongoing violation because it has not been cured.

Plaintiffs have not been unconditionally been restored as Foster Parents. Plaintiffs meet the second prong of the test because they seek an injunction ordering them to be reinstated as Foster Parents and prohibiting further discrimination against them by these defendants.

Plaintiff is not, as Defendants state trying to "squeeze" this case into any exception. This case fits squarely within the exception. Unlike the cases Defendants cite there is an <u>ongoing violation of the Plaintiffs Constitutional</u> rights.  They continue to be punished for their religious views and speech.

Finally Defendant argues that Plaintiffs have not bet their burden because they do not name the specific official or officials of the DCCP that suspended their license. First as pointed out the 3rd circuit held that there was a plausible claim that Plaintiffs foster parent license was suspended for unconstitutional reasons. The Court's <u>finding of a plausible claim is based on the behavior of the named Defendants.</u>  Defendant seems to be attempting to re-litigate that issue. What is not a plausible claim, is that none of the named Defendants had a part in the decision to suspend the license. It is true that, at this juncture, Plaintiff does not know exactly which parties played a part, however, it is clear that <u>someone in the Division suspended the license</u>. It may very well be that people who Plaintiffs are unaware of suspended the license, or at least played a part in that decision.  That is why Plaintiffs took the entirely permissible step of naming "Doe" Defendants in the Complaint. When through discovery the Plaintiffs reveal exactly which parties had a hand in the suspension the Complaint will be amended accordingly. None of that changes the fact that the license was suspended, is still suspended, and that 3rd circuit Court of Appeals held that Plaintiffs have stated a plausible claim, that individuals in the DCC were involved in suspending that license in violation of the Plaintiffs' First Amendment Rights.

## POINT II

## THE DEFENSE OF QUALIFIED IMMUNITY IS NOT AVAILABLE TO THE DEFENDANTS BECAUSE THEY VIOLATED A CLEARLY ESTABLISHED RIGHT.

To the extent the Plaintiff has a damages claim, whether it be actual or nominal that damages claim is barred by the doctrine of qualified immunity.

The Supreme Court has held that despite their participation in constitutionally impermissible conduct, parties may nevertheless be shielded from liability for civil damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known", *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666, 678, (2002) citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982).

The Court in Hope went on to state  that officials can be on notice that their conduct violates established law even in novel factual circumstances and that they expressly rejected a requirement that previous cases be "fundamentally similar." Although earlier cases involving "fundamentally similar" facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding. The same is true of cases with "materially similar" facts. The salient question that should be asked is whether the state of the law at the time gave respondents fair warning that their alleged conduct was unconstitutional. *Hope, Supra.* at 741.

The Court went on to state that,

> "This is not to say, of course, that the single warning standard points to a single level of specificity sufficient in every instance. In some circumstances, as when an earlier case expressly leaves open

11

whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful,' *Anderson, supra*, at 640." 74 F.3d 266 at 270-271 (citation omitted). *Hope v. Pelzer,* 536 U.S. 730, 740-741, 1 (2002)

The question here is, should workers in the DCPP know that they should not make decisions about whether a person can be a foster parent based on their disagreement with the religious beliefs of a person.  Numerous cases would lead a reasonable state caseworker to conclude that it is impermissible to discriminate against someone based on their religious beliefs.

In *Church of Lukumi Babalu Aye v. City of Hialeah,* 508 U.S. 520, 533, (1993), the Court held that a law targeting religious beliefs as such is never permissible. More recently, the Supreme Court held in *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1720, (2018) that "The government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices. The Free Exercise Clause bars even subtle departures from neutrality on matters of religion. More specifically, I will point to the New Jersey State Supreme the case *In re "E"*, 59 N.J. 36, 53, 279 A.2d 785 (1971), where the Court held that discrimination based on religious belief when making adoption decisions is impermissible.

On the issue of religious beliefs regarding homosexuality and whether that can be a basis for discrimination, I would point the Defendants to the words of Justice Kennedy in *Obergefell v. Hodges,* 135 S. Ct. 2584, 2607, 192 L.Ed.2d 609, 634 (2015).

> It must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned. The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths and to their own deep aspirations to continue the family structure they have long revered.

This is a clear expression from the Supreme Court that discrimination on the basis of a person's religious beliefs about homosexuality is not permissible. Based on this case law it should be obvious to anyone that prohibiting a person from being a foster parent because of their religious beliefs, even their beliefs about homosexuality, is impermissible.

Defendants rely on cases such as *Kiesla v. Hughes* 138 S. Ct. 1148 (2018), which, suggest that the conduct alleged to be unconstitutional must very similar to previous instances of conduct held to be unconstitutional for police officers to lose the defense of qualified immunity. *Kiesla v. Hughes* 138 S. Ct. 1148 (2018). *Kiesla* dealt with police officers making life and death decisions under emergent circumstances. The Supreme Court also pointed out the many conflicting cases in the lower court that could have led a police officer to reach a different conclusion regarding when it is appropriate to use deadly force. Neither *Kyla* nor any other case Defendants cite overrule *Hope v. Pelzer* (citation omitted). *Kyla* was not a rejection of *Hope v. Pelzer* but a clarification of its application in a factual scenario far removed from the scenario currently before the Court. *Hope* made it clear that different factual scenarios may require different levels of particularity.  There is sufficient decisional authority to give government officials fair notice that they should not deny benefits too or take punitive actions against people based solely on their religious beliefs, even when those beliefs concern the issue of sexual orientation.

Finally Defendants seem to make the argument that the Plaintiffs have not alleged in the Complaint that their license would not have been suspended if their disapproval of homosexuality was based on secular reasons. Therefore, if the decision of the Division to suspend the license was religious neutral then cases involving religious discrimination don't put them on notice that their conduct was unconstitutional. First this argument is based on a factual issue, the Defendants' intent. This issue is in dispute. The second problem with this argument is that it ignores the finding of the Third Circuit that a plausible claim for religious discrimination has been plead. Certainly during the litigation the Defendants can attempt to disprove that claim but for the purposes of this motion the claim that their actions were for religious discriminatory reasons must be assumed.  Defendants can't re-litigate issues decided by the Third Circuit.

## POINT III

## SHOULD THE PLAINTIFFS FEDERAL CLAIMS BE DISMISSED THE COURT SHOULD NOT DISMISS PLAINTIFFS STATE CLAIM BUT SHOULD REMAND IT.

Plaintiffs originally filed their complaint in State Court.  The State Attorney General's office then made the decision to remove this case to Federal Court.  If the court dismisses the remaining Federal claims rather than dismiss the State claim, the case should be remanded back to the State Court under its original State Docket Number. Plaintiffs would further request that the order for remand be held in abeyance until the time to file an appeal has run.

## POINT IV

## ADDRESSING THE LAD CLAIM ON ITS MERITS IS PREMATURE

Defendants attempt to dispose of Plaintiffs state claim on grounds that would be more appropriate for a motion for summary judgment. First the standard that Defendant has put forth is

the standard that is used when a claim is based on an employment relationship. It is far from

clear that Foster Parents would be considered employees. In fact it has been held that for

purposes of the Torts Claim Act that Foster Parents are not employees of the *State. New Jersey*

*Property-Liability Ins. Guaranty Asso. v. State,* 195 N.J. Super. 4, 477 A.2d 826, (App. Div.

1984).  This is a public accommodations case.  There is no case law that has been cited, or that

counsel can find, the states, if I refuse to serve someone because of their religious belief but if I

would also refuse to serve someone who had the same belief but for a secular reason then I have

not violated the statute.  In this case we are clearly talking about a religious belief.  The belief

that homosexual conduct is a sin. Sin is a religious concept.

More importantly, complaints that state a plausible grounds for relief survive a motion to

dismiss. *Ashcroft v. Iqbal* 566 .S, 662, 678 (2009).  It has been determined that Plaintiffs have

stated a plausible claim that they were discriminated against. Defendant is now trying to

interpose a defense appropriate for a summary judgment motion, not a motion to dismiss. The

defense being that there was a nondiscriminatory reason for what they did. Plaintiff now gets to

have discovery to see if that claim is true or just a pretext. For instance if real reasons for the

license suspension were the concerns that counsel states, then why did the Defendants prevent

Plaintiff from adopting a heterosexual teenage girl?  Why did one Defendant state that the same

teenage girl would need psychiatric counseling because she held the same religious belief as

Plaintiff? Those actions certainly indicate an animus towards certain beliefs rather than concern

for the emotional well-being of an LBGTQ child. Those are just two of the many areas Plaintiff

intends to explore to show that Defendants "defense" is a pretext. Until there is discovery in this

case, Defendants' motion to dismiss the LAD claim on the grounds stated is premature.

## CONCLUSION

For the reasons set forth herein it is respectfully requested that the Court deny the

Defendants motion to dismiss the Complaint.

Respectfully Submitted

*Michael P. Laffey*

Michael P. Laffey
Attorney for the Plaintiffs

16

# EXHIBIT A

Robert J. McGuire   **[ARGUED]**
Office of Attorney General of New Jersey
Division of Law
25 Market Street
Hughes Justice Complex
Trenton, NJ 08625

       *Counsel for Appellees*

––––––––––––––

OPINION*

––––––––––––––

PHIPPS, *Circuit Judge.*

    Two foster parents with religious views against same-sex marriage and homosexual conduct had their foster child removed and their foster license suspended. The foster parents claim that a New Jersey state agency took those actions based on their religious beliefs. On that premise, the foster parents sued the state agency and four of its employees on multiple grounds, including claims under two federal civil rights statutes, 42 U.S.C. § 1983 and § 1985(3), and also under New Jersey's Law Against Discrimination, *see* N.J. Stat. Ann. § 10:5-13(a)(2). After two rounds of motions to dismiss, the District Court dismissed the original complaint and the amended complaint for failure to state a claim for relief. *See* Fed. R. Civ. P. 12(b)(6).

    In this appeal, the foster parents challenge the orders dismissing their claims against four employees of the state agency in their individual capacities. On *de novo*

–––––––––––––––––––––––

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

review, *see St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295, 299 (3d Cir. 2020), we will affirm those orders in part, vacate them in part, and remand the case.

## I.  FACTUAL BACKGROUND (BASED ON ALLEGATIONS IN THE COMPLAINT)

A Christian couple in New Jersey, Michael and Jennifer Lasche, have "traditional values and beliefs about family, marriage and sex."  Am. Compl. ¶ 1 (App. 107).  For over ten years, they served as foster parents.

In September 2017, the Monmouth County Office of the New Jersey Division of Child Placement and Permanency ('DCPP') contacted the Lasches about fostering two children.  The children were sisters, one was thirteen ('Foster Child 1') and the other was ten ('Foster Child 2').  They also had three younger siblings who were placed in foster care.  After speaking with a DCPP caseworker, Kyle Higgins, and her supervisor, Katie Epperly, the Lasches agreed to foster the two girls.  By November 2017, the girls' biological parents no longer retained any parental rights, and in October and December the Lasches heard from the caseworker, Higgins, that they were under consideration to adopt the girls.

But three weeks after informing the Lasches that they might be able to adopt the children, Higgins told the Lasches that a couple in Illinois was interested in adopting all five siblings.  The Lasches inquired about the prospective adoptive family, and both Higgins and her supervisor, Epperly, stated that they did not know the answers to those questions.  Later, in discussing the putative adoption with the foster parents for the other siblings, the Lasches learned that the Illinois couple was "two wealthy gay men with lots

of family around to support them and the adoption." Am. Compl. ¶ 14 (App. 109). A few days later, Higgins came to the Lasches' home and questioned Foster Child 1 about whether she would change her religious beliefs about homosexual conduct – which she held before meeting the Lasches – if she were placed with another family. About four months later, for reasons that remain confidential, the Lasches and DCPP agreed that Foster Child 2 should be removed from the Lasches' home.

During that time and for two months afterwards, the prospective adoption of all five siblings by the Illinois couple remained under consideration. In a meeting with Higgins and the therapist for Foster Child 1 in May 2018, Jennifer Lasche stated that she did not oppose allowing Foster Child 1 to spend time with her siblings to see if she wanted to be adopted with them. At that meeting, Jennifer Lasche also received an update on the adoption process. Higgins explained that DCPP would present two placement options at an upcoming court hearing, and DCPP would not take a position on either. The first option was for the children to be adopted by their current foster families; the second was for the Illinois couple to adopt all five children.

The hearing on June 4, 2018, was eventful. The Illinois couple no longer had an interest in adopting any of the five siblings. And the judge indicated that the children needed psychiatric evaluations moving forward.

After that hearing, inquiries about the Lasches' religious beliefs intensified. Later that month, Foster Child 1 came home from a therapy session visibly upset because the therapist repeatedly brought up religion and told her not to feel pressured to follow the Lasches' religious beliefs. When Jennifer Lasche confronted the therapist, the therapist

4

relayed that she and Higgins had previously discussed the Lasches' "ideas about same-sex couples." Am. Compl. ¶ 23 (App. 111). Later, after picking up Foster Child 1 for her sibling visit, Higgins and an unnamed woman stopped at a Dunkin' Donuts where they questioned Foster Child 1 about her religious beliefs. Although Higgins told Foster Child 1 that the Lasches could not "meet her needs," Am. Compl. ¶ 26 (App. 112), that did not dissuade Foster Child 1 from wanting to remain with the Lasches.

Around that same time, Higgins called Jennifer Lasche to discuss transitioning Foster Child 1 to her foster brother's home. That news came as a surprise to Jennifer Lasche because she was under the impression that since adoption by the Illinois couple was no longer an option, the children would be adopted by their current foster families.

Shortly afterwards, DCPP scheduled a meeting with the Lasches to discuss Foster Child 1's best interests. During the call to schedule the meeting, Epperly previewed her concern that the Lasches influenced Foster Child 1 and Foster Child 2 with their views on same-sex relationships. The meeting on June 29, 2018, at the Monmouth County DCPP office involved several people: the Lasches, their attorney, four DCPP employees (Kyle Higgins, Katie Epperly, Mary Lippencot, and Janelle Clark), one or two additional DCPP representatives, and an attorney for the State of New Jersey.

The central topic of the meeting was the Lasches' religious beliefs about the sinfulness of homosexual conduct. The DCPP employees expressed concern about the Lasches' belief that homosexual conduct was a sin, and they agreed that the Lasches' religious beliefs were a problem. They also sought assurance from the Lasches that they would not reject Foster Child 1 if she ever decided to explore her sexuality. One DCPP

5

representative remarked that Foster Child 1 would need therapy to deal with her belief that homosexual conduct is a sin.

A few days later, the Lasches again received surprising news.  On July 2, 2018, without providing the Lasches with the statutorily required notice,[1] DCPP representatives went to family court and sought the removal of Foster Child 1 from the Lasches' custody. Foster Child 1's law guardian – an attorney appointed to provide legal representation to children in family court on matters involving allegations of abuse and neglect, or the potential termination of parental rights[2] – attended the hearing and objected to the removal of Foster Child 1 from the Lasches' home.  The next day, however, Foster Child 1 was removed and placed in the same home as Foster Child 2.

Three months later, the Lasches learned something else that they should have known earlier.  During the annual inspection for foster-parent license renewal, they discovered that DCPP had suspended their license without notice or explanation.

## II.    PROCEDURAL HISTORY AND JURISDICTIONAL ANALYSIS

In November 2018, the Lasches filed suit in New Jersey state court for violations of federal and state law.  The Lasches brought federal claims under § 1983 and § 1985(3) for violations of their free exercise, due process, and equal protection rights.  *See* 42 U.S.C. §§ 1983, 1985(3).  They also brought state law claims under the New Jersey Law Against Discrimination ('LAD') and the New Jersey Civil Rights Act.  The

---

[1] *See* N.J. Stat. Ann. § 30:4C-12.2; *id.* § 30:4C-61.2(b)(7).

[2] *See* New Jersey Office of the Public Defender, *Structure: Office of Law Guardian (OLG)*, https://www.state.nj.us/defender/structure/olg/ (last visited February 8, 2022).

defendants – the State of New Jersey, the DCPP, and four DCPP employees (Kyle Higgins, Katie Epperly, Mary Lippencot, and Janelle Clark)[3] – removed the case to the District Court based on federal-question jurisdiction.  28 U.S.C. § 1441(a); *see also* 28 U.S.C. § 1331; 28 U.S.C. § 1367(a).

The defendants filed a motion to dismiss the Lasches' complaint.  In granting that motion, the District Court dismissed all of the Lasches' state-law claims with prejudice. It also dismissed with prejudice several of the Lasches' federal claims, specifically those against the State, the DCPP, and the DCPP-employee defendants in their official capacities, as well as the entirety of the § 1983 and § 1985(3) claims premised on a due process violation.  In dismissing the remaining claims without prejudice, the District Court permitted the Lasches thirty days to amend their complaint.

The Lasches filed an amended complaint within that time.  The individual-capacity defendants filed a motion to dismiss that challenged the sufficiency of the allegations in the amended complaint and asserted a qualified-immunity defense.  The District Court determined that the allegations in the amended complaint were insufficient and granted the motion without addressing qualified immunity.  Its order of dismissal allowed the Lasches another thirty days to file a motion to amend the complaint but only with respect to their § 1983 claim for violations of the First Amendment.  If the Lasches did not so move, the order directed closure of the case.

---

[3] The complaint also listed ten 'Doe' defendants, but to date those defendants have not been identified or served.

The Lasches did not file a motion to amend that claim; instead, within nineteen days of the order, they appealed. Had they also filed a motion to amend their complaint within the thirty-day window, then the District Court's order would not have been a final appealable order. But under this Circuit's stand-on-the-complaint rule, *see Weber v. McGrogan*, 939 F.3d 232, 239–41 (3d Cir. 2019), by not also moving to amend, they fall within this Court's appellate jurisdiction over final orders, *see Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851 n.5 (3d Cir. 1992); *see also* 28 U.S.C. § 1291.

## III. DISCUSSION

The plausibility of claims challenged at the motion-to-dismiss stage is analyzed through a three-step process. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). The first step is the articulation of the elements of the claim. *See id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). The second step involves reviewing the complaint to disregard any '"formulaic recitation[s] of the elements of a . . . claim' or other legal conclusion," *id.* at 789 (alteration in original) (quoting *Iqbal*, 556 U.S. at 681), as well as allegations that are "so threadbare or speculative that they fail to cross the line between the conclusory and the factual," *id.* at 790 (citation omitted). The third step evaluates the plausibility of the remaining allegations – after assuming their veracity, construing them in the light most favorable to the plaintiff, and drawing all reasonable inferences in the plaintiff's favor. *See id.* at 787, 790; *see also Iqbal*, 556 U.S. at 679; *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

If, after completing this process, the complaint alleges "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the necessary elements of

a claim, then it plausibly pleads a claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). But if "a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).

## A. First Amendment Retaliation

The District Court dismissed the Lasches' § 1983 claim against the individual-capacity defendants for First Amendment retaliation on two grounds. First, it concluded that, as a matter of law, foster parents sharing religious views with their foster children was not constitutionally protected conduct. Second, it determined that the complaint did not contain plausible allegations of a causal link between the Lasches' religious beliefs and the alleged retaliatory actions. The individual-capacity defendants defend that ruling on both grounds, and they also raise a qualified-immunity defense. Because the District Court erred in both of its conclusions, we will partially vacate its orders, leaving initial consideration of the qualified-immunity defense for the District Court on remand.

1. Articulation of the Elements. By its text, § 1983 allows civil suits for *deprivations* of federal rights. *See* 42 U.S.C. § 1983. Courts also permit § 1983 claims for *retaliation* in response to the exercise of constitutional rights, including First Amendment rights. *See, e.g.*, *Mirabella v. Villard*, 853 F.3d 641, 648–49 (3d Cir. 2017). Such a retaliation claim has three elements:

(1)     constitutionally protected conduct;

(2)     retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and

(3)      a causal link between the constitutionally protected conduct and the retaliatory action.

*See id.* at 649.

2.  Identification of Deficient Allegations.  Some allegations in the amended complaint do little more than parrot the elements of a First Amendment retaliation claim. *See* Am. Compl. ¶ 46 (App. 116) (alleging that "the individual defendants acted under color of state law"); *id.* ¶ 47 (App. 116) (alleging that they took "retaliatory action" against the Lasches because of their religious beliefs "in violation of the First Amendment"); *id.* ¶ 48 (App. 116) (alleging "retaliatory action" because of "a religious practice" that was "a violation of the First Amendment"); *id.* ¶ 49 (App. 116) (alleging "retaliatory action" based on the Lasches' speech "in violation of the First Amendment"). Those formulaic allegations receive no weight in the plausibility analysis.  *See Connelly*, 809 F.3d at 789–90.

3.  Evaluation of the Remaining Allegations.  Even without crediting the deficient allegations, the Lasches state a plausible claim for First Amendment retaliation.

*a.      Constitutionally Protected Conduct.*  Through the Free Exercise Clause, the First Amendment secures the "freedom to believe and [the] freedom to act." *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  Consistent with that protection, the Lasches allege two forms of constitutionally protected activity – one involving religious belief, and the other, action inspired by religious belief.

With respect to belief, the Lasches identify their religious opposition to same-sex marriage as constitutionally protected.  That is correct: the Free Exercise Clause provides

10

an absolute right to hold religious beliefs.  *See Cantwell*, 310 U.S. at 303; *see also Emp.
Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990) (explaining that the
Free Exercise Clause protects "the right to believe and profess whatever religious
doctrine one desires").

The Lasches also allege a plausible claim of retaliation for sharing their views on
same-sex marriage with Foster Child 1.  The Supreme Court has invalidated
governmental regulation of faith-inspired action that is not neutral and generally
applicable.  *See, e.g.*, *Fulton v. City of Phila.*, 141 S. Ct. 1868, 1878–79 (2021) (holding
that a city's non-discrimination policy was not generally applicable because it allowed for
individualized, discretionary exemptions); *see also Masterpiece Cakeshop, Ltd. v. Colo.
Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1731 (2018) (explaining that state action based on
"hostility to a religion or religious viewpoint" violates the state's obligation under the
Free Exercise Clause to "proceed in a manner neutral toward" religion); *Church of the
Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531–32 (1993).  And here, the
individual-capacity defendants do not identify a neutral, generally applicable basis for
their treatment of the Lasches.  Nor is such a reason apparent from the pleadings.  For
instance, the Lasches' actions do not conflict with the biological parents' rights because
Foster Child 1's father's rights were terminated and her mother abandoned her parental
rights.  Thus, the Lasches plausibly allege that they engaged in constitutionally protected
conduct by sharing their religious views on same-sex marriage with Foster Child 1.  *See
Obergefell v. Hodges*, 576 U.S. 644, 679 (2015) (emphasizing that the First Amendment
ensures "that religions, and those who adhere to religious doctrines, may continue to

advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned").

**b.**      ***Retaliatory Action.***  The Lasches also plausibly allege that the individual-capacity defendants acted to remove Foster Child 1 from their care and suspended their foster license.  Both of those actions would deter people "of ordinary firmness from exercising [their] constitutional rights," and for that reason they qualify as retaliatory. *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) (citation omitted).

**c.**      ***Causation.***  To complete their claim, the Lasches must allege facts that their constitutionally protected activity was a "substantial or motivating factor" for the retaliatory actions.  *Conard v. Pa. State Police*, 902 F.3d 178, 184 (3d Cir. 2018) (citation omitted).  That may be demonstrated through "unusually suggestive temporal proximity" between the protected conduct and the retaliatory action, *Mirabella*, 853 F.3d at 652 (citation omitted), or through a "pattern of antagonism" coupled with suggestive timing, *Conard*, 902 F.3d at 184 (citation omitted).

Here, the timing of the retaliatory actions would ordinarily suffice for causation. Within a month of the same-sex couple's decision not to adopt the foster children, the individual defendants failed to provide the statutorily required notice of a family court hearing, and they obtained a court order at that hearing to remove Foster Child 1 from the Lasches.  That timing is unusually suggestive.  The DCPP's decision to suspend the Lasches' foster parent license is further removed temporally.  But in light of the prior pattern of antagonism regarding the family court hearing and the removal of Foster Child 1, the timing of those events is still suggestive of retaliation.

The District Court determined that the Lasches' allegations of causation were implausible for a different reason. It concluded that the family court order of removal broke any chain of causation between the Lasches' protected activity and the individual-capacity defendants' allegedly retaliatory actions. That is only a partial defense because the court order was for the removal of Foster Child 1 – not for the suspension of the Lasches' foster license, and thus that component of the Lasches' claim survives the motion to dismiss.

But as to the removal of Foster Child 1, an intervening court order may interrupt a causal chain if the court was "provided with the appropriate facts." *Egervary v. Young*, 366 F.3d 238, 250 (3d Cir. 2004). And here, the Lasches allege only that they did not receive the statutorily required notice of the court hearing. They do not allege that the family court lacked the appropriate facts. Nor do they allege that the individual defendants misled the court as to the relevant facts. Without those allegations, the family court order interrupts the causal chain regarding the removal of Foster Child 1. Thus, the District Court did not err in dismissing the Lasches' First Amendment retaliation claim related to the removal of Foster Child 1.

### B. Equal Protection

The Lasches also sue the individual defendants for allegedly violating their rights under the Equal Protection Clause. *See* U.S. Const. amend. XIV, § 1. Their allegations fall short of the plausibility standard.

1. Articulation of the Elements. This Circuit recognizes several varieties of equal protection claims. *See PG Publ'g Co. v. Aichele*, 705 F.3d 91, 114–16 (3d Cir. 2013)

(articulating the class-of-one theory, the selective-enforcement theory, and the

inconsistent-application theory). Here, the Lasches pursue only a class-of-one theory.

*See id.* at 114–15. A class-of-one claim that does not involve discrimination based on a

protected characteristic has three elements:

(1)     differential treatment from those similarly situated;

(2)     done intentionally; and

(3)     without rational basis for the difference.

*See Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006).

    2.  Identification of Deficient Allegations. Two of the Lasches' allegations should

be disregarded. First, their allegation of similarly situated persons is conclusory. *See*

Am. Compl. ¶ 52 (App. 117) (stating that the individual defendants "discriminated

against [the Lasches] on the basis of their religious beliefs and treated them differently

than similarly situated people who do not hold those religious beliefs"). Second, in a

formulaic and conclusory manner, they allege that the individual defendants "violat[ed]"

their equal protection rights. *Id.* ¶ 53 (App. 117). Due to these deficiencies, neither of

these allegations can be considered in evaluating the plausibility of the equal protection

claim. *See Twombly*, 550 U.S. at 555; *Connelly*, 809 F.3d at 789–90 (explaining that

conclusory allegations are not entitled to a presumption of truth and excluding them on

that basis); *Fowler*, 578 F.3d at 210 (explaining that *Iqbal* instructed courts that "all civil

complaints must contain 'more than an unadorned, the-defendant-unlawfully-harmed-me

accusation'" (quoting *Iqbal*, 556 U.S. at 678)).

14

3.  Evaluation of the Remaining Allegations.  With those allegations disregarded, the Lasches do not plausibly allege the first element of a class-of-one claim – differential treatment from those similarly situated.  At most, they state that despite personally knowing many foster parents over a ten-year period, they never heard of DCPP questioning other foster parents about their religious beliefs or removing foster children due to the foster parents' religious beliefs.  Yet, in the equal protection context, persons are similarly situated "when they are alike 'in all relevant aspects.'"  *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).  The Lasches' allegation does not meet that requirement.  They allege commonality at a very general level (status as foster parents), and their statement is based on a small sample size of a large group (the foster parents that they personally know).  Also, they offer nothing in the way of the most relevant comparators: DCPP's treatment of foster parents in the context of a proposed adoption by a same-sex couple, and DCPP's treatment of foster parents holding a belief that homosexual conduct is sinful.  For these reasons, the Lasches do not plausibly allege a class-of-one equal protection violation.

To avoid that outcome, the Lasches seem to argue for relaxing the plausibility standard in this context to permit consideration of some degree of reasonable speculation.  They explain that the confidential nature of DCPP's work impedes them from finding examples of its treatment of other foster parents.  Without access to that information, the Lasches submit that there must have been hundreds of foster parents who were alike in all relevant respects except for a belief that homosexual conduct is a sin and that DCPP permitted those foster parents to adopt a foster child or did not suspend those foster

parents' license.  But a party cannot demonstrate plausibility through speculation.  *See Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief *above the speculative level*[.]" (emphasis added) (citation omitted)); *Connelly*, 809 F.3d at 790 (explaining that "threadbare or speculative" allegations receive no weight in the plausibility analysis (quotation omitted)).  Thus, the Lasches' efforts do not salvage the plausibly of their class-of-one equal protection claim.

### C.  Conspiracy under 42 U.S.C § 1985(3)

The Lasches also sue the individual-capacity defendants for conspiracy under 42 U.S.C. § 1985(3), premised on violations of their free exercise and equal protection rights.  They plausibly allege a § 1985(3) conspiracy claim for a violation of their free exercise rights, but not for an equal protection violation.

1. Articulation of the Elements.  As part of the Civil Rights Act of 1871, and later codified at § 1985(3), Congress created a private cause of action for damages against persons who conspire to violate federal rights.  *See Griffin v. Breckenridge*, 403 U.S. 88, 98–99 (1971).  That cause of action has four elements:

(1)     a conspiracy between two or more persons;

(2)     for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws;

(3)     an act in furtherance of the object of the conspiracy;

(4)     that either injures a person's person or property or deprives a person of a right or privilege of a citizen of the United States.

*See* 42 U.S.C. § 1985(3); *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828–29 (1983); *Farber v. City of Paterson*, 440 F.3d 131, 134 (3d Cir. 2006) (quotation

omitted).  In construing the purposeful mental-state requirement in the second element, the Supreme Court explained that "there must be some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action."  *Griffin*, 403 U.S. at 102.  And the class must be linked by "the characteristic that formed the basis of the targeting[.]"  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 273 n.4 (1993); *see also Farber*, 440 F.3d at 136 (explaining that the conspired-against group must have "an identifiable existence independent of the fact that its members are victims").

2.  Identification of Deficient Allegations.  The complaint recites in a formulaic fashion the mental-state element for the conspiracy.  *See* Am. Compl. ¶ 57 (App. 118) ("The individual Defendants conspired for the purpose of depriving Plaintiffs either directly or indirectly, [of] the equal protection of the laws, their First Amendment Rights and / or of the equal privileges and immunities under the laws.").  That statement, therefore, receives no consideration in evaluating the plausibility of the Lasches' § 1985(3) claim.

3.  Evaluation of the Remaining Allegations.  Because the Lasches do not plausibly allege an equal protection claim or a retaliation claim related to the removal of Foster Child 1, a violation of those rights cannot form the basis of a § 1985(3) claim.  *See Dondero v. Lower Milford Twp.*, 5 F.4th 355, 362 n.1 (3d Cir. 2021) (noting that conspiracy is only actionable under § 1983 when there is a "legal harm" (citations omitted)).  But the Lasches also premise their § 1985(3) claim on an alleged conspiracy

17

against them due to the exercise of their religious beliefs that resulted in the suspension of their foster license.

Even without the disregarded allegations, the Lasches plausibly allege such a claim. They identify a conspiracy (the first element of a § 1985(3) claim) by alleging that the individual-capacity defendants met together and told the Lasches that their "religious beliefs were a problem." Am. Compl. ¶ 55 (App. 118); *see also id.* ¶ 34 (App. 113–14) (expressing concern at the meeting with the Lasches' religious belief "that homosexuality [i]s a sin"). Those same allegations suffice for the mental-state requirement (the second element) since they support the inference that the Lasches' religious belief against same-sex marriage was the characteristic that motivated the conspirators to invidiously discriminate against them. *See Fulton*, 141 S. Ct. at 1877 (explaining that the government violates the Free Exercise Clause when it "proceeds in a manner intolerant of religious beliefs" (citing *Masterpiece Cakeshop*, 138 S. Ct. at 1730–32)). The Lasches also allege an act in furtherance of the conspiracy (the third element): despite a statutory obligation to do so, *see* N.J. Stat. Ann. § 30:4C-12.2; *id.* § 30:4C-61.2(b)(7), the individual defendants did not notify the Lasches of the court hearing regarding the removal of Foster Child 1 from their custody. The burdening of the Lasches' right to exercise their religious beliefs suffices for an injury (the fourth element). *See Griffin*, 403 U.S. at 103. Thus, the Lasches allege a plausible conspiracy claim under § 1985(3) with respect to the suspension of their foster license.

### D.  New Jersey Law Against Discrimination

The Lasches also sued four DCPP employees under New Jersey's LAD for religious discrimination in a place of public accommodation.  *See* N.J. Stat. Ann. § 10:5-13(a)(2) (authorizing civil suits by persons aggrieved by unlawful discrimination); *see also* § 10:5-4 (declaring as a civil right "the opportunity to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of . . . creed"); *id.* § 10:5-12(f)(1) (making unlawful discrimination by employees of a "place of public accommodation").  Normally, it is appropriate to engage in the three-step plausibility analysis.  *See Connelly*, 809 F.3d at 787.  But for this claim, the full treatment is unnecessary since the challenge turns on a single legal issue – the meaning of the term 'place of public accommodation.'

The District Court rejected the Lasches' LAD claim by reasoning that DCPP as an entity is not a place of public accommodation.  As an ordinary interpretation of statutory text, that conclusion appears reasonable: the premises of the DCPP may be *places* of public accommodation, but that does not mean that DCPP's entire operations would also constitute such a place.  That is consistent with the text of the LAD, which includes an extensive, but non-exhaustive list of places of public accommodation that does not specifically include governmental entities like the DCPP.[4]  Yet when a federal court

---

[4] *See* N.J. Stat. Ann. § 10:5-5(l) (defining the term "place of public accommodation" to include, but not be limited to, the following: "any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodation of those seeking health, recreation, or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession

exercises supplemental jurisdiction over a state-law claim, it must decide substantive

issues as the forum state's supreme court "would rule if it were deciding [the] case."

*Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91–92 (3d Cir. 2008); *see also Chin v.*

*Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008).  And the New Jersey Supreme Court

has, at the direction of the New Jersey Legislature, construed the term 'place of public

accommodation' liberally so that it is not "a fixed location."  *Dale v. Boy Scouts of Am.*

734 A.2d 1196, 1208–09 (N.J. 1999), *rev'd on other grounds*, 530 U.S. 640 (2000).  In

fact, the New Jersey Supreme Court has concluded that a place of public accommodation

can be "a moving situs."  *Id.* at 1210 (citation omitted); *see also id.* at 1218 (concluding

that the Boy Scouts are a place of public accommodation).  And it has emphasized the

breadth of the term 'place of public accommodation' and made clear that the LAD

applies to New Jersey governmental entities: "New Jersey governmental entities are, of

course, bound by the LAD."  *Id.* at 1212 n.7.  Since then, New Jersey's intermediate

appellate court has on two occasions held that government agencies are places of public

---

dealing with goods or services of any kind; any restaurant, eating house, or place where
food is sold for consumption on the premises; any place maintained for the sale of ice
cream, ice and fruit preparations or their derivatives, soda water or confections, or where
any beverages of any kind are retailed for consumption on the premises; any garage, any
public conveyance operated on land or water or in the air or any stations and terminals
thereof; any bathhouse, boardwalk, or seashore accommodation; any auditorium, meeting
place, or hall; any theatre, motion-picture house, music hall, roof garden, skating rink,
swimming pool, amusement and recreation park, fair, bowling alley, gymnasium,
shooting gallery, billiard and pool parlor, or other place of amusement; any comfort
station; any dispensary, clinic, or hospital; any public library; and any kindergarten,
primary and secondary school, trade or business school, high school, academy, college
and university, or any educational institution under the supervision of the State Board of
Education or the Commissioner of Education of the State of New Jersey.").

accommodation.  *See Thomas v. Cnty. of Camden*, 902 A.2d 327, 332, 334 (N.J. Super. Ct. App. Div. 2006); *Ptaszynski v. Uwaneme*, 853 A.2d 288, 297 (N.J. Super. Ct. App. Div. 2004).  Thus, despite cogent textual arguments to the contrary, it is likely that the New Jersey Supreme Court would interpret the LAD so that the DCPP – as an entity, not merely its premises – qualifies as a place of public accommodation.  With that understanding, the Lasches' LAD claim against the individual-capacity defendants, who are DCPP employees, cannot be dismissed on the basis that DCPP is not a place of public accommodation.

\* \* \*

For these reasons, we affirm in part and vacate in part.  The remaining claims against the individual-capacity defendants – those under § 1983 and § 1985(3) premised on First Amendment retaliation as well as the LAD claim – are remanded.