**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MICHAEL LASCHE and JENNIFER
LASCHE,

                    Plaintiffs,

    v.

STATE OF NEW JERSEY, *et al.*,

                  Defendants.

Civ. Action No. 18-17552 (FLW)

**OPINION**

**WOLFSON, Chief Judge**:

      This matter comes before the Court on a motion to dismiss Plaintiffs Michael and Jennifer Lasche's ("Plaintiffs") Second Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  Plaintiffs, formerly licensed foster parents, allege that defendants Kyle Higgins, Katie Epperly, Mary Lippencott, and Janelle Clark (the "Individual Defendants"), who are all employees of the New Jersey Division of Child Protection and Permanency (the "DCPP"), violated their First Amendment rights by suspending Plaintiffs' foster parent license because Plaintiffs shared their religious views regarding homosexuality with their foster children, and that the Individual Defendants and the DCPP (collectively, "Defendants") also violated New Jersey antidiscrimination law by doing so.  In a June 4, 2020 Opinion, I previously granted Defendants' motion to dismiss Plaintiffs' Amended Complaint, which asserted additional claims against Defendants under the First Amendment and the Equal Protection Clause of Fourteenth Amendment.  Plaintiffs appealed.  On March 1, 2022, a three-judge panel of the Third Circuit affirmed in part, vacated in part, and remanded the case for further review, finding that Plaintiffs had sufficiently alleged a violation of

their First Amendment rights due to the suspension of their foster parent license and instructing this Court to address the issue of qualified immunity. Plaintiffs subsequently filed their Second Amended Complaint, alleging only causes of action consistent with the Third Circuit's mandate. Now, once again, Defendants move to dismiss under Rule 12(b)(6). Plaintiffs oppose the motion.

For the reasons set forth herein, Defendants' motion to dismiss is **GRANTED**; in lieu of dismissal, Plaintiffs are given leave to amend consistent with the dictates of this Opinion. Should Plaintiffs decline the opportunity to amend, I will remand Plaintiffs' remaining state law claim to state court.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The relevant facts in this case are set forth in detail in this Court's June 4, 2020 Opinion. *See* ECF No. 24; *Lasche v. New Jersey*, No. 18-17552, 2020 WL 2989145 (D.N.J. June 4, 2020). Because the factual allegations in Plaintiffs' Second Amended Complaint are virtually identical to those previously set forth in prior versions of the complaint, a full recounting of the facts here would be duplicative and unnecessary. For context, a brief summary follows.

### A.  Plaintiffs' Second Amended Complaint

Plaintiffs are formerly licensed foster parents who identify as "devout Christians who hold to traditional values and beliefs about family, marriage and sex." ECF No. 40, Second Am. Compl. ("SAC") ¶ 1. In September 2017, the DCPP informed Plaintiffs that two sisters, ages 13 ("Foster Child 1") and 10 ("Foster Child 2"), were in need of a foster home placement and asked if Plaintiffs would be willing to care for them. *Id.* ¶ 8. Plaintiffs agreed. *Id.*

Throughout October and November 2017, Kyle Higgins, the DCPP case worker assigned to the two sisters, allegedly advised Plaintiffs that the cases were moving toward adoption and that Plaintiffs would be given "first choice" to adopt the girls. *Id.* ¶ 10. However, in late December 2017, Higgins informed Plaintiffs that a family in Illinois was interested in adopting both Foster Child 1

and 2, as well as their three siblings, who were housed elsewhere. *Id.* ¶ 13. When Plaintiffs and the two foster children asked Higgins and her supervisor, Katie Epperly, for additional information about the Illinois family, the two purportedly claimed not to know the answers to their questions. *Id.* ¶ 14. Subsequently, through a conversation with the other foster parents of Foster Child 1 and 2's siblings, Plaintiffs learned that the potential adoptee couple "were two wealthy gay men with lots of family around to support them and the adoption." *Id.* A few days later, during a discussion with Foster Child 1 at Plaintiffs' home, Higgins "questioned the child about her religious beliefs concerning homosexuality and asked her if she would change her religious beliefs if she went with another family." *Id.* ¶ 15.

To resolve the placement of the foster children, a June 4, 2018 court hearing was scheduled at which a judge was to decide whether all five siblings should be adopted by the Illinois family or adopted by the families with whom they were currently placed. *Id.* ¶¶ 17–18. On the day of the hearing, Plaintiffs were informed by Foster Child 1's law guardian that "the Illinois couple was off the table and that the judge wanted psychiatric evaluations of all the children before a permanent plan was put into place." *Id.* ¶ 19.

Thereafter, Plaintiffs allege that Higgins' attitude toward Plaintiffs "radically changed," including that she proposed transitioning Foster Child 1 to the same foster home as her brother, rather than moving forward with adoption by Plaintiffs. *Id.* ¶ 21. Plaintiffs also allege several instances in which Higgins and others questioned Foster Child 1 about her religious beliefs and views regarding homosexuality. On one occasion, Foster Child 1 came home from a regularly scheduled therapy session and informed Plaintiffs that she was upset because her "therapist kept bringing up religion and told her she should not feel pressured to follow her foster family's religious beliefs." *Id.* ¶ 20. Foster Child 1's therapist later purportedly admitted to Plaintiffs that the questions about Foster Child 1's religious views and homosexuality were prompted by a prior conversation with Higgins. *Id.* ¶

23. Plaintiffs allege that Higgins "felt that Plaintiffs' religious beliefs had been passed on to [Foster Child 1] and interfered with" placement of her and her siblings with the Illinois family. *Id.* ¶ 24. On another occasion, on June 21, 2018, Higgins picked up Foster Child 1 to visit one of her siblings and, along the way, allegedly interrogated Foster Child 1 about her religious views and desire to be adopted by Plaintiffs. *Id.* ¶¶ 25–27. Plaintiffs aver that Higgins told Foster Child 1, among other things, that Plaintiffs would not be able to "meet her needs." *Id.* ¶ 26.

On June 22, 2018, Plaintiffs spoke with Higgins and Epperly on the telephone to schedule a meeting regarding Foster Child 1's future placement. *Id.* ¶ 29. During the call, both Higgins and Epperly purportedly expressed concern that Plaintiffs had passed their religious views regarding homosexuality onto Foster Child 1. *Id.* On June 29, 2018, Plaintiffs met with DCPP representatives, including the Individual Defendants. *Id.* ¶ 34. Plaintiffs allege that "[a]lmost the entire meeting was about Plaintiffs' belief that homosexuality was a sin," and that the DCPP representatives expressed concern that "Plaintiffs would reject Foster Child 1 if she ever decided to explore her sexuality." *Id.*

A few days later, on July 2, 2018, a hearing was held before a New Jersey family court judge, and the DCPP sought to remove Foster Child 1 from Plaintiffs' home. *Id.* ¶ 35. The next day, presumably pursuant to a court order, the DCPP removed Foster Child 1 from Plaintiffs' home, and placed her in the same foster home as Foster Child 2, who had been previously transferred in April 2018, due to confidential reasons unique to Foster Child 2. *Id.* ¶¶ 16, 38.

After Foster Child 1's removal, on October 12, 2018, a DCPP representative visited Plaintiffs' home to conduct an annual inspection, which was necessary for Plaintiffs to renew their foster parent license. *Id.* ¶ 41. Following the inspection, the representative informed Plaintiffs that their foster parent license had been suspended by the Monmouth County DCPP, a fact of which Plaintiffs were unaware. *Id.* The representative allegedly told Plaintiffs that they should have been notified of the suspension and the bases for the suspension. *Id.* Plaintiffs allege that they "had been relicensed as

foster parents on a regular basis over a 10 year period with no complaints against them," and that "Defendants ignored the Rules and Regulations and did not give Plaintiffs notice as to why they were suspended because they did not have a legitimate non-discriminatory basis for the suspension." *Id.* ¶ 42.

### B.      Procedural History

On November 19, 2018, Plaintiffs filed a four-count complaint against Defendants in New Jersey state court, alleging violations of the New Jersey Law Against Discrimination ("NJLAD"), the New Jersey Civil Rights Act ("NJCRA"), 42 U.S.C § 1983, and 42 U.S.C § 1985.  On December 24, 2018, Defendants removed the matter to this Court and thereafter, moved to dismiss Plaintiffs' Complaint.  In my September 26, 2019 Opinion, I dismissed Plaintiff's' claims and granted Plaintiffs leave to amend their Complaint.  ECF No. 14.  On October 24, 2019, Plaintiffs filed an Amended Complaint re-asserting the Equal Protection and First Amendment claims under § 1983 and their § 1985 conspiracy claim.  ECF No. 16.  Defendants then moved to dismiss the Amended Complaint. In my June 4, 2020 Opinion, I granted Defendants' motion to dismiss in its entirety.  ECF No. 24. Plaintiffs appealed to the Third Circuit.

In a March 1, 2022 Unpublished Opinion, a three-judge panel of the Third Circuit affirmed in part and reversed in part the prior decisions of this Court dismissing Plaintiffs' claims.  *See Lasche v. New Jersey*, No. 20-2325, 2022 WL 604025 (3d Cir. Mar. 1, 2022).  The Third Circuit affirmed the dismissal of Plaintiffs' Equal Protection claims and Plaintiffs' First Amendment retaliation claim arising from the removal of Foster Child 1.  *Id.* at *4–8.  However, the panel found that Plaintiffs had plausibly alleged a First Amendment retaliation claim with respect to the suspension of Plaintiffs' foster parent license and reversed the dismissal of that claim and the related conspiracy claim.  *Id.* In addition, the Third Circuit found that Plaintiffs' claim pursuant to the NJLAD was improperly dismissed on the erroneous grounds that the DCPP does not qualify as a place of public

accommodation under the statute.  *Id.* at *8.  The panel remanded Plaintiffs' remaining claims for further consideration, including whether the Individual Defendants are entitled to qualified immunity. *Id.* at *9.

On May 12, 2022, Plaintiffs filed their Second Amended Complaint, asserting three causes of action arising from Defendants' alleged suspension of Plaintiffs' foster parent license: (i) violation of the NJLAD (Count I); (ii) violation of the First Amendment of the U.S. Constitution pursuant to 42 U.S.C. § 1983 as to the Individual Defendants (Count II); and (iii) conspiracy to violate Plaintiffs' First Amendment rights pursuant to 42 U.S.C. § 1985 as to the Individual Defendants (Count III). *See* SAC ¶¶ 45–59.  Plaintiffs seek both injunctive relief and monetary damages.  *See id.*  Defendants moved to dismiss the Second Amended Complaint on July 5, 2022.  ECF No. 44 ("Defs. Mot.").  Plaintiffs opposed the motion on August 1, 2022.  ECF No. 46 ("Pls. Opp.").  Defendants filed their reply on August 15, 2022.  ECF No. 49 ("Defs. Reply").

## II.    LEGAL STANDARD

Courts undertake a three-part analysis when considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).  "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)) (alteration in original).  Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quotations omitted). In doing so, the court is free to ignore legal conclusions or factually unsupported accusations that merely state, "the-defendant-unlawfully-harmed-me."  *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "[M]ere restatements of the elements of [a] claim[ ] . . . are not entitled to the assumption of truth."  *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) (alterations in original) (quotations omitted).  Finally, the court must determine whether "the

facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citation omitted).

## III.   DISCUSSION

To begin, Defendants argue that notwithstanding the fact that Plaintiffs have alleged a First Amendment retaliation claim based on the suspension of their foster parent license, the Individual Defendants are nevertheless entitled to qualified immunity. *See* Defs. Mot. 11–19. Next, Defendants assert that Plaintiffs cannot seek injunctive relief pursuant to *Ex Parte Young*, 209 U.S. 123 (1908) as a remedy because (i) Plaintiffs have not sued the Individual Defendants in their official capacities and (ii) Plaintiffs do not allege that the Individual Defendants have the authority to effectuate the injunctive relief sought. *See* Defs. Mot. 19–22. I find that because the constitutional rights plausibly alleged to have been violated by the Individual Defendants are not clearly established, the Individual Defendants are entitled to qualified immunity with respect to Plaintiffs' constitutional claims for monetary damages. Additionally, because Plaintiffs fail to properly allege that the Individual Defendants have the requisite authority to enforce the injunctive relief Plaintiffs seek, Plaintiffs' injunction request cannot proceed at this time.

### A.   Plaintiffs' Constitutional Claims and Qualified Immunity

The Individual Defendants assert the defense of qualified immunity to Plaintiffs' First Amendment retaliation claim pursuant to § 1983 and the conspiracy claim under § 1985 regarding the suspension of Plaintiffs' foster license. "Qualified immunity protects government officials from insubstantial claims in order to 'shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 168 (3d Cir. 2016) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)). The Supreme

Court has "mandated a two-step sequence for resolving government officials' qualified immunity claims." *Pearson*, 555 U.S. at 232. First, a court must assess whether the facts that a plaintiff has alleged demonstrate "that the official violated a statutory or constitutional right." *Aschroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Second, if so, the court must determine whether "the right was 'clearly established' at the time of the challenged conduct." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Pearson*, 555 U.S. at 232 (citation omitted). Before reaching the issue of qualified immunity, the Court must start with the threshold § 1983 question of personal involvement. *See Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) (stating that under § 1983 "a plaintiff must demonstrate a defendant's personal involvement in the alleged wrongs") (internal quotations and citation omitted).

### 1.   The Individual Defendants' Personal Involvement in the License Suspension

In the March 1, 2022 Opinion, the Third Circuit found that Plaintiffs sufficiently allege facts demonstrating a First Amendment retaliation claim. Specifically, the Third Circuit held that Plaintiffs (i) "plausibly allege that they engaged in constitutionally protected conduct by sharing their religious views on same-sex marriage with Foster Child 1," (ii) "also plausibly allege that the individual-capacity defendants acted to remove Foster Child 1 from their care and suspended their foster license," and (iii) that the facts surrounding the license suspension are "suggestive of retaliation." *See Lasche*, 2022 WL 604025, at *5. Notably, the Third Circuit conducted its analysis of Plaintiffs' retaliation claim with respect to the license suspension against the Individual Defendants in tandem with Plaintiffs' retaliation claim regarding the removal of Foster Child 1—a claim which the Third Circuit affirmed dismissal of, and which Plaintiffs do not raise in their Second Amended Complaint. Indeed, the circuit court did not focus on allegations speaking to the Individual

Defendants' actions with respect to the license suspension.  Thus, whether Plaintiffs sufficiently alleged that the Individual Defendants were personally involved in the license suspension is an issue left unaddressed by the Third Circuit's analysis.

A threshold matter for any civil rights action is that "a defendant's § 1983 liability must be predicated on his direct and personal involvement in the alleged violation." *Williams v. City of York*, 967 F.3d 252, 261 (3d Cir. 2020); *see Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*.").  Moreover, "[a]llegations of participation or actual knowledge and acquiescence . . . must be made with appropriate particularity." *Rode*, 845 F.2d at 1207.  Yet, in finding that Plaintiffs plausibly allege a First Amendment retaliation claim arising from the license suspension, the Third Circuit elides this critical pleading requirement—focusing instead on the Individual Defendants' personal actions with respect to the removal of Foster Child 1, not the subsequent license suspension.  While Plaintiffs' allegations make clear that the Individual Defendants were personally involved in the removal of Foster Child 1 by demonstrating that the Individual Defendants were intimately involved with the oversight and placement of Foster Child 1, Plaintiffs' Second Amended Complaint is devoid of allegations indicating the Individual Defendants' personal involvement in the suspension of Plaintiffs' foster license.  Thus, despite the Third Circuit's holding, based on the Second Amended Complaint, this Court is unable to find that Plaintiffs have alleged sufficient facts to show a constitutional violation by the Individual Defendants pursuant to § 1983 due to the license suspension.  Indeed, the Second Amended Complaint does not identify any individual with the requisite authority to suspend a foster parent license, let alone allege that the Individual Defendants in particular were personally

responsible for, or involved in, the suspension decision. [1]

### 2.   *Qualified Immunity*

But, even if Plaintiffs plausibly allege a First Amendment retaliation claim against the Individual Defendants, or any individuals with the requisite authority, they are entitled to qualified immunity because Plaintiffs cannot point to any Supreme Court or Third Circuit precedent demonstrating that suspension of Plaintiffs' foster license in retaliation for imparting their religious views regarding homosexuality to their foster child violated a clearly established constitutional right. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'"   *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).   "In other words, there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited." *Mammaro*, 814 F.3d at 169 (quoting *McLaughlin v. Watson,* 271 F.3d 566, 572 (3d Cir. 2001)).   The analysis requires that a court "look first for applicable Supreme Court precedent," but "if none exists, it may be possible that a robust consensus of cases of persuasive authority in the Court of Appeals could clearly establish a right for purposes of qualified immunity." *Id.* (internal quotations and citation omitted).   To be sure, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," if "the state of the law [at the time of the alleged conduct] gave [the defendants] fair warning that their alleged treatment of [the plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

---

[1] As discussed further *infra* with respect to Plaintiffs' request for injunctive relief, without allegations as to who is tasked with issuing or revoking foster licenses, this Court would be unable to issue an enforceable injunction.

"Defining the right at issue is critical to this inquiry." *L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 248 (3d Cir. 2016). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *al-Kidd*, 563 U.S. at 742). Rather "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *L.R.*, 836 F.3d at 248 (quoting *Mullenix*, 577 U.S. at 12). As such, the court "must frame the right in light of the specific context of the case, not as a broad general proposition." *Id.* (internal quotations and citation omitted).

Here, the right at issue, as framed by both the Third Circuit and Plaintiffs, is Plaintiffs' right to be free from retaliation for "sharing their religious views on same-sex marriage with Foster Child 1." *Lasche*, 2022 WL 604025, at *5. Indeed, Plaintiffs allege that, by suspending their foster parent license, the Individual Defendants "took retaliatory action against the Plaintiffs because they had shared a religious belief with their Foster Children." SAC ¶ 52. However, this Court is unaware of, and Plaintiffs have failed to provide, any authority indicating that the Individual Defendants would have been on notice that the foster license suspension, in 2018, for the reason alleged, clearly violated Plaintiffs' First Amendment rights. Indeed, the cases cited by Plaintiffs are either inapposite or address religious freedom rights at far too high a level of generality to overcome qualified immunity.

Asserting that the Individual Defendants' alleged conduct violated clearly established law, Plaintiffs point to *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) and *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719 (2018). *See* Pls. Opp. 11–14. While both cases set forth certain contours of religious liberty rights, neither remotely addresses the alleged conduct and constitutional violation here so as to preclude application of qualified immunity. In *Lukumi*, the Supreme Court held that city ordinances, which prohibited animal sacrifice, were violative of the First Amendment because they were underinclusive in terms of the conduct they restricted and selectively enforced such that only religious conduct was burdened.

508 U.S. at 547.  In *Masterpiece Cakeshop*, the Supreme Court held that the Colorado Civil Rights Commission violated its "duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint" when it failed to recognize the legitimacy of a bakeshop owner's right to abstain from creating wedding cakes for same-sex couples due to his religious beliefs.  138 S. Ct. at 1731–32.  Both cases emphasize that "the government, if it is to respect the Constitution's guarantee of free exercise, cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices."  *Id.* at 1731 (citing *Lukumi*, 508 U.S. at 534).  However, such precedent does not clearly establish a First Amendment right of foster parents to impart their religious views to their foster children or a corollary right to be free from government retaliation for doing so—particularly where the religious views imparted directly affect the adoption process of the foster children.  *See* SAC ¶ 29 ("the DCP&P was concerned that both Foster Child 1 and Foster Child 2 indicated that same-sex relationships were against their religion" and "felt the children had gotten that belief from the Plaintiffs").  The notion that the government must maintain neutrality towards religious views is precisely the type of "broad general proposition" that cannot operate to foreclose qualified immunity.  Indeed, the right at issue here is novel, narrow, and case-specific.

In my June 4, 2020 Opinion, I noted that it was unclear whether Plaintiffs' conduct was constitutionally protected, explaining that "[a]lthough Plaintiffs have an absolute right to practice whatever religious beliefs they choose, their right to free exercise does not, necessarily, permit them to engage in religious practice and share their beliefs with Foster Child 1, who was not Plaintiffs' adoptive child and Plaintiffs were not her legal guardian."  *Lasche*, 2020 WL 2989145, at *6.  The Third Circuit reversed that finding, holding that "the Lasches plausibly allege that they engaged in constitutionally protected conduct by sharing their religious views on same-sex marriage with Foster

Child 1."[2]  *Lasche*, 2022 WL 604025, at *5.  Importantly, however, in finding such a right under the First Amendment, the Third Circuit did not cite a single case espousing its prior existence or indicating that conduct in violation of the right would amount to conduct in violation of clearly established law—"leaving initial consideration of the qualified immunity defense for the District Court."  *Id.* at *4–5.  Although "the Free Exercise clause of the First Amendment indisputably protects an individual's right to control the religious upbringing of his or her children," *Lasche*, 2020 WL 2989145, at *6 (collecting cases), as far as this Court is aware, the Third Circuit's March 1, 2022 Opinion is seemingly the first to recognize a similar right among foster parents vis-à-vis their foster children.[3]  Indeed, throughout the course of this litigation, Plaintiffs have cited no case directly supporting that proposition.  Absent prior authority to the contrary, I cannot find that, in 2018, the Individual Defendants were on notice that suspension of Plaintiffs' foster parent license for sharing

---

[2] Defendants argue that "Plaintiffs do not plead facts that would show that their negative views about homosexuality would not have been explored by DCPP had the Lasches indicated they held those views for secular reasons," thus demonstrating that Plaintiffs cannot show that suspension of the license was "anything other than a neutral policy."  Defs. Mot. 15.  But such considerations regarding the Individual Defendants' intent are not appropriate at this stage, particularly as Plaintiffs do not allege that their license was suspended pursuant to an express policy of the DCPP.  Given that the Third Circuit has found that Plaintiffs set forth a plausible First Amendment retaliation claim and that on a motion to dismiss this Court must accept Plaintiffs' well-pleaded allegations as true, my qualified immunity analysis assumes that the alleged retaliation was violative of Plaintiffs' First Amendment rights.

[3] This Court's own research on the matter has only revealed prior instances in which "federal courts have held that that the state should make some effort to accommodate the child and parents' religious needs when making foster care placements."  *See Lasche*, 2020 WL 2989145, at *6 (citing *Pfoltzer v. Fairfax Cty. Dep't of Human Dev.*, 966 F.2d 1443 (4th Cir. 1992) ("With respect to children in foster care, a state is required to make reasonable efforts to accommodate the parent's religious preferences."); *Wilder v. Bernstein*, 848 F.2d 1338, 1347 (2d Cir. 1988) ("So long as the state makes reasonable efforts to assure that the religious needs of the children are met during the interval in which the state assumes parental responsibilities, the free exercise rights of the parents and their children are adequately observed"); *Walker v. Johnson*, 891 F. Supp. 1040, 1049 (M.D. Pa. 1995) (recognizing parents' "limited rights to control the religious upbringing" of a child in foster care)).  This line of cases in no way indicates a clearly established First Amendment right among foster parents to impart their religious beliefs to a foster child, who is neither their biological child nor their adoptive child.

their religious views regarding homosexuality with Foster Child 1 was violative Plaintiffs' clearly established First Amendment rights.   Thus, the Individual Defendants are entitled to qualified immunity as to Plaintiffs' First Amendment retaliation claim pursuant to § 1983.

Further, because the Individual Defendants are immune with respect to the § 1983 claim, the Individual Defendants are also entitled to qualified immunity as to Plaintiffs' conspiracy claim under § 1985.  *See, e.g.*, *Downey v. Coalition Against Rape & Abuse, Inc.*, 143 F. Supp. 2d 423, 453 (D.N.J. 2001) ("The § 1983 qualified immunity analysis applies equally to claims brought against public officials under § 1985; if an official is immune from suit under § 1983, that official also is immunized from suit under § 1985(3).").   Indeed, without a First Amendment retaliation claim against the Individual Defendants, Plaintiffs' § 1985 claim, which is premised on retaliation in violation of the First Amendment, fails.  *See id.*   Plaintiffs' claims for monetary damages under § 1983 and § 1985(3) are dismissed.

### B.    Injunctive Relief

Defendants also argue that to the extent Plaintiffs seek injunctive relief, such a request fails because (i) Plaintiffs do not plead facts demonstrating that the Individual Defendants were responsible for the decision to suspend Plaintiffs' foster license, and (ii) Plaintiffs cannot proceed under the *Ex Parte Young* doctrine because (a) Plaintiffs sue the Individual Defendants only in their individual capacity—not their official capacity and (b) Plaintiffs fail to allege that the Individual Defendants have the authority to reinstate Plaintiffs' license were an injunction to issue.  *See* Defs. Mot. 19–22.  Each basis identified by Defendants is an obstacle to Plaintiffs obtaining injunctive relief.

As noted *supra*, the Second Amended Complaint lacks sufficient factual allegations as to the Individual Defendants' personal involvement in suspension of Plaintiffs' foster license.  Plaintiffs merely allege that "their license was suspended by the Monmouth County DCP&P office" and that

"suspending their license could not have been taken solely on the initiative of the case workers but also required the approval and cooperation of the other Defendants."  SAC ¶¶ 41, 57.  Plaintiffs do not allege that any of the Individual Defendants actually took steps to suspend their foster license, nor do they allege that any of the Individual Defendants, by virtue of their positions, had the authority to suspend the license.  In fact, as Plaintiffs acknowledge, the denial, suspension, and revocation of foster licenses are governed by statutes that require notice and an opportunity to be heard regarding any suspension decision.  *See* SAC ¶ 42; N.J.S.A. 30:4C-27.10.  Even if, as Plaintiffs allege, such mandatory procedures were not followed in the suspension of their license, the relevant administrative regulations make clear that the suspension of foster care licenses is within the purview of the Department of Children and Families Office of Licensing.  *See* N.J.A.C. 3A:51-2.5.  Plaintiffs' allegations as to the Individual Defendants wholly ignore this grant of authority in the applicable regulations and fail to demonstrate that the Individual Defendants are even involved in licensing decisions at all.

Relatedly, in seeking injunctive relief, the Second Amended Complaint fails to set forth allegations demonstrating the applicability of the *Ex Parte Young* doctrine.  "In general, the Eleventh Amendment prevents suits in federal court against states, or state officials if the state is the real party in interest."  *Hindes v. F.D.I.C.*, 137 F.3d 148, 165 (3d Cir. 1998).  However, *Ex Parte Young* and its progeny provide that "a state official sued in his official capacity for prospective injunctive relief is a person within section 1983, and the Eleventh Amendment does not bar such a suit."  *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 179 (3d Cir. 2002) (internal quotations and citation omitted); *see Gregory v. Admin. Office of the Courts of State of N.J.*, 168 F. Supp. 2d 319, 327 (D.N.J. 2001) (noting that *Ex Parte Young* "held that the Eleventh Amendment did not preclude suits against state officers, in their official capacities, to enjoin violations of federal law").  Importantly, the Supreme Court has held that "a particular official [is] properly named as a defendant if the official

'by virtue of his office has some connection with the enforcement of the act.'" *Finberg v. Sullivan*, 634 F.2d 50, 54 (3d Cir. 1980) (quoting *Ex Parte Young*, 209 U.S. at 157).   Here, Plaintiffs request an injunction "reinstating them as foster parents and enjoining the Defendants from discriminating against them or violating their First Amendment Rights."  SAC ¶¶ 54, 59.  But, seeking damages from the Individual Defendants, Plaintiffs have not sued the Individual Defendants in their official capacities as required under the *Ex Parte Young* doctrine, nor have Plaintiffs properly alleged that the Individual Defendants "by virtue of [their] office" have "some connection with the enforcement" of foster license suspensions—an authority delegated to the Department of Children and Families Office of Licensing.  The Second Amended Complaint also describes John and Jane Doe defendants, stating that "John and Jane Doe 1 through 10 are unknown employees, agents or contractors of the DCP&P who were involved in the allegations set forth below and violated Plaintiffs' rights as set forth below."  SAC ¶ 7.  Yet, Plaintiffs do not purport to sue any John Doe in an official capacity, nor does this description bring claims against an official possessing some authority with respect to foster licensing administration under New Jersey law.  *See, e.g.*, *Smith v. N.Y. Sec'y of State*, No. 20-CV-4958, 2022 WL 970749, at *8 (E.D.N.Y. Mar. 31, 2022) (Under *Ex Parte Young* doctrine, "Plaintiff's claims against the John Doe Defendants must be dismissed because, notwithstanding Plaintiff's conclusory descriptions of them, they lack the power and duty to grant the requested relief.").  For these reasons, Plaintiffs' § 1983 retaliation claim for injunctive relief is dismissed.

In light of the identified deficiencies in Plaintiffs' allegations, Plaintiffs may amend their Complaint in the following ways in pursuit of only injunctive relief.  First, Plaintiffs may include additional allegations as to the Individual Defendants, which demonstrate that the Individual Defendants were directly involved in the suspension of Plaintiffs' foster license by virtue of their authority to participate in foster licensing administration or otherwise.  Second, Plaintiffs may identify a defendant who does have authority to suspend a foster license under New Jersey law, and

plausibly allege that this individual did, in fact, suspend Plaintiffs' license for retaliatory reasons. Third, Plaintiffs may amend their description of the John Doe defendants to make clear that the unnamed officials have the authority to suspend foster licenses under New Jersey law.

### C.      The Remaining State Law Claim

The parties agree that should this Court dismiss the federal claims, Plaintiffs' NJLAD claim should be remanded to state court, where Plaintiffs originally filed this action.  *See* Pls. Opp. 14; Defs. Reply 11.  As indicated *supra*, Plaintiffs federal claims are dismissed, and therefore the only basis for this Court's jurisdiction over Plaintiffs' NJLAD claim is supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  "Supplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims where they 'are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.'"  *Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 387 (1998).  However, a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  Given the parties' agreement on this issue, the Court, in its discretion, declines to exercise supplemental jurisdiction.  That said, because Plaintiffs may amend their Complaint, I will reserve any action with respect to Plaintiffs' NJLAD claim at this time.  If Plaintiffs refuse the opportunity to amend, I will remand the state law claim.

## IV.      CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is **GRANTED**; Plaintiffs are given leave to amend their Complaint consistent with this Opinion within 30 days.  An appropriate Order shall follow.

Date: November 28, 2022                                          /s/ Freda L. Wolfson
                                                                Hon. Freda L. Wolfson
                                                                U.S. Chief District Judge