Michael P. Laffey (ID # 026761986)
**222 Highway 35,**
**2ND Floor**
**Red Bank, NJ 07701**
**(732)642-6784**
**mplaffeylaw@gmail.com**
*Attorneys for Plaintiffs Michael and*
*Jennifer Lasche*

---

| | |
|---|---|
| MICHAEL LASCHE and JENNIFER LASCHE<br>                    PLAINTIFFS<br>         Vs.<br><br>THE STATE OF NEW JERSEY, THE DEPT. OF CHILDREN AND FAMILIES, CHRISTINE NORBUT BEYER IN HER OFFICIAL CAPACITY, KYLE HIGGINS INDIVIDUALLY AND IN HER OFFICIAL CAPACITY, KATIE EPPERLY, INDIVIDUALLY AND IN HER OFFICIAL, CAPACITY, MARY, LIPPINCOT, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY JANELLE CLARK, INDIVIDUALLY AND IN HER OFFICIAL CAPACITY JOHN OR JANE DOES 1-10 INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITY<br>                    DEFENDANTS | **UNITED STATES DISTRICT COURT**<br><br>**DISTRICT OF NEW JERSEY**<br><br>**Civil Action No.:   18-17552 (FLW) (TJB)**<br><br>**THIRD AMENDED COMPLAINT and JURY DEMAND** |

Plaintiffs, Michael Lasche and Jennifer Lasche, individuals residing Monmouth County,

New Jersey, by way of complaint against the Defendants say:

## AVERMENTS APPLICABLE TO ALL COUNTS

## THE PARTIES

1.      The Plaintiffs, Michael and Jennifer Lasche were Foster Parents licensed by the State

1

of New Jersey.   They are devout Christians who hold to traditional values and beliefs about family, marriage and sex. Plaintiffs had Fostered children prior to the events set forth herein. Jennifer Lasche is also a former foster child who was adopted by her Foster Parents. Plaintiffs will suffer continuing damage as a result of the discriminatory and unconstitutional actions of the individually named Defendants

2.      The Division of Child Placement and Permanency is division within the New Jersey Department of Children and Families (DCP&P). The local office of the DCP&P is located in Asbury Park, Monmouth County New Jersey

3.      Christine Norbut Beyer is the Commissioner of the New Jersey Department of Children and Families and on information and belief has final authority over the actions, policies and procedures of the DCP&P including the suspension of a foster parent's license

4.      Defendant Kyle Higgins is a State of New Jersey Division of Child Placement and Permanency (hereinafter "DCP&P") caseworker assigned to a foster child that had been placed with Plaintiffs. On information and belief, acting in her official capacity she would have had input into the suspension of Plaintiffs Foster Parent License and / or had the authority to request said suspension. At all times herein she acted under color of state law.

5.      On information and belief Defendant Katie Epperly is Kyle Higgin's DCP&P Supervisor. On information and belief, acting in her official capacity she would have had input into the suspension of Plaintiffs Foster Parent License and / or had the authority to request said suspension.. At all times herein she acted under color of state law.

6.      On information and belief Defendant Mary Lippencott is the manager of the Asbury Park office of the DCP&P. On information and belief, acting in her official capacity she would have had input into the suspension of Plaintiffs Foster Parent License and /or made the final decision to

request suspension of Plaintiffs License. At all times herein she acted under color of state law.

7.     On information and belief Defendant Janelle Clark is a resource worker in the Monmouth Office of the DCP&P. At all ties herein she acted under color of state law.

8.     John and Jane Doe 1 through 10 are unknown employees, agents or contractors of the DCP&P or the Dept. Of Children And Families Office of Licensing who were involved in the allegations set forth below and, acting in their official capacity would have had input into and / or had the authority to and made the decision to suspend Plaintiffs Foster Parent License and did so in violation of Plaintiffs rights as set forth below.

## FACTS RELEVANT TO ALL COUNTS

9.     On or about September 1, 2017, the defendants Kyle Higgins and Katie Epperly called the Plaintiffs about two girls being removed from a foster home and asked if Plaintiffs would take them in. The girls were ages 13 (hereinafter referred to as "Foster child 1") and 10 (hereinafter referred to as "Foster child 2") (hereinafter collectively referred to as the "Foster children"). Plaintiffs agreed to the placement. Foster Child 1 was the oldest of five siblings placed in Foster Care.

10.     During the placement, Kyle Higgins advised the Plaintiffs that the girls' cases were moving towards adoption and that the natural father's rights were already terminated.

11.     In October of 2017, during the monthly visit, Kyle Higgins advised Plaintiffs that the case is moving towards adoption and that they would have the first choice to adopt the girls.

12.     In November of 2017, Plaintiffs were advised that the natural mother had surrendered her parental rights and that the children were now free for adoption.

3.   In December of 2017, Kyle Higgins met with the Plaintiffs and informed them that they were in consideration for adoption

3

14. Three weeks after the December meeting, Plaintiffs were informed by Kyle Higgins that a family in Illinois was interested in adopting all five children and Plaintiffs were told what the plan was for proceeding with that.

15. The Plaintiffs and the children both asked Defendants Kyle Higgins and Katie Epperly questions about the family. These defendants claimed to not know the answers.   It later came to the attention of Plaintiffs, that the foster parents of the two younger brothers and younger sister of the Foster child 1 and Foster child 2 had been given details about the Illinois family. One of the foster parents advised Plaintiffs that the potential adoptive family "were two wealthy gay men with lots of family around to support them and the adoption." Plaintiffs were baffled as to why the caseworker refused to share this information with them.

16. A few days thereafter Defendant Kyle Higgins came to Plaintiffs home and expressed she heard that the two Foster children were anxious to have their questions answered about the adoptive home.   During Defendant Kyle Higgin's discussion with the Foster Child 1 she questioned the child about her religious beliefs concerning homosexuality and asked her if she would change her religious beliefs if she went with another family.

17.  In April of 2018, Foster Child 2 was removed from Plaintiffs home for confidential reasons unique to Foster child 2.   This was by agreement between the Plaintiffs and DCP&P.

18. On May 22, 2018 Plaintiff Jennifer Lasche met with Kyle Higgins and the therapist for the Foster Child 1. At that meeting Plaintiff, Defendant Higgins and the therapist agreed not to discuss adoption with the foster child because it was too soon after Foster Child 2's removal and put too much pressure on Foster Child 1. The therapist said that she wanted Foster Child 1 to just be able to relax and be part of the family as they all got readjusted to the new living situation. Plaintiff agreed this was best for Foster Child 1. There was some discussion among the meeting participants

4

of Foster Child 1 possibly exploring time with her siblings to see if she wanted to be adopted with them. Plaintiff was not opposed to letting Foster Child 1 explore that and allowing her to make the decision without any question or resentment.

19.    At that meeting, Defendant Higgins discussed that there was going to be a Court date on June 4, 2018, where the options for all five Foster children would be presented to the Judge for a decision as to what would be best for the children. Those options would be for the Foster Children to be adopted by the families where they were currently placed or for all five Foster children to be adopted by the Illinois family. Defendant Higgins further represented that the Division was not going to take a position but instead would let the law guardians advocate for the Children.

20.    On June 4, 2018, the Plaintiffs received a text from Foster child 1's law guardian that the Illinois couple was off the table and that the judge wanted psychiatric evaluations of all of the children before a permanent plan was put into place. It was at this point that the attitude of the case worker towards the Plaintiffs radically changed.

21.    On or about June 31, 2018 Foster child 1 came home from her regularly scheduled therapy meeting and appeared very upset.   She stated she was upset because the therapist kept bringing up religion and told her she should not feel pressured to follow her foster family's religious beliefs.

22.    On June 19, 2018 Plaintiff Jennifer Lasche received a phone call from Defendant Kyle Higgins who begins to discuss transitioning Foster child 1 to her foster brother's home. Plaintiff expressed confusion because she thought the plan was to move forward with adoption of all the children in their current foster placements.

23.    The Plaintiff then called the law guardian for Foster child 1 who expressed surprise and confusion at what was said during the conversation and said she would investigate

24.     Shortly thereafter the therapist arrived at the house for Foster Child 1's therapy session. Plaintiff Jennifer Lasche confronted the therapist and asked why Foster child 1 was being asked if she was being pressured to follow their religion. She tried to cover by saying it was normal to discuss how people have different beliefs, ethics, religion etc., however, after being pressed the Therapist admitted getting a phone call from Defendant Higgins before the session. The Therapist said that the Division brought to her attention that there had been a conversation that was had with Plaintiffs about the Foster Children being placed out of state with a homosexual couple, The Therapist also stated that there was "a conversation with Defendant Kyle Higgins about the Illinois couple" and "discussion about "Plaintiffs' ideas about same-sex couples."   She also said that in that conversation Defendant Kyle Higgins told the therapist that the therapist was to discuss with Foster child 1 being placed with her brothers.

25.     It is clear from this conversation that the Defendant Kyle Higgins wanted to place the Children with the Indiana Couple and that she felt the Plaintiffs religious beliefs had been passed on to the Foster Children and interfered with that placement. At this point the Defendant Kyle Higgins conduct and the Conduct of the other Defendants became even more hostile.

26.     On or about June 21, 2018, Foster Child 1 was picked by Defendant Kyle Higgins and another woman ostensibly for her sibling visit. It was very rare for Defendant Kyle Higgins to transport Foster Child 1 to this visit. On information and belief, they stopped at Dunkin Donuts where they interrogated Foster child 1 and lied to her in an effort to intimidate her into agreeing that she did not want to be adopted by Plaintiffs. For instance, Defendant Kyle Higgins asked the Foster child "So I hear that Mrs. Lasche tells you every time I call her" This statement was untrue and Defendant had no way of knowing if this was the case or not.

27.     While at the Dunkin Donuts, Defendant Kyle Higgins told Foster Child 1 that

6

Plaintiffs would not be able to "meet her needs." They once again interrogated Foster Child 1 about her religious beliefs. At the conclusion of this interrogation instead of taking Foster Child 1 to the office for her sibling visit, as was usually the case, she was taken to the home where her foster brothers were living.

28.     The actions of the Defendant Kyle Higgins at the Dunkin Doughnuts was an attempt to convince the Foster Child that she did not want to be adopted by the Plaintiffs and the questioning of the Child about her religious beliefs in general and regarding homosexuality in particular are evidence that the reason she wanted to separate the Foster child from Plaintiff was because of plaintiffs religious beliefs.

29.     On return Defendant Kyle Higgins stated to Plaintiffs that she knew Foster Child 1 wanted to stay with them and that "we' (the DCP&P) understand that and "want to work with you because we want what's in her (foster Child 1's) best interests. Defendant Kyle Higgins then stated, "we (DCP&P) would like to have a meeting with you".

30.     The next day, Plaintiffs spoke to Defendants Kyle Higgins and Katie Epperly on the telephone to schedule the meeting. When questioned about the purpose of the meeting, Defendant Katie Epperly indicated that the DCP&P was concerned that both Foster child 1 and Foster Child 2 indicated that same-sex relationships were against their religion. Defendant Katie Epperly stated that "they" felt the children had gotten that belief from the Plaintiffs. That the Defendant indicated that they were concerned that the Foster Children had adopted a religious belief of the Plaintiffs indicates a hostility to that religious belief.

31.     There are no regulations which prohibit Foster Pants sharing religious beliefs.

32.     Plaintiffs have been active Foster parents for over 10 years and have known numerous Foster Parents and have never heard of parents or children being questioned about their

7

religious beliefs or having a child removed on the basis of a parents religious beliefs.

33.    While Plaintiffs took the Foster Children to Church and freely shared their religious beliefs with the children, on information and belief the Foster Children had picked up their religious beliefs regarding homosexuality prior to coming to Plaintiffs home.

34.    On Friday, June 29, 2018, a meeting was held at the Monmouth County office of the DCP&P.   Present at that meeting were the Plaintiffs, their attorney, Defendants Kyle Higgins, Katie Epperly, Mary Lippencot and Janelle Clark, an attorney for the State of New Jersey, and one or two additional employees of the DCP&P.

35.    At the June 29th meeting, the representatives of the DCP&P expressed concern that the Plaintiffs believed homosexuality was a sin.   They expressed concern that the Plaintiffs would reject Foster child 1 if she ever decided to explore her sexuality and sought assurance from the Plaintiffs that would not be the case. One of the individual defendants indicted that Foster child 1 would need therapy to deal with her belief that homosexuality was a sin to avoid possible future harm suggesting that a belief that homosexuality was a sin was some type of mental disorder that required treatment. Almost the entire meeting was about Plaintiffs belief that homosexuality was a sin.   It was clear to the Plaintiffs from this meeting that the Defendants were hostile to the Plaintiffs religious beliefs regarding homosexuality.

36.    On Monday, July 2, 2018, the DCP&P went before the Family Court and sought the removal of Foster Child 1 from Plaintiffs' custody.   The law guardian appointed to represent the interests of Foster Child 1 told Plaintiffs that this was done over her objections.

37.    Plaintiffs were not given notice that they had a right to be heard at the hearing. On information and belief case workers for the DCP&P do not usually ignore statutory mandates. This failure to give notice in accordance with the law is evidence that the Defendants were trying to hide

something from Plaintiffs and were acting in bad faith. Defendant's bad faith was due to their hostility to the Plaintiffs Religious beliefs as expressed in the meeting the day before.

38.     Based on the issues that were raised and the comments made at the meeting just prior to the Court hearing Plaintiffs allege that the reason for the Defendants seeking removal the Foster Child 1 from their home was hostility to their religious beliefs.

39.     The next day the DCP&P removed Foster child 1 from Plaintiffs' home in spite of their wish to adopt said child and in complete disregard of the wishes of the child. Foster Child 1 was placed in the foster home where foster child 2 had been placed. Plaintiffs have not seen the child since July 3, 2018.

40.     On information and belief, a therapist had advised the DCP&P that because, as the oldest child of the five siblings, Foster child 1 had become so "parentified" by her younger siblings as a result of trauma in the biological home. The therapist further opined that it was in Foster Child 1's best interests to be adopted alone. In spite of this the Defendants sought to have the child adopted with a sibling rather than by the Plaintiffs because their hostility to Plaintiffs religious beliefs were so strong.

41.     On October 12, 2018, a representative of the DCP&P arrived at the Plaintiffs' house to perform the required yearly inspection that is necessary for a Foster Parents license to be renewed.

42.   When the inspection was completed, the inspector asked the Plaintiffs if they knew that their license was suspended by the Monmouth County DCP&P office.   Plaintiffs informed the inspector that they were not aware that they had been suspended. The inspector then informed them that the Monmouth County office should have notified Plaintiffs that they were suspended and told them what the reasons for the suspension were.

43.     Based on the suspension taking place shortly after the meeting wherein the

9

Defendants expressed hostility to Plaintiffs religious beliefs, and the lack of any other disqualifying factors for suspending Plaintiffs as Foster Parents, it is clear that the only reason for the Plaintiffs' suspension from the system was the defendants hostility to Plaintiffs' religious belief that homosexuality is a sin. Further, Defendants ignored the Rules and Regulations and did not give Plaintiffs notice as to why they were suspended because they did not have a legitimate non-discriminatory basis for the suspension.

44.     Plaintiffs' qualifications to be foster parents had never been questioned and they had been relicensed as foster parents on a regular basis over a 10 year period with no complaints against them. It was not until the Defendants found out about Plaintiffs religious beliefs regarding homosexuality that they were suddenly found unfit to adopt a child or to be Foster Parents.

45.     On information and belief a suspension by the Department of Children and Families Office of Licensing would have to be initiated by the Plaintiffs DCP&P case worker Kyle Higgins and approved by the case workers supervisor, Katie Epperly and / or the Manager for the district office Mary Lippincott. The person with ultimate authority over both the DCP&P and the Department of Children and Families Office of Licensing is the Defendant Christine Norbut Beyer.

46.     As of this date they have still not been given a reason by DCP&P for their suspension.


## COUNT I

## VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION

## N.J.S.A. § 10:5-1 et. seq.

47.     Plaintiffs repeat each and every allegation set forth in paragraphs 1-35 as if set forth more fully herein.

48.    The New Jersey Dept. Of Children and Families and the DCP&P are places of public accommodation.

49.    The State of NJ, the New Jersey Dept. Of Children and Families the DCP&P, and all the individual defendants have discriminated against the Plaintiffs and denied the Plaintiffs the ability to be Foster Parents because of the Plaintiff's religious beliefs.

50.    The acts of the Defendants are violations of N.J.S.A. § 10:5-4.

WHEREFORE Plaintiffs demand judgment for injunctive relief, damages, punitive damages, attorney fees and costs of suit.

## COUNT II

## ACTION PURSUANT TO 42 USCS §§ 1983 FOR VIOLATION OF PLAINTIFFS FIRST AMENDMENT RIGHTS

51.    Plaintiffs repeat each and every allegation set forth in Counts 1 through 48 as if set forth more fully herein.

52.    At all relevant times herein the individual defendants acted under color of state law.

53.    The individual defendants took retaliatory action against the Plaintiffs on the basis of a religious belief held by plaintiffs in violation of the First Amendment to the Constitution of the United States.

54.    A key tenant of Christianity is that religious belief should be shared. Defendants took retaliatory action against the Plaintiffs because they had shared a religious belief with their Foster Children. This retaliatory action based on a religious practice is a violation of the First Amendment to the Constitution.

11

55.     The Defendants also took retaliatory action based on the speech of the Defendants in violation of the First Amendment to the Constitution.

56.     The Defendants have denied Plaintiffs the right to participate in the Foster Care Program solely on the basis of their exercise of their first Amendment rights to hold a religious belief and to share a religious belief.

WHEREFORE pursuant to 42 USCS §§ 1983 Plaintiffs demand Judgment against the The State of New Jersey, The Dept. Of Children And Families, Christine Norbut Beyer In her official capacity and the individual Defendants acting in their official capacity for injunctive relief reinstating them as foster parents and enjoining the Defendants from discriminating against them or violating their First Amendment Rights in the future and for attorney fees and costs of suit.

## COUNT III

## ACTION PURSUANT TO 42 USCS § 1985 FOR CONSPIRACY TO VIOLATE PLAINTIFFS CONSTITUTIONAL RIGHTS

57.     Plaintiffs repeat each and every allegation set forth in paragraphs 1-54 as if set forth more fully herein.

58.     On or about June 22 2018 the Defendants Kyle Higgins and Katie Epperly together made a call to the Plaintiff Jennifer Lasche wherein they both indicated they wanted a meeting with Plaintiffs to discuss their religious beliefs. At that meeting the other Defendants were present and indicated agreement with Defendants Higgins and Epperly opinion that the Plaintiffs religious beliefs were a problem.

59.     The actions of removing the Foster Child from Plaintiffs home and suspending their license could not have been taken solely on the imitative of the case worker but also required the approval and cooperation of the other Defendants all acting in their official capacity.

60.     The individual Defendants conspired for the purpose of depriving Plaintiffs either directly or indirectly, their First Amendment Rights.

61.     As a result of said conspiracy Plaintiffs have been deprived of having and exercising the rights or privilege of a citizen of the United States, granted pursuant to the 1st, 5th and 14th Amendments to the Constitution.

WHEREFORE pursuant to 42 USCS § 1985 Plaintiffs demand Judgment against the individual Defendants for injunctive relief reinstating them as foster parents and enjoining the Defendants from discriminating against them or violating their First Amendment Rights or conspiring to do so and for attorney fees and costs of suit.

Dated:   December 26, 2022          By:   *Michael P. Laffey*
                                          Michael P. Laffey
                                              *Attorneys for Plaintiffs*


## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all matters properly triable thereto.

Dated: December 26, 2022

                                    *Michael P. Laffey*
                                    Michael P. Laffey


## DESIGNATION OF TRIAL COUNSEL

Plaintiff designates Michael P. Laffey, Esq. as its trial counsel in this matter.

Dated: December 26, 2022

                                    *Michael P. Laffey*
                                    Michael P. Laffey

13