# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

MICHAEL LASCHE AND
JENNEFER LASCHE

       Plaintiffs,

       v.

STATE OF NEW JERSEY, ET. AL.

       Defendants.

Civil Action No. 3:18-cv-17552-FLW-TJB

BRIEF IN OPPOSITION TO MOTION TO
DISMISS THIRD AMENDED
COMPLAINT

MICHAEL P LAFFEY
226 BROADWAY
LONG BRANCH, NJ 07740
(732) 642-6784
mplaffeylaw@gmail.com
Attorney for Plaintiffs

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES…………………………………………………….. ii

STATEMENT OF FACTS…………………………………………………… 1

STANDARD OF REVIEW…………………………………………………… 7

LEGAL ARGUMENT

POINT I

      <u>THE STATE OF NEW JERSEY AND THE</u>
      <u>DEARTMENT OF FAMILIES AND CILDREN</u>
      <u>ARE PROPER DEFENDANTS</u>………………………………………… 8

POINT II

      <u>PLAINTIFFSSHOULD BE PERMITTED</u>
      <u>TO AMEND THEIR COMPLAINT</u>
      <u>AGAINST JANELLE CLARK</u> ………………………………………….. 8

POINT III

      <u>ADDRESSING THE LAD CLAIM</u>
      <u>ON ITS MERITS IS PREMATURE</u> ………………………………………9

CONCLUSION……………………………………………………………… 10

i

# **TABLE OF AUTHORITIES**

Page

*Ashcroft v. Iqbal,* 556 U.S. 662, 662, (2009)……………………………………7, 9

*Lombardo v. Pa. Dep't. of Pub. Welfare,* 540 F.3d 190, 198 (3d Cir. 2008)……... 8

*New Jersey Property-Liability Ins. Guaranty Asso. v. State*,
195 N.J. Super. 4, (App. Div. 1984)…………………………………………… 9

*Shane v. Fauver*, 213 F.3d 113, (3d Cir. N.J. May 19, 2000)……………………… 9

Fed. R. Civ. P. 8(a) (2)…………………………………………………………... 7

## STATEMENT OF FACTS

The Plaintiffs, Michael and Jennifer Lasche, were Foster Parents licensed by the State of New Jersey. They are devout Christians who hold to traditional values and beliefs about family, marriage, and sex. The plaintiffs had Fostered children before the events set forth herein. Jennifer Lasche is also a former foster child whom her Foster Parents adopted. *See* Third Amended Complaint ¶ 1, attached as exhibit A.

On or about September 1, 2017, Defendants Kyle Higgins and Katie Epperly called the Plaintiffs about two girls being removed from a foster home and asked if Plaintiffs would take them in. The girls were ages 13 (hereinafter referred to as "Foster child 1") and 10 (hereinafter referred to as "Foster child 2") (hereinafter collectively referred to as the "Foster children"). The plaintiffs agreed to the placement. Foster Child 1 was the oldest of five siblings placed in Foster Care. *Ibid* ¶ 8

During the placement, Kyle Higgins advised the Plaintiffs that the girls' cases were moving towards adoption and that the natural father's rights were already terminated. *Ibid* ¶ 9

In October of 2017, during the monthly visit, Kyle Higgins advised Plaintiffs that the case was moving towards adoption and that they would have the first choice to adopt the girls. In November of 2017, the Plaintiffs were advised that the natural mother had surrendered her parental rights and that the children were now free for adoption. In December of 2017, Kyle Higgins met with the Plaintiffs and informed them that they were in consideration for adoption. *Ibid* ¶ ¶ 10, 11, 12

Three weeks after the December meeting, the Plaintiffs were informed by Kyle Higgins that a family in Illinois was interested in adopting all five children, and the Plaintiffs were told what the plan was for proceeding with that. *Ibid* ¶ 13

The Plaintiffs and the children both asked Defendants Kyle Higgins and Katie Epperly

1

questions about the family. These defendants claimed not to know the answers. It later came to the attention of the Plaintiffs that the foster parents of the two younger brothers and younger sister of Foster child 1 and Foster child 2 had been given details about the Illinois family. One of the foster parents advised the Plaintiffs that the potential adoptive family "were two wealthy gay men with lots of family around to support them and the adoption." The plaintiffs were baffled as to why the caseworker refused to share this information with them. *Ibid* ¶ 14

A few days after that, Defendant Kyle Higgins came to the Plaintiffs home and expressed that she heard that the two Foster children were anxious to have their questions answered about the adoptive home. During Defendant Kyle Higgin's discussion with Foster Child 1, she questioned the child about her religious beliefs concerning homosexuality and asked her if she would change her religious beliefs if she went with another family. Ibid ¶ 15

On May 22, 2018, Plaintiff Jennifer Lasche met with Kyle Higgins and the Therapist for Foster Child 1. At that meeting, Plaintiff, Defendant Higgins, and the Therapist agreed not to discuss adoption with the foster child because it was too soon after Foster Child 2's removal and put too much pressure on Foster Child 1. The Therapist said that she wanted Foster Child 1 just to be able to relax and be part of the family as they all got readjusted to the new living situation. Plaintiff agreed this was best for Foster Child 1. There was some discussion among the meeting participants of Foster Child 1 possibly exploring time with her siblings to see if she wanted to be adopted with them. Plaintiff was not opposed to letting Foster Child 1 explore that and allowing her to make the

decision without any question or resentment. Ibid ¶ 17

At that meeting, Defendant Higgins discussed that there was going to be a Court date on June 4, 2018, where the options for all five Foster children would be presented to the Judge for a

decision as to what would be best for the children. Those options would be for the Foster Children to be adopted by the families where they were currently placed or for all five Foster children to be adopted by the Illinois family. Defendant Higgins further represented that the Division would not take a position but instead let the law guardians advocate for the Children. *Ibid* ¶ 18

On June 4, 2018, the Plaintiffs received a text from Foster child 1's law guardian that the Illinois couple was off the table and that the judge wanted psychiatric evaluations of all of the children before a permanent plan was put into place. At this point, the attitude of the case worker towards the Plaintiffs radically changed. *Ibid* ¶ 19

On or about June 31, 2018, Foster child 1 came home from her regularly scheduled therapy meeting and appeared very upset. She stated she was upset because the Therapist kept bringing up religion and told her she should not feel pressured to follow her foster family's religious beliefs. *Ibid* ¶ 20

On June 19, 2018, Plaintiff Jennifer Lasche received a phone call from Defendant Kyle Higgins, who began to discuss transitioning Foster child 1 to her foster brother's home. Plaintiff expressed confusion because she thought the plan was to move forward with adopting all the children in their current foster placements.    The Plaintiff then called the law guardian for Foster child 1, who expressed surprise and confusion at what was said during the conversation and said she would investigate *Ibid* ¶ ¶ 21, 22

Shortly thereafter, the Therapist arrived at the house for Foster Child 1's therapy session. Plaintiff Jennifer Lasche confronted the Therapist and asked why Foster child 1 was being asked if she was pressured to follow their religion. She tried to cover by saying it was normal to discuss how people have different beliefs, ethics, religion, etc. However, after being pressed, the Therapist admitted getting a phone call from Defendant Higgins before the session. The Therapist said that

3

the Division brought to her attention that there had been a conversation with the Plaintiffs about the Foster Children being placed out of state with a homosexual couple. The Therapist also stated that there was "a conversation with Defendant Kyle Higgins about the Illinois couple" and "discussion about "Plaintiffs' ideas about same-sex couples."  She also said that in that conversation Defendant Kyle Higgins told the Therapist that the Therapist was to discuss with Foster child 1 being placed with her brothers. *Ibid* ¶ 23

It is clear from this conversation that the Defendant, Kyle Higgins, wanted to place the Children with the Indiana Couple and that she felt the Plaintiff's religious beliefs had been passed on to the Foster Children and interfered with that placement. At this point, Defendant Kyle Higgins's conduct and the Conduct of the other Defendants became even more hostile. Ibid ¶ 24

On or about June 21, 2018, Foster Child 1 was picked up by Defendant Kyle Higgins and another woman, ostensibly for her sibling visit. It was very rare for Defendant Kyle Higgins to transport Foster Child 1 to this visit. On information and belief, they stopped at Dunkin Donuts, where they interrogated Foster child 1 and lied to her to intimidate her into agreeing that she did not want to be adopted by the Plaintiffs. For instance, Defendant Kyle Higgins asked the Foster child, "So I hear that Mrs. Lasche tells you every time I call her" This statement was untrue, and Defendant had no way of knowing if this was the case or not. While at the Dunkin Donuts, Defendant Kyle Higgins told Foster Child 1 that Plaintiffs would not be able to "meet her needs." They once again interrogated Foster Child 1 about her religious beliefs. At the conclusion of this interrogation, instead of taking Foster Child 1 to the office for her sibling visit, as was usually the case, she was taken to the home where her foster brothers were living. *Ibid* ¶ 25.26

On return, Defendant Kyle Higgins stated to Plaintiffs that she knew Foster Child 1 wanted

4

to stay with them and that "we' (the DCP&P) understand that and "want to work with you because we want what's in her (foster Child 1's) best interests. Defendant Kyle Higgins then stated, "We (DCP&P) would like to have a meeting with you .*"Ibid* ¶ 28

The next day, the Plaintiffs spoke to Defendants Kyle Higgins and Katie Epperly on the telephone to schedule the meeting. When questioned about the purpose of the meeting, Defendant Katie Epperly indicated that the DCP&P was concerned that both Foster child 1 and Foster Child 2 indicated that same-sex relationships were against their religion. Defendant Katie Epperly stated that "they" felt the children had gotten that belief from the Plaintiffs. That a Defendant indicated that they were concerned that the Foster Children had adopted a religious belief of the Plaintiffs indicates hostility to that religious belief.        *Ibid* ¶ 29

There are no regulations that prohibit Foster Pants from sharing religious beliefs. *Ibid* ¶ 30

On Friday, June 29, 2018, a meeting was held at the Monmouth County Office of the DCP&P.  Present at that meeting were the Plaintiffs, their attorney, Defendants Kyle Higgins, Katie Epperly, Mary Lippincott and Janelle Clark, an attorney for the State of New Jersey, and one or two additional employees of the DCP&P. *Ibid* ¶ 33

At the June 29th meeting, the representatives of the DCP&P expressed concern that the Plaintiffs believed homosexuality was a sin. They expressed concern that the Plaintiffs would reject Foster child 1 if she ever decided to explore her sexuality and sought assurance from the Plaintiffs that would not be the case. One of the individual defendants indicated that Foster child 1 would need therapy to deal with her belief that homosexuality was a sin to avoid possible future harm, suggesting that a belief that homosexuality was a sin was some type of mental disorder that required treatment. Almost the entire meeting was about Plaintiffs' belief that homosexuality was a

sin. It was clear to the Plaintiffs from this meeting that the Defendants were hostile to their religious beliefs regarding homosexuality. *Ibid* ¶ 34

On Monday, July 2, 2018, the DCP&P went before the Family Court and sought the removal of Foster Child 1 from Plaintiffs' custody. The law guardian appointed to represent the interests of Foster Child 1 told Plaintiffs that this was done over her objections.     The plaintiffs were not given notice that they had a right to be heard at the hearing. On information and belief, caseworkers for the DCP&P do not usually ignore statutory mandates. This failure to give notice in accordance with the law is evidence that the Defendants were trying to hide something from the Plaintiffs and were acting in bad faith. Defendant's bad faith was due to their hostility to Plaintiff's Religious beliefs as expressed in the meeting the day before. *Ibid* ¶ 35

The next day the DCP&P removed Foster child 1 from the Plaintiffs' home in spite of their wish to adopt the child and in complete disregard of the wishes of the child. Foster Child 1 was placed in the foster home where foster child 2 had been placed. The plaintiffs have not seen the child since July 3, 2018. *Ibid* ¶ 38

On information and belief, a therapist had advised the DCP&P that, as the oldest child of the five siblings, Foster child 1 had become so "parentified" by her younger siblings as a result of trauma in the biological home. The Therapist further opined that it was in Foster Child 1's best interests to be adopted alone. Despite this, the Defendants sought to have the child adopted with a sibling rather than by the Plaintiffs because their hostility to the Plaintiffs' religious beliefs was so strong. *Ibid* ¶ 39

On October 12, 2018, a representative of the DCP&P arrived at the Plaintiffs' house to perform the required yearly inspection that is necessary for a Foster Parents license to be renewed. When the inspection was completed, the inspector asked the Plaintiffs if they knew their license

was suspended by the Monmouth County DCP&P office. The Plaintiffs informed the inspector that they were unaware they had been suspended. The inspector then informed them that the Monmouth County office should have notified the Plaintiffs that they were suspended and told them what the reasons for the suspension were. *Ibid* ¶ ¶ 40, 41

Plaintiffs' qualifications to be foster parents had never been questioned, and they had been relicensed as foster parents on a regular basis over a 10 year period with no complaints against them. It was not until the Defendants found out about the Plaintiffs' religious beliefs regarding homosexuality that they were suddenly found unfit to adopt a child or to be Foster Parents. Ibid ¶ 43

As of this date, they have still not been given a reason by DCP&P for their suspension. Ibid ¶ 44

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 8(a) (2), a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. The rule does not require detailed factual allegations be pleaded, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, *Ashcroft v. Iqbal*, 556 U.S. 662, 662, 129 S. Ct. 1937, 1939, 173 L. Ed. 2d 868, 868, 2009)

**LEGAL ARGUMENT**

**POINT I**

**THE STATE OF NEW JERSEY AND THE DEPARTMENT OF FAMILIES AND CHILDREN ARE PROPER DEFENDANTS.**

The Defendants are correct that the State of New Jersey and the Department of Children and Families have sovereign immunity with regard to the claims brought pursuant to U.S.C.S. 42 § 1983 and § 1984. However, they are proper parties to the Plaintiffs' claim brought pursuant to N.J.S.A. 10:5-10 et. seq.

It should be noted that the Defendants waived their Eleventh Amendment immunity when they remanded the case from State Court to this Court. *Lombardo v. Pa. Dep't. of Pub. Welfare,* 540 F.3d 190, 198 (3d Cir. 2008).

The Defendants are not, nor have they asserted in their motion, that they are entitled to immunity from the Law Against Discrimination (L.A.D.) claim. To the extent that the complaint alleges Federal claims directly against the State of New Jersey or the D.C.F., Plaintiffs concede those should be dismissed. However, the State of New Jersey and the D.C.F. are proper parties with regard to the L.A.D. claim.

**POINT II**

**PLAINTIFFS SHOULD BE PERMITTED TO AMEND THEIR CLAIM AGAINST JANELLE CLARK.**

With regard to all of the individual Defendants, the Plaintiffs have alleged that on information and belief, they would have had input into the decision to suspend the Plaintiffs' Foster Parent license.   That this allegation was not made with regard to Defendant Janette Clark

8

is a drafting error on the part of Counsel. When an individual has filed a complaint under 42 U.S.C.S. § 1983, which is subject to dismissal for lack of factual specificity, he should be given a reasonable opportunity to cure the defect, if he can, by amendment of the complaint and denial. *Shane v. Fauver*, 213 F.3d 113, (3d Cir. N.J. May 19, 2000). In the alternative, the dismissal of Janette Clark should be without prejudice so that if discovery shows that she played an active part in the license suspension, the Plaintiffs will have an opportunity to petition the Court to Amend the Complaint.

## **POINT III**

## **ADDRESSING THE LAD CLAIM ON ITS MERITS IS PREMATURE**

Defendants attempt to dispose of the Plaintiffs' state claim on grounds that would be more appropriate for a motion for summary judgment.

First, the standard that Defendant has put forth is the standard that is used when a claim is based on an employment relationship. It is far from clear that Foster Parents would be considered employees. In fact, it has been held that for purposes of the Torts Claim Act, Foster Parents are not employees of the State. *New Jersey Property-Liability Ins. Guaranty Asso. v. State*, 195 N.J. Super. 4, 477 A.2d 826, (App. Div. 1984).

This is a <u>public accommodations</u> case. No case law has been cited, and Counsel for Plaintiffs has found no case law that states if I refuse to serve someone because of their religious belief but if I would also refuse to serve someone who had the same belief, but for a secular reason then I have not violated the statute. In this case, we are clearly talking about a religious belief. The belief is that homosexual conduct is a sin. Sin is a religious concept.

More importantly, complaints that state a plausible grounds for relief survive a motion to dismiss. *Ashcroft v. Iqbal* 566 .S, 662, 678 (2009). It has been determined that the Plaintiffs have stated a plausible claim that they were discriminated against. The Defendants are now trying to interpose a defense appropriate for a summary judgment motion, The defense being that there was a nondiscriminatory reason for what they did. Plaintiff now gets to have discovery to see if that claim is true or just a pretext.

If the real reason for the license suspension are the concerns that Defendants state in their brief, then why did the Defendants prevent Plaintiff from adopting a heterosexual teenage girl? Why did one Defendant state that the same teenage girl would need psychiatric counseling because she held the same religious belief as the Plaintiffs? Those actions indeed indicate an animus towards certain beliefs rather than concern for the emotional well-being of an L.B.G.T.Q. child. Those are just two of the many areas Plaintiff intends to explore to show that Defendants' "defense" is a pretext.

There are a lot of unknown facts in this case. There are a lot of known facts that are subject to differing interpretations. Defendants are asking the Court to interpret the material facts stated in the complaint in a certain way. That is inappropriate in a motion to dismiss. In fact, that would be inappropriate in a motion for summary judgment. It is a particularly improper argument considering that the Court of Appeals has already ruled that Plaintiff's' complaint contains sufficient factual matter, if accepted as true, to state a claim to relief that is plausible on its face. Until there is discovery in this case, the Defendants' motion to dismiss the L.A.D. claim on the grounds stated is premature

10

## **CONCLUSION.**

For the reasons stated herein, the relief requested by the Defendants should be denied.

*Michael P. Laffey*
Michael P. Laffey
Attorney for Plaintiffs

11

Michael P. Laffey (ID # 026761986)
**222 Highway 35,**
**2ᴺᴰ Floor**
**Red Bank, NJ 07701**
**(732)642-6784**
**mplaffeylaw@gmail.com**
*Attorneys for Plaintiffs Michael and*
*Jennifer Lasche*

# EXIHBIT A

MICHAEL LASCHE and JENNIFER LASCHE
        PLAINTIFFS
     Vs.

THE STATE OF NEW JERSEY, THE DEPT. OF
CHILDREN AND FAMILIES, CHRISTINE
NORBUT BEYER IN HER OFFICIAL CAPACITY,
KYLE HIGGINS INDIVIDUALLY AND IN HER
OFFICIAL CAPACITY, KATIE EPPERLY,
INDIVIDUALLY AND IN HER OFFICIAL,
CAPACITY, MARY, LIPPINCOT,
INDIVIDUALLY AND IN HER OFFICIAL
CAPACITY JANELLE CLARK, INDIVIDUALLY
AND IN HER OFFICIAL CAPACITY JOHN OR
JANE DOES 1-10 INDIVIDUALLY AND IN
THEIR OFFICIAL CAPACITY
        DEFENDANTS

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

**Civil Action No.:   18-17552 (FLW) (TJB)**

**THIRD AMENDED COMPLAINT and
JURY DEMAND**

Plaintiffs, Michael Lasche and Jennifer Lasche, individuals residing Monmouth County,

New Jersey, by way of complaint against the Defendants say:

## AVERMENTS APPLICABLE TO ALL COUNTS

### THE PARTIES

1.    The Plaintiffs, Michael and Jennifer Lasche were Foster Parents licensed by the State

1

of New Jersey.   They are devout Christians who hold to traditional values and beliefs about family, marriage and sex. Plaintiffs had Fostered children prior to the events set forth herein. Jennifer Lasche is also a former foster child who was adopted by her Foster Parents. Plaintiffs will suffer continuing damage as a result of the discriminatory and unconstitutional actions of the individually named Defendants

2.     The Division of Child Placement and Permanency is division within the New Jersey Department of Children and Families (DCP&P). The local office of the DCP&P is located in Asbury Park, Monmouth County New Jersey

3.     Christine Norbut Beyer is the Commissioner of the New Jersey Department of Children and Families and on information and belief has final authority over the actions, policies and procedures of the DCP&P including the suspension of a foster parent's license

4.     Defendant Kyle Higgins is a State of New Jersey Division of Child Placement and Permanency (hereinafter "DCP&P") caseworker assigned to a foster child that had been placed with Plaintiffs. On information and belief, acting in her official capacity she would have had input into the suspension of Plaintiffs Foster Parent License and / or had the authority to request said suspension. At all times herein she acted under color of state law.

5.     On information and belief Defendant Katie Epperly is Kyle Higgin's DCP&P Supervisor. On information and belief, acting in her official capacity she would have had input into the suspension of Plaintiffs Foster Parent License and / or had the authority to request said suspension.. At all times herein she acted under color of state law.

6.     On information and belief Defendant Mary Lippencott is the manager of the Asbury Park office of the DCP&P. On information and belief, acting in her official capacity she would have had input into the suspension of Plaintiffs Foster Parent License and /or made the final decision to

2

request suspension of Plaintiffs License. At all times herein she acted under color of state law.

7.      On information and belief Defendant Janelle Clark is a resource worker in the Monmouth Office of the DCP&P. At all ties herein she acted under color of state law.

8.      John and Jane Doe 1 through 10 are unknown employees, agents or contractors of the DCP&P or the Dept. Of Children And Families Office of Licensing who were involved in the allegations set forth below and, acting in their official capacity would have had input into and / or had the authority to and made the decision to suspend Plaintiffs Foster Parent License and did so in violation of Plaintiffs rights as set forth below.

## FACTS RELEVANT TO ALL COUNTS

9.      On or about September 1, 2017, the defendants Kyle Higgins and Katie Epperly called the Plaintiffs about two girls being removed from a foster home and asked if Plaintiffs would take them in. The girls were ages 13 (hereinafter referred to as "Foster child 1") and 10 (hereinafter referred to as "Foster child 2") (hereinafter collectively referred to as the "Foster children"). Plaintiffs agreed to the placement. Foster Child 1 was the oldest of five siblings placed in Foster Care.

10.     During the placement, Kyle Higgins advised the Plaintiffs that the girls' cases were moving towards adoption and that the natural father's rights were already terminated.

11.     In October of 2017, during the monthly visit, Kyle Higgins advised Plaintiffs that the case is moving towards adoption and that they would have the first choice to adopt the girls.

12.     In November of 2017, Plaintiffs were advised that the natural mother had surrendered her parental rights and that the children were now free for adoption.

3.      In December of 2017, Kyle Higgins met with the Plaintiffs and informed them that they were in consideration for adoption

3

14.     Three weeks after the December meeting, Plaintiffs were informed by Kyle Higgins that a family in Illinois was interested in adopting all five children and Plaintiffs were told what the plan was for proceeding with that.

15.     The Plaintiffs and the children both asked Defendants Kyle Higgins and Katie Epperly questions about the family. These defendants claimed to not know the answers.   It later came to the attention of Plaintiffs, that the foster parents of the two younger brothers and younger sister of the Foster child 1 and Foster child 2 had been given details about the Illinois family. One of the foster parents advised Plaintiffs that the potential adoptive family "were two wealthy gay men with lots of family around to support them and the adoption." Plaintiffs were baffled as to why the caseworker refused to share this information with them.

16.     A few days thereafter Defendant Kyle Higgins came to Plaintiffs home and expressed she heard that the two Foster children were anxious to have their questions answered about the adoptive home.   During Defendant Kyle Higgin's discussion with the Foster Child 1 she questioned the child about her religious beliefs concerning homosexuality and asked her if she would change her religious beliefs if she went with another family.

17.      In April of 2018, Foster Child 2 was removed from Plaintiffs home for confidential reasons unique to Foster child 2.   This was by agreement between the Plaintiffs and DCP&P.

18.     On May 22, 2018 Plaintiff Jennifer Lasche met with Kyle Higgins and the therapist for the Foster Child 1. At that meeting Plaintiff, Defendant Higgins and the therapist agreed not to discuss adoption with the foster child because it was too soon after Foster Child 2's removal and put too much pressure on Foster Child 1. The therapist said that she wanted Foster Child 1 to just be able to relax and be part of the family as they all got readjusted to the new living situation. Plaintiff agreed this was best for Foster Child 1. There was some discussion among the meeting participants

4

of Foster Child 1 possibly exploring time with her siblings to see if she wanted to be adopted with them. Plaintiff was not opposed to letting Foster Child 1 explore that and allowing her to make the decision without any question or resentment.

19.     At that meeting, Defendant Higgins discussed that there was going to be a Court date on June 4, 2018, where the options for all five Foster children would be presented to the Judge for a decision as to what would be best for the children. Those options would be for the Foster Children to be adopted by the families where they were currently placed or for all five Foster children to be adopted by the Illinois family. Defendant Higgins further represented that the Division was not going to take a position but instead would let the law guardians advocate for the Children.

20.     On June 4, 2018, the Plaintiffs received a text from Foster child 1's law guardian that the Illinois couple was off the table and that the judge wanted psychiatric evaluations of all of the children before a permanent plan was put into place. It was at this point that the attitude of the case worker towards the Plaintiffs radically changed.

21.     On or about June 31, 2018 Foster child 1 came home from her regularly scheduled therapy meeting and appeared very upset.   She stated she was upset because the therapist kept bringing up religion and told her she should not feel pressured to follow her foster family's religious beliefs.

22.     On June 19, 2018 Plaintiff Jennifer Lasche received a phone call from Defendant Kyle Higgins who begins to discuss transitioning Foster child 1 to her foster brother's home. Plaintiff expressed confusion because she thought the plan was to move forward with adoption of all the children in their current foster placements.

23.     The Plaintiff then called the law guardian for Foster child 1 who expressed surprise and confusion at what was said during the conversation and said she would investigate

5

24. Shortly thereafter the therapist arrived at the house for Foster Child 1's therapy session. Plaintiff Jennifer Lasche confronted the therapist and asked why Foster child 1 was being asked if she was being pressured to follow their religion. She tried to cover by saying it was normal to discuss how people have different beliefs, ethics, religion etc., however, after being pressed the Therapist admitted getting a phone call from Defendant Higgins before the session. The Therapist said that the Division brought to her attention that there had been a conversation that was had with Plaintiffs about the Foster Children being placed out of state with a homosexual couple, The Therapist also stated that there was "a conversation with Defendant Kyle Higgins about the Illinois couple" and "discussion about "Plaintiffs' ideas about same-sex couples."  She also said that in that conversation Defendant Kyle Higgins told the therapist that the therapist was to discuss with Foster child 1 being placed with her brothers.

25. It is clear from this conversation that the Defendant Kyle Higgins wanted to place the Children with the Indiana Couple and that she felt the Plaintiffs religious beliefs had been passed on to the Foster Children and interfered with that placement. At this point the Defendant Kyle Higgins conduct and the Conduct of the other Defendants became even more hostile.

26. On or about June 21, 2018, Foster Child 1 was picked by Defendant Kyle Higgins and another woman ostensibly for her sibling visit. It was very rare for Defendant Kyle Higgins to transport Foster Child 1 to this visit. On information and belief, they stopped at Dunkin Donuts where they interrogated Foster child 1 and lied to her in an effort to intimidate her into agreeing that she did not want to be adopted by Plaintiffs. For instance, Defendant Kyle Higgins asked the Foster child "So I hear that Mrs. Lasche tells you every time I call her" This statement was untrue and Defendant had no way of knowing if this was the case or not.

27. While at the Dunkin Donuts, Defendant Kyle Higgins told Foster Child 1 that

6

Plaintiffs would not be able to "meet her needs." They once again interrogated Foster Child 1 about her religious beliefs. At the conclusion of this interrogation instead of taking Foster Child 1 to the office for her sibling visit, as was usually the case, she was taken to the home where her foster brothers were living.

28.     The actions of the Defendant Kyle Higgins at the Dunkin Doughnuts was an attempt to convince the Foster Child that she did not want to be adopted by the Plaintiffs and the questioning of the Child about her religious beliefs in general and regarding homosexuality in particular are evidence that the reason she wanted to separate the Foster child from Plaintiff was because of plaintiffs religious beliefs.

29.     On return Defendant Kyle Higgins stated to Plaintiffs that she knew Foster Child 1 wanted to stay with them and that "we' (the DCP&P) understand that and "want to work with you because we want what's in her (foster Child 1's) best interests. Defendant Kyle Higgins then stated, "we (DCP&P) would like to have a meeting with you".

30.     The next day, Plaintiffs spoke to Defendants Kyle Higgins and Katie Epperly on the telephone to schedule the meeting. When questioned about the purpose of the meeting, Defendant Katie Epperly indicated that the DCP&P was concerned that both Foster child 1 and Foster Child 2 indicated that same-sex relationships were against their religion. Defendant Katie Epperly stated that "they" felt the children had gotten that belief from the Plaintiffs. That the Defendant indicated that they were concerned that the Foster Children had adopted a religious belief of the Plaintiffs indicates a hostility to that religious belief.

31.     There are no regulations which prohibit Foster Pants sharing religious beliefs.

32.     Plaintiffs have been active Foster parents for over 10 years and have known numerous Foster Parents and have never heard of parents or children being questioned about their

7

religious beliefs or having a child removed on the basis of a parents religious beliefs.

33.     While Plaintiffs took the Foster Children to Church and freely shared their religious beliefs with the children, on information and belief the Foster Children had picked up their religious beliefs regarding homosexuality prior to coming to Plaintiffs home.

34.     On Friday, June 29, 2018, a meeting was held at the Monmouth County office of the DCP&P.   Present at that meeting were the Plaintiffs, their attorney, Defendants Kyle Higgins, Katie Epperly, Mary Lippencot and Janelle Clark, an attorney for the State of New Jersey, and one or two additional employees of the DCP&P.

35.     At the June 29th meeting, the representatives of the DCP&P expressed concern that the Plaintiffs believed homosexuality was a sin.   They expressed concern that the Plaintiffs would reject Foster child 1 if she ever decided to explore her sexuality and sought assurance from the Plaintiffs that would not be the case. One of the individual defendants indicted that Foster child 1 would need therapy to deal with her belief that homosexuality was a sin to avoid possible future harm suggesting that a belief that homosexuality was a sin was some type of mental disorder that required treatment. Almost the entire meeting was about Plaintiffs belief that homosexuality was a sin.   It was clear to the Plaintiffs from this meeting that the Defendants were hostile to the Plaintiffs religious beliefs regarding homosexuality.

36.     On Monday, July 2, 2018, the DCP&P went before the Family Court and sought the removal of Foster Child 1 from Plaintiffs' custody.   The law guardian appointed to represent the interests of Foster Child 1 told Plaintiffs that this was done over her objections.

37.     Plaintiffs were not given notice that they had a right to be heard at the hearing. On information and belief case workers for the DCP&P do not usually ignore statutory mandates. This failure to give notice in accordance with the law is evidence that the Defendants were trying to hide

something from Plaintiffs and were acting in bad faith. Defendant's bad faith was due to their hostility to the Plaintiffs Religious beliefs as expressed in the meeting the day before.

38.     Based on the issues that were raised and the comments made at the meeting just prior to the Court hearing Plaintiffs allege that the reason for the Defendants seeking removal the Foster Child 1 from their home was hostility to their religious beliefs.

39.     The next day the DCP&P removed Foster child 1 from Plaintiffs' home in spite of their wish to adopt said child and in complete disregard of the wishes of the child. Foster Child 1 was placed in the foster home where foster child 2 had been placed. Plaintiffs have not seen the child since July 3, 2018.

40.     On information and belief, a therapist had advised the DCP&P that because, as the oldest child of the five siblings, Foster child 1 had become so "parentified" by her younger siblings as a result of trauma in the biological home. The therapist further opined that it was in Foster Child 1's best interests to be adopted alone. In spite of this the Defendants sought to have the child adopted with a sibling rather than by the Plaintiffs because their hostility to Plaintiffs religious beliefs were so strong.

41.     On October 12, 2018, a representative of the DCP&P arrived at the Plaintiffs' house to perform the required yearly inspection that is necessary for a Foster Parents license to be renewed.

42.   When the inspection was completed, the inspector asked the Plaintiffs if they knew that their license was suspended by the Monmouth County DCP&P office.   Plaintiffs informed the inspector that they were not aware that they had been suspended. The inspector then informed them that the Monmouth County office should have notified Plaintiffs that they were suspended and told them what the reasons for the suspension were.

43.     Based on the suspension taking place shortly after the meeting wherein the

Defendants expressed hostility to Plaintiffs religious beliefs, and the lack of any other disqualifying factors for suspending Plaintiffs as Foster Parents, it is clear that the only reason for the Plaintiffs' suspension from the system was the defendants hostility to Plaintiffs' religious belief that homosexuality is a sin. Further, Defendants ignored the Rules and Regulations and did not give Plaintiffs notice as to why they were suspended because they did not have a legitimate non-discriminatory basis for the suspension.

44.     Plaintiffs' qualifications to be foster parents had never been questioned and they had been relicensed as foster parents on a regular basis over a 10 year period with no complaints against them. It was not until the Defendants found out about Plaintiffs religious beliefs regarding homosexuality that they were suddenly found unfit to adopt a child or to be Foster Parents.

45.     On information and belief a suspension by the Department of Children and Families Office of Licensing would have to be initiated by the Plaintiffs DCP&P case worker Kyle Higgins and approved by the case workers supervisor, Katie Epperly and / or the Manager for the district office Mary Lippincott. The person with ultimate authority over both the DCP&P and the Department of Children and Families Office of Licensing is the Defendant Christine Norbut Beyer.

46.     As of this date they have still not been given a reason by DCP&P for their suspension.

## COUNT I

## VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION

## N.J.S.A. § 10:5-1 et. seq.

47.     Plaintiffs repeat each and every allegation set forth in paragraphs 1-35 as if set forth more fully herein.

10

48.   The New Jersey Dept. Of Children and Families and the DCP&P are places of public accommodation.

49.   The State of NJ, the New Jersey Dept. Of Children and Families the DCP&P, and all the individual defendants have discriminated against the Plaintiffs and denied the Plaintiffs the ability to be Foster Parents because of the Plaintiff's religious beliefs.

50.   The acts of the Defendants are violations of N.J.S.A. § 10:5-4.

WHEREFORE Plaintiffs demand judgment for injunctive relief, damages, punitive damages, attorney fees and costs of suit.

## COUNT II

## ACTION PURSUANT TO 42 USCS §§ 1983 FOR VIOLATION OF PLAINTIFFS FIRST AMENDMENT RIGHTS

51.   Plaintiffs repeat each and every allegation set forth in Counts 1 through 48 as if set forth more fully herein.

52.   At all relevant times herein the individual defendants acted under color of state law.

53.   The individual defendants took retaliatory action against the Plaintiffs on the basis of a religious belief held by plaintiffs in violation of the First Amendment to the Constitution of the United States.

54.   A key tenant of Christianity is that religious belief should be shared. Defendants took retaliatory action against the Plaintiffs because they had shared a religious belief with their Foster Children. This retaliatory action based on a religious practice is a violation of the First Amendment to the Constitution.

11

55.     The Defendants also took retaliatory action based on the speech of the Defendants in violation of the First Amendment to the Constitution.

56.     The Defendants have denied Plaintiffs the right to participate in the Foster Care Program solely on the basis of their exercise of their first Amendment rights to hold a religious belief and to share a religious belief.

WHEREFORE pursuant to 42 USCS §§ 1983 Plaintiffs demand Judgment against the The State of New Jersey, The Dept. Of Children And Families, Christine Norbut Beyer In her official capacity and the individual Defendants acting in their official capacity for injunctive relief reinstating them as foster parents and enjoining the Defendants from discriminating against them or violating their First Amendment Rights in the future and for attorney fees and costs of suit.

## COUNT III

## ACTION PURSUANT TO 42 USCS § 1985 FOR CONSPIRACY TO VIOLATE PLAINTIFFS CONSTITUTIONAL RIGHTS

57.     Plaintiffs repeat each and every allegation set forth in paragraphs 1-54 as if set forth more fully herein.

58.     On or about June 22 2018 the Defendants Kyle Higgins and Katie Epperly together made a call to the Plaintiff Jennifer Lasche wherein they both indicated they wanted a meeting with Plaintiffs to discuss their religious beliefs. At that meeting the other Defendants were present and indicated agreement with Defendants Higgins and Epperly opinion that the Plaintiffs religious beliefs were a problem.

59.     The actions of removing the Foster Child from Plaintiffs home and suspending their license could not have been taken solely on the imitative of the case worker but also required the approval and cooperation of the other Defendants all acting in their official capacity.

12

60.   The individual Defendants conspired for the purpose of depriving Plaintiffs either directly or indirectly, their First Amendment Rights.

61.   As a result of said conspiracy Plaintiffs have been deprived of having and exercising the rights or privilege of a citizen of the United States, granted pursuant to the 1st, 5th and 14th Amendments to the Constitution.

WHEREFORE pursuant to 42 USCS § 1985 Plaintiffs demand Judgment against the individual Defendants for injunctive relief reinstating them as foster parents and enjoining the Defendants from discriminating against them or violating their First Amendment Rights or conspiring to do so and for attorney fees and costs of suit.

Dated:   December 26, 2022            By:   *Michael P. Laffey*
                                            Michael P. Laffey
                                            *Attorneys for Plaintiffs*


## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury of all matters properly triable thereto.

Dated: December 26, 2022

*Michael P. Laffey*
Michael P. Laffey


## DESIGNATION OF TRIAL COUNSEL

Plaintiff designates Michael P. Laffey, Esq. as its trial counsel in this matter.

Dated: December 26, 2022

*Michael P. Laffey*
Michael P. Laffey

14