**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MICHAEL LASCHE and JENNIFER LASCHE, <br><br> Plaintiffs, <br><br> v. <br><br> NEW JERSEY DEPARTMENT OF CHILDREN AND FAMILIES, *et al.*, <br><br> Defendants. | Civil Action No. 18-17552 (GC) (TJB) <br><br> **OPINION** |

**CASTNER, District Judge**

**THIS MATTER** comes before the Court upon Defendants New Jersey Department of Children and Families (the Department), Christine Norbut Beyer, Commissioner of the New Jersey Department of Children and Families, Kyle Higgins, Mary Lippincot, Katie Epperly, Janelle Clark, and Juslande Pacius's Motion to Dismiss Plaintiffs Michael and Jennifer Lasche's Fourth Amended Complaint (FAC) (ECF No. 114) under Federal Rule of Civil Procedure (Rule) 12(b)(1) and 12(b)(6). (ECF No. 115.) Plaintiffs opposed, and Defendants replied. (ECF Nos. 117, 121.) The parties also submitted briefing on supplemental authority issued after the completion of briefing in this case, and supplemental briefing on whether Plaintiffs have standing to pursue injunctive and declaratory relief. (ECF Nos. 122, 124, 134, 135.) The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendants' Motion is **GRANTED in part** and **DENIED in part**.

## I.     BACKGROUND

### A.     Factual Background[1]

This case has been the subject of three Opinions of this Court and an Opinion issued by the United States Court of Appeals for the Third Circuit.  *See Lasche v. New Jersey,* Civ. No. 18-17552, 2019 WL 4727922 (D.N.J. Sep. 26, 2019); *Lasche v. New Jersey*, Civ. No. 18-17552, 2020 WL 2989145 (D.N.J. June 4, 2020); *Lasche v. New Jersey*, Civ. No. 20-2325, 2022 WL 604025 (3d Cir. Mar. 1, 2022); *Lasche v. New Jersey*, Civ. No. 18-17552, 2022 WL 17250731 (D.N.J. Nov. 28, 2022).[2]  Thus the Court presumes the parties' familiarity with the underlying facts and summarizes only those facts necessary for the resolution of this Motion.

#### 1.     *Plaintiffs' Christian Beliefs and Their Service as Resource Parents*

Plaintiffs are devout Christians who served as licensed resource parents[3] in New Jersey for more than ten years.  (ECF No. 114 ¶¶ 2, 4.)  As part of their Christian faith, Plaintiffs uphold the "teachings that marriage is the lifelong union of one man and one woman [and] that sexuality is reserved for marriage[.]"  (*Id.* ¶ 4.)  After completing the requisite licensing requirements to become resource parents in New Jersey, which involved spending "six to eight weeks in initial classes, and collectively around thirty hours on classes, paperwork, and interviews," Plaintiffs fostered their first child in or around 2007.  (*Id.* ¶¶ 55-56.)  In advance of their first placement, Plaintiffs "were extremely open with New Jersey about their entire lives—including their love of

---

[1]     On a motion to dismiss under Rule 12(b)(6), the Court must accept all facts as true, but courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation omitted).

[2]     This matter was reassigned to the Undersigned on January 17, 2023.  (ECF No. 55.)

[3]     The Court will refer to Plaintiffs as "resource parents" consistent with Plaintiffs' FAC. (ECF No. 114 ¶ 2.)  The New Jersey Administrative Code refers to foster parents as "resource family parents."  *See* N.J. Admin. Code § 3A:51-1.1 *et seq.*

God, their Christian faith, and their desire to help children in need, all from a Christian perspective." (*Id.* ¶ 56.)  Plaintiffs contend they did not "receive or perceive any negative reaction to their religious beliefs, exercise, or speech," and their "license was renewed every 3 years for 11 years." (*Id.* ¶¶ 56-57.)

### 2.    *Plaintiffs Foster Jane Doe and Susan Doe[4]*

In September 2017, the New Jersey Division of Child Protection and Permanency (DCPP)[5] "contacted [Plaintiffs] to ask them whether they would be willing to foster two girls (Jane Doe and Susan Doe) who had recently been removed from another foster home." (*Id.* ¶ 58.)  Plaintiffs, who had previously hosted the girls for a weekend, accepted Jane and Susan (biological sisters) into their home. (*Id.* ¶¶ 59, 62.)  Before accepting Jane and Susan, Plaintiffs "made clear that they were concerned about inappropriate sexual boundaries being introduced into their home." (*Id.* ¶ 60.)  In response, "Defendants Katie Epperly (the case supervisor) and Kyle Higgins (the caseworker) reassured [Plaintiffs] that this wasn't an issue." (*Id.* ¶ 61.)

Plaintiffs aver that they openly discussed their Christian faith with the girls, including by reading the Bible together. (*Id.* ¶ 70.)  Plaintiffs further contend these discussions were always conducted in an age-appropriate manner, as Jane and Susan were 12 and 10 years old, respectively. (*Id.*)  Plaintiffs "have no recollection of ever discussing same-sex attraction, same-sex sexual relationships, or same-sex marriage in any direct way with Jane or Susan." (*Id.*)

Plaintiffs maintain that Jane and Susan adjusted well to living with them.  During September and October 2017, Plaintiffs took the sisters on day trips to museums and to the beach,

---

[4]    Plaintiffs use pseudonyms to protect the identities of the minors involved.  *See* L. Civ. R. 5.2(17).

[5]    DCPP is part of the New Jersey Department of Children and Families (the Department). *See Craven v. Leach*, 647 F. App'x 72, 73-74 (3d Cir. 2016).

hiked, biked, attended church, and participated in family devotions. (*Id.* ¶ 63.) In December 2017, after DCPP informed Plaintiffs that Jane and Susan's biological mother had surrendered her parental rights, Plaintiffs met with DCPP to discuss the possibility of adoption. (*Id.* ¶¶ 65-66.) At this meeting, Plaintiffs confirmed they were interested in adopting Jane, "but expressed concern about Susan, as the reassurance given by Epperly and Higgins [regarding Plaintiffs' concern about inappropriate sexual boundaries being introduced into their home] was belied." (*Id.* ¶ 67.)

### 3.    *A Same-Sex Illinois Couple Seeks to Adopt Jane, Susan, and Their Siblings*

Despite Plaintiffs' willingness to adopt Jane, DCPP later determined that Jane, Susan, and their three other siblings had to be adopted together. (*Id.* ¶¶ 62, 68.) DCPP identified "an interested same-sex couple in Illinois that had recently passed [DCPP]'s home study" to potentially adopt the siblings. (*Id.* ¶ 69.) Plaintiffs contend that in light of this development—and because DCPP knew of Plaintiffs' Christian beliefs—DCPP's "attitude toward [Plaintiffs] deteriorated." (*Id.* ¶ 71.)

For example, Higgins (Jane and Susan's caseworker) told Plaintiffs that she was unable to provide them with basic information about the Illinois couple. (*Id.* ¶¶ 72-74.) But according to Plaintiffs, Higgins provided information about the Illinois couple to Lori, the resource mother of one of Jane and Susan's siblings. (*Id.* ¶¶ 76-79.) Specifically, Higgins told the other resource parents that "the Illinois couple comprised two wealthy men in a same-sex relationship, who each had plenty of family members nearby who could support the adoption." (*Id.* ¶ 78.) Plaintiffs confronted Higgins, who "became visibly nervous and began fumbling for words." (*Id.* ¶ 83.) Higgins claimed that Lori already knew the Illinois couple and had therefore shared information about them with the other resource parents. (*Id.*) Higgins also said that DCPP was unable to provide more details about the Illinois couple because of "unique" confidentiality issues. (*Id.*)

Higgins met with Jane to discuss the possible adoption. (*Id.* ¶ 84.)  At one point in the conversation, Jane asked Higgins the couple's names, to which Higgins responded: "Are you asking that question to know their gender?" (*Id.*)  According to Plaintiffs, Higgins then asked Jane "how she would react if her friends started to have feelings for someone of the same sex." (*Id.* ¶ 85.)  Jane responded that "she already had friends who expressed those feelings, but that those friends later abandoned those feelings because they knew those feelings were wrong." (*Id.* ¶ 86.)  Further, Jane told Higgins that she would not change her religion if she joined another family. (*Id.* ¶ 87.)

### 4.      *DCPP Attempts to Pressure Jane to Leave Plaintiffs' Home*

In March 2018, Susan was removed from Plaintiffs' home due to certain conduct related to Susan that Plaintiffs learned from Jane. (*Id.* ¶ 88.)  Jane, however, continued to live with Plaintiffs.  In May 2018, Jane's therapist encouraged Plaintiffs to stop discussing potential adoption with Jane because it was "putting too much pressure" on her. (*Id.* ¶¶ 91-92.)  Jane's therapist also suggested that Jane spend more time with her siblings, "which would help her ensure that she wanted to be adopted alone." (*Id.* ¶ 93.)  Plaintiffs agreed to allow Jane to spend time with her siblings so that she could make an informed decision about her adoption. (*Id.*)

Higgins informed Plaintiffs that on June 4, 2018, DCPP would present the Illinois couple to the court. (*Id.* ¶ 94.)  Plaintiffs did not attend the hearing,[6] but Jane was accompanied by her law guardian, Lauren, who "could advocate for her placement before the court." (*Id.* ¶ 95.)  Lauren "wanted Jane to remain with [Plaintiffs] because she knew that Jane loved [Plaintiffs], and that

---

[6]      Plaintiffs note that as "resource parents, they do not represent a child's legal interests in court proceedings." (ECF No. 114 ¶ 95.)

[Plaintiffs] would love and support Jane." (*Id.* ¶ 96.) At the hearing, "the judge rejected the Illinois couple as adoptive parents." (*Id.* ¶ 97.)

The next day, Jane returned home from a meeting with her therapist "visibly upset." (*Id.* ¶ 99.) According to Jane, her therapist had "pressured her to abandon her Christian beliefs." (*Id.* ¶ 100.) More specifically, the therapist "kept reminding Jane that she didn't have to follow [Plaintiffs'] religion," and the therapist told Jane that she would have to become comfortable with the idea of being adopted with her siblings. (*Id.* ¶¶ 100-101.) Jane objected to the idea of being adopted along with her siblings. (*Id.* ¶ 101.) According to Plaintiffs, the therapist discussed religion with Jane because Higgins called the therapist prior to the counseling session to "explain [Plaintiffs'] religious beliefs about same-sex couples." (*Id.* ¶ 112.)

Later in June 2018, Higgins called Plaintiffs to discuss the possibility of removing Jane from Plaintiffs' home. (*Id.* ¶ 103.) According to Plaintiffs, Higgins said that Jane could not decide whether to be adopted with her siblings because Jane "loved [Plaintiffs] too much." (*Id.* ¶¶ 104-105.) Higgins informed Plaintiffs that "Jane wanted to live with her brothers, but she was too afraid to admit it because of her love for" Plaintiffs. (*Id.* ¶ 106.) Plaintiffs claim "that neither the judge nor the law guardian requested" Jane's removal from Plaintiffs' home, but rather DCPP "alone determined that this change was necessary." (*Id.* ¶ 107.) Plaintiffs allege that it was Higgins' hope that "Jane would be open to abandoning her religious beliefs so that [DCPP] could allow the Illinois couple to adopt her." (*Id.* ¶ 113.)

Several days later, Higgins arranged for Jane to meet with her siblings. (*Id.* ¶ 115.) Higgins and another woman picked Jane up and first took her to a Dunkin' Donuts. (*Id.* ¶¶ 116-117.) According to Plaintiffs, while in the parking lot, "Higgins and the other woman began interrogating Jane, trying to intimidate her into leaving" Plaintiffs' home. (*Id.* ¶ 117.) Among other things,

6

Higgins "tried to convince Jane that [Plaintiffs] would not be able to 'meet her needs.'" (*Id.* ¶ 119.)  This made Jane feel uncomfortable, and she asked Higgins and the other woman why they were questioning her. (*Id.* ¶ 120.)  Higgins responded that DCPP did the same with everyone. (*Id.*)

On that same day, Plaintiffs met with Jane's law guardian, Lauren. (*Id.* ¶ 122.)  Plaintiffs allege that Lauren told Plaintiffs that DCPP was seeking to "muscle" Jane out of their home, and she explained that DCPP would go so far as to fabricate evidence as a basis for an emergent removal. (*Id.* ¶ 123.)

### 5.    *DCPP's Concerns Over Jane and Susan's Religious Beliefs*

Following Jane's visit with her siblings, Higgins asked to meet with Plaintiffs. (*Id.* ¶ 124.)  When Jennifer called Higgins to schedule the meeting, both Higgins and Epperly (Jane's case supervisor) were on the phone. (*Id.* ¶ 126.)  Jennifer recorded the call, during which Epperly stated that DCPP wanted to schedule a meeting with Plaintiffs because there had been "a lot of miscommunication" recently. (*Id.* ¶¶ 126-127.)  Further, Epperly told Jennifer that concerns about "inappropriate statements or boundaries" had been reported to her. (*Id.* ¶ 128.)

When Jennifer asked Epperly to clarify what she meant, Epperly stated that "both the children had reported that their belief is now that same-sex couples are against their religion and not okay.  And everybody's entitled to their own beliefs, but as, you know, foster families, we – that's not something we can support." (*Id.* ¶ 129 (emphasis omitted).)  Epperly added that "really played a part into why we could not proceed with the home in Chicago," and that was "an issue for us because we, as an agency, need to be supportive to all races [and] sexual orientation[s.]" (*Id.*)  Jennifer questioned Epperly about what Jane and Susan's religious beliefs had to do with Plaintiffs, to which Epperly responded, "[w]ell, that's their belief since they got into your home." (*Id.*)

7

### 6.    *Plaintiffs' Meeting with DCPP*

On June 29, 2018, Plaintiffs met with "Epperly, Higgins, Mary Lippincott ([DCPP's] manager at the Asbury Park office), Juslande Pacius ([Plaintiffs'] resource parent supervisor), Janelle Clark ([Plaintiffs'] resource parent worker), and several other unidentified [DCPP] employees to discuss the issues identified by Epperly over the phone." (*Id.* ¶ 132.) According to Plaintiffs, almost the entire meeting focused on their religious beliefs. (*Id.* ¶ 133.) Plaintiffs aver that their "Christian beliefs regarding marriage and sexuality worried [DCPP] because it believed that [Plaintiffs] would reject Jane if she ever chose to explore her sexuality." (*Id.* ¶ 134.) Plaintiffs allege that one DCPP employee at the meeting "remarked that Jane would need therapy to address her religious belief that homosexuality was sinful." (*Id.* ¶ 135.) In response to DCPP's questioning about whether Plaintiffs "would allow Jane to explore her sexuality if she chose to do so," Plaintiffs "confirmed that they would love and support her no matter what." (*Id.* ¶ 137.)

### 7.    *Jane is Removed from Plaintiffs' Home*

On July 2, 2018, DCPP "requested an emergent hearing to ask the judge to remove Jane from [Plaintiffs'] home, but they did not notify [Plaintiffs] about the hearing." (*Id.* ¶ 140.) Jennifer learned about the hearing upon receiving "a frantic text from Lauren." (*Id.* ¶ 141.) At the hearing, DCPP "claimed that Jane needed to be removed from [Plaintiffs'] home because [Plaintiffs] had apparently inflicted emotional trauma on Jane." (*Id.* ¶ 148.) Lauren attended the hearing and objected to DCPP's request to remove Jane from Plaintiffs' home. (*Id.* ¶ 149.) But the judge ordered that Jane be removed, and further "ordered [DCPP] to investigate [Plaintiffs'] home and determine whether to suspend their resource parent license." (*Id.* ¶¶ 150-151.) DCPP removed Jane shortly thereafter. (*Id.* ¶ 154.)

Jane later contacted Plaintiffs via text message to ask about her removal. (*Id.* ¶¶ 155, 158.) Jennifer relayed Higgins' explanation—that "[Plaintiffs'] Christian beliefs would prevent Jane

from exploring her sexuality." (*Id.* ¶ 158.) Jane, however, responded that "Higgins had given her a different explanation," specifically that Plaintiffs "had problems taking care of" her. (*Id.* ¶ 159.) But when Jane pressed Higgins to provide more details, Higgins replied "Oh, I can't say." (*Id.*)

### 8.     *Plaintiffs' Resource Parent License is Suspended*

In October 2018, several months after Jane's removal, Plaintiffs learned that DCPP had suspended Plaintiffs' resource parent license. (*Id.* ¶¶ 160-161.) A state inspector conducting a routine home inspection asked Plaintiffs "whether they knew that their home had been suspended by the [DCPP's] Asbury Park Office." (*Id.* ¶ 161.) Plaintiffs were unaware of this at the time. (*Id.*) The inspector told Plaintiffs that "he had received an email from [DCPP] on September 28, 2018, explaining that [DCPP] would contact [Plaintiffs] about the suspension." (*Id.* ¶ 162.) But DCPP never did so. (*Id.* ¶ 163.) The inspector informed Plaintiffs that although they had met all the criteria to maintain their resource parent license, he "explained that the suspension by the Asbury Park Office made it impossible for [Plaintiffs] to care for any future foster children." (*Id.* ¶ 164.) Although DCPP maintains that Plaintiffs may reapply for their resource parent license, Plaintiffs contend that they cannot demonstrate compliance with the applicable resource parent guidelines "with the ban on [Plaintiffs'] religious speech and exercise that [DCPP] grafts onto the Regulations." (*Id.* ¶¶ 166-167.)

### B.     Procedural Background

On November 19, 2018, Plaintiffs filed their initial Complaint in New Jersey state court. (ECF No. 1-1.) Defendants thereafter removed the matter to this Court.[7] (ECF No. 1.) Two rounds of motions to dismiss followed, and the Court dismissed Plaintiffs' Complaint and First Amended Complaint for failure to state a claim against the state employees under Rule 12(b)(6).

---

[7]     The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

*See Lasche*, 2019 WL 4727922 (D.N.J. Sep. 26, 2019); *Lasche*, 2020 WL 2989145 (D.N.J. June 4, 2020). Plaintiffs appealed, and the Third Circuit affirmed in part and reversed in part. *See Lasche*, 2022 WL 604025 (3d Cir. Mar. 1, 2022). The Third Circuit affirmed the dismissal of Plaintiffs' First Amendment retaliation claim to the extent it was based on the removal of Jane from their home as well as Plaintiffs' equal protection claim. *Id.* at *5-6. However, the Third Circuit held that Plaintiffs stated a plausible claim for First Amendment retaliation based on the suspension of their license, but it left the initial consideration of Defendants' qualified immunity defense to this Court on remand. *Id.* at *4-5. The Third Circuit also held that DCPP, as an entity, qualifies as a place of public accommodation, thereby remanding Plaintiffs' New Jersey Law Against Discrimination (NJLAD), N.J. Stat. Ann. § 10:5-1 *et seq.*, claim. *Id.* at *8.

On remand, Plaintiffs filed a Second Amended Complaint (SAC) "alleging only causes of action consistent with the Third Circuit's mandate." *Lasche,* 2022 WL 17250731, at *1 (Nov. 28, 2022). Defendants moved to dismiss the SAC. On November 28, 2022, the Court ruled in favor of Defendants. First, the Court found that Plaintiffs' federal constitutional claims were barred under the doctrine of qualified immunity. *Id.* at *5-7. Specifically, the Court held that the constitutional rights Defendants plausibly violated were not clearly established. *Id.* Second, the Court held that Plaintiffs' claims for injunctive relief failed because Plaintiffs did not "properly allege that [ ] Defendants have the requisite authority to enforce the injunctive relief" sought. *Id.* at *4. Finally, the Court declined to rule on Plaintiffs' NJLAD claim, as the parties agreed that the claim should be remanded to state court if the Court dismissed the federal claims. *Id.* at *8. The Court granted Plaintiffs thirty days to file an amended complaint. *Id.*

On December 26, 2022, Plaintiffs filed their Third Amended Complaint (TAC). (ECF No. 52.) Defendants thereafter filed a Partial Motion to Dismiss the TAC. (ECF No. 56.) The parties

10

then entered into settlement discussions.  The parties were unable to resolve the matter.  On January 17, 2025, the Plaintiffs were permitted to amend their complaint once again.  (ECF No. 113.)  On January 21, 2025, Plaintiffs filed the operative FAC.  (ECF No. 114.)

In their nine-count FAC, Plaintiffs bring four claims under 42 U.S.C. § 1983 for violations of the Free Exercise Clause of the First Amendment to the United States Constitution: not generally applicable individualized exemptions (Count One); not generally applicable comparable activity (Count Two); religious hostility (Count Three); and religious status discrimination (Count Four). Plaintiffs also bring two claims under 42 U.S.C. § 1983 for violations of the Free Speech Clause of the First Amendment: viewpoint discrimination (Count Five) and compelled speech (Count Six).  Finally, Plaintiffs bring claims under 42 U.S.C. § 1983 for First Amendment retaliation (Count Seven); 42 U.S.C. § 1985 for conspiracy to interfere with civil rights (Count Eight); and NJLAD for religious discrimination (Count Nine).  (ECF No. 114 ¶¶ 168-262.)

Plaintiffs seek monetary, injunctive, and declaratory relief.  (*Id.* ¶¶ 263-268.)  Plaintiffs seek declaratory relief requiring Defendants "to cease discriminating against [Plaintiffs] and those who share [Plaintiffs'] religious beliefs on the basis of their religious beliefs, exercise, or speech." (*Id.* ¶ 263.)  Plaintiffs also seek injunctive relief prohibiting Defendants "from any suspension of [Plaintiffs] on the basis of their religious beliefs, exercise, or speech" and prohibiting Defendants "from construing and applying their regulations and policies to discriminate against resource parents on the basis of their religious beliefs, exercise, or speech."  (*Id.* ¶¶ 264-265.)  In terms of monetary relief, Plaintiffs seek nominal, compensatory and punitive damages.  (*Id.* ¶ 266.)

## II.   LEGAL STANDARD

### A.    Rule 12(b)(1)

Rule 12(b)(1) permits a defendant to move at any time to dismiss the complaint for lack of subject matter jurisdiction on either facial or factual grounds.  *Gould Electronics Inc. v. United*

*States*, 220 F.3d 169, 176 (3d Cir. 2000). A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction." *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999). In analyzing a facial challenge, a court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Electronics Inc.*, 220 F.3d at 176. "A court considering a facial challenge construes the allegations in the complaint as true and determines whether subject matter jurisdiction exists." *Arosa Solar Energy Sys., Inc. v. Recom Solar, LLC*, Civ. No. 18-1340, 2021 WL 1196405, at *2 (D.N.J. Mar. 30, 2021).

A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts." *Hartig Drug Co. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268. Regardless of the type of challenge, the plaintiff bears the "burden of proving that the court has subject matter jurisdiction." *Cottrell v. Heritages Dairy Stores, Inc.*, Civ. No. 09-1743, 2010 WL 3908567, at *2 (D.N.J. Sep. 30, 2010) (citing *Mortensen*, 549 F.2d at 891).

Rule 12(b)(1) also encompasses dismissals for "lack of jurisdiction due to Eleventh Amendment immunity." *Nemeth v. Off. of the Clerk of the N.J. Super. Ct.*, Civ. No. 19-16809, 2020 WL 2537754, at *2 (D.N.J. May 19, 2020). State sovereign immunity under the Eleventh Amendment "is a jurisdictional bar which deprives federal courts of subject matter jurisdiction."

*Wright v. New Jersey/Dep't of Educ.*, 115 F. Supp. 3d 490, 494 (D.N.J. 2015). Once a challenge to jurisdiction is raised under Rule 12(b)(1), the plaintiff bears the burden to demonstrate the existence of subject-matter jurisdiction. *See McCann v. Newman Irrevocable Tr.*, 458 F.3d 281, 285-86 (3d Cir. 2006).

### B.    Rule 12(b)(6)

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it contain enough facts to state a claim to relief that is plausible on its face." *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (citation modified). "A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (citation modified). When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements." *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021)). The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim." *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020) (citing *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016)).

## III.    <u>DISCUSSION</u>

### A.    Standing to Pursue Declaratory and Injunctive Relief

Following the parties' initial briefing, the Court ordered the parties to provide supplemental briefing as to whether Plaintiffs have standing to pursue the injunctive and declaratory relief they seek in light of their allegation that "[t]o this day, [DCPP] maintains that [Plaintiffs] may reapply for a license to serve as resource parents." (ECF No. 114 ¶ 166; ECF No. 133); *Wayne Land &*

13

*Mineral Group, LLC v. Del. River Basin Comm.*, 959 F.3d 569, 574 (3d Cir. 2020) (stating that "federal courts have an obligation to assure themselves of litigants' standing under Article III" including that "we raise the issue of standing . . . sua sponte." (citation modified)).

Article III of the United States Constitution limits a federal court's jurisdiction to actual cases or controversies. U.S. Const., art. III, § 2, cl. 1. The doctrine of Article III standing is "an additional limitation on the federal judicial power derived from the case-or-controversy requirement," which prohibits courts from issuing "advisory opinions." *Lutter v. JNESO*, 86 F.4th 111, 123-24 (3d Cir. 2023). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing" standing. *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016). A plaintiff must meet that burden "with the manner and degree of evidence required at the successive stages of the litigation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

A plaintiff must establish standing "for each claim that it presses and for each form of relief that it seeks." *Lutter*, 86 F.4th at 124 (citation modified). For prospective injunctive relief, "a plaintiff must show (1) [he or she] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Freedom from Religion Found. Inc v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 476 (3d Cir. 2016) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).[8] The Court

---

[8]   A plaintiff seeking declaratory relief must meet the same three-part standing test as a plaintiff seeking injunctive relief. *See Lovaglio v. Baston*, Civ. No. 23-21803, 2025 WL 2268133, at *7 (D.N.J. Aug. 8, 2025); *see also St. Thomas--St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*, 218 F.3d 232, 240 (3d Cir. 2000) ("A declaratory judgment or injunction can issue only when the constitutional standing requirements of a 'case' or 'controversy' are met.");

may consider "[p]ast wrongs" as "evidence bearing on whether there is a real and immediate threat of repeated injury," but past wrongs alone cannot establish standing for injunctive relief "if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (citation modified); *Short v. N.J. Dep't of Educ.*, Civ. No. 23-21105, 2024 WL 3424729, at *4 (D.N.J. July 16, 2024) ("[B]y itself . . . prior injury is insufficient to confer standing for injunctive relief[.]").

The injunctive relief Plaintiffs seek includes: (1) "prohibiting Defendants, their agents, employees, and those acting in concert with any of them from any suspension of [Plaintiffs] on the basis of their religious beliefs, exercise, or speech;" and (2) "prohibiting Defendants, their agents, employees, and those acting in concert with any of them from construing and applying their regulations and policies to discriminate against resource parents on the basis of their religious beliefs, exercise, or speech[.]" (ECF No. 114 ¶¶ 264-265.) As for declaratory relief, Plaintiffs ask this Court to "[d]eclare that the First and Fourteenth Amendments to the United States Constitution require Defendants to cease discriminating against [Plaintiffs] and those who share [Plaintiffs'] religious beliefs on the basis of their religious beliefs, exercise, or speech." (*Id.* ¶ 263.)

Defendants argue that Plaintiffs lack standing to pursue such relief because "their continued failure to apply for renewal of their expired resource parent license means that their purported injury—their nonparticipation in the State's foster care system—is neither traceable to Defendants' actions nor redressable by prospective relief." (ECF No. 135 at 1.)[9] Defendants "dispute that they

---

*Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 193 (3d Cir. 2004) ("A plaintiff seeking a declaratory judgment must possess constitutional standing but need not have suffered 'the full harm expected.'") (citation omitted).

[9]     Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

15

ever suspended [Plaintiffs'] license prior to the filing of this lawsuit in December 2018," and instead contend that "DCPP renewed [Plaintiffs'] license for a fifth consecutive three-year term on October 31, 2019," and that license subsequently "expired in the ordinary course in October 2022." (*Id.* at 3.)  Defendants submit that "the only reason [Plaintiffs] have not been licensed is because they chose not to seek further renewal." (*Id.*)  Therefore, Defendants argue that Plaintiffs' inability to participate in the foster care system is traceable to their own choice and is self-imposed.  (*Id.* at 3-4.)

Plaintiffs contend that their Article III standing "is unaffected by their decision not to re-apply for a resource parent license" because their "unconstitutional suspension remains on their file," and pursuant to the [Department's] regulations a previous suspension "*shall* constitute grounds for the Department to investigate the circumstances that led to the original negative action and to make a determination as to whether to reject or process the new application for a license." (ECF No. 134 at 6-7 (emphasis in original) (quoting N.J. Admin Code § 3A:51-2.5(e)).)  Moreover, Plaintiffs claim they cannot "achieve[] compliance" with the resource parent licensing guidelines because they cannot forego their religious beliefs.  (*See* ECF No. 134 at 7 (quoting N.J. Admin. Code § 3A:51-2.5(g) (stating that "[i]f a license is suspended, the Office of Licensing shall issue or reinstate the license once the resource family parent demonstrates that he or she has achieved compliance with the applicable provisions of this chapter.")).)

The Court must first identify the date by which to evaluate Plaintiffs' standing.  Standing is generally evaluated "at the time the action commences—that is, at the time the plaintiff brought the lawsuit." *Road-Con, Inc. v. City of Phila.*, 120 F.4th 346, 354 (3d Cir. 2024) (citation modified); *see also Freedom from Religion Found. Inc*, 832 F.3d at 475 ("[S]tanding must exist at the time a complaint was filed[.]").  "[O]nce the plaintiff shows standing at the outset, she need

not keep doing so throughout the lawsuit." *Hartnett v. Pa. State Educ. Ass'n*, 963 F.3d 301, 305 (3d Cir. 2020). And the filing of an amended complaint "does not restart the date for assessing standing" but rather provides a court with "additional information that can be used to evaluate standing as of the date that the lawsuit was filed." *Lutter*, 86 F.4th at 125. "That is so because an amended complaint revises the prior pleading only to reflect a more accurate understanding of the state of things when the action was filed—not to update the pleading with later occurring facts." *Id.* On the other hand, if a court permits "a supplemental complaint, then for the claims and requested relief substantively affected by the alleged post-suit developments, a plaintiff's Article III standing is evaluated as of the date of the supplemental pleading." *Id.* at 125-26; *see also Greenberg v. Lehocky*, 81 F.4th 376, 384 n.4 (3d Cir. 2023) (evaluating a plaintiff's standing based on a later-filed complaint that challenged a revision to a rule that occurred after the filing of the original complaint).

The Court finds that the FAC is more properly construed as an amended pleading as Plaintiffs' claims regarding the alleged unlawful suspension of their resource parent license and their requested relief have remained largely the same since the filing of their initial complaint. (*Compare* ECF No. 1-1 ¶ 36 ("The only apparent basis for suspending Plaintiffs as Foster Parents and for the removal of Foster Child 1 from Plaintiffs['] home was because of the Plaintiffs' religious belief[.]"), *and* ¶ 48 ("The actions of the Defendants deprived Plaintiffs of their rights, privileges, or immunities secured by the Constitution."), *with* ECF No. 114 ¶ 12 ("[DCPP] therefore had no authority to suspend [Plaintiffs] – a suspension that could just as easily apply to many families that hold similar religious teachings on marriage and sexuality."), *and* ¶ 264 (seeking "preliminary and permanent relief prohibiting Defendants . . . from any suspension of [Plaintiffs] on the basis of their religious beliefs, exercise, or speech.").) Regardless of whether

17

the Court evaluates Plaintiffs' standing at the time the suit was commenced or upon the filing of the FAC, the Court finds that Plaintiffs have standing for this Court to exercise subject matter jurisdiction.

First, to the extent Defendants challenge whether Plaintiffs have suffered an injury-in-fact, the Court finds that the suspension of Plaintiffs' resource parent license is a concrete and particularized injury. *See Shaaya v. Jaguar Land Rover N. Am. LLC*, Civ. No. 20-5679, 2022 WL 2341599, at *3 (D.N.J. June 29, 2022) ("An injury is 'concrete' if it actually exists, and 'particularized' if it affects the plaintiff personally and individually."). Plaintiffs' injury is also continuing and ongoing as Plaintiffs contend that upon renewing their license, their prior suspension subjects them to a mandatory investigation by the Department, and that Plaintiffs cannot "demonstrate compliance" with the Department's regulations without forgoing their religious beliefs.[10] (ECF No. 114 ¶¶ 166-167 (citing N.J. Admin. Code § 3A:51-2.5(e) (a suspension "shall constitute grounds for the Department to investigate the circumstances that led to the original negative action and to make a determination as to whether to reject or process the new application for a license"); N.J. Admin. Code § 3A:51-2.5(g) ("[T]he Office of Licensing shall . . . reinstate the license once the resource family parent demonstrates that he or she has achieved compliance with the applicable provisions of this chapter.")).) And Plaintiffs contend

---

[10]     Defendants dispute that they ever suspended Plaintiffs' license prior to the filing of this lawsuit in 2018. (ECF No. 135 at 3). To the extent Defendants raise a factual challenge, the Court can consider evidence outside the pleadings. *See Barrentine v. New Jersey Transit*, 44 F. Supp. 3d 530, 535 (D.N.J. 2014). Plaintiffs provided the Court with a printout of the Department's Provider Note records showing a notation from July 2018 indicating "[t]he [Plaintiffs'] home is being placed on suspension" following a court order directing DCPP to "do a thorough assessment of this resource home and suspend any resource license if necessary" as well as notations beginning in 2021 that Plaintiffs' license is "SUSPENDED." (ECF No. 134-2 at 2, 5.) Defendants have not challenged the Provider Note records and any arguments related to the cause of a suspension are more appropriate following discovery.

that they "remain very interested in serving again as resource parents in New Jersey." (ECF No. 137 at 8 (citing ECF No. 134-1 ¶ 12 (J. Lasche Declaration).) *See Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 206 (3d Cir. 2021) ("A plaintiff who alleges that he has been denied a benefit or opportunity for which he did not actually apply must generally plead enough facts to show that 'he is "able and ready" to apply.' . . . This is not necessarily a high bar to clear." (internal citation omitted)); *Carney v. Adams*, 592 U.S. 53, 65-66 (2020) (noting line of cases where plaintiffs have established more than an abstract generalized grievance to satisfy standing based on undisputed history of prior application submissions or the prior rejection of an application, along with an intent to reapply). Therefore, Plaintiffs' suspension presents a continuing adverse effect for purposes of establishing standing.

As to traceability, the United States Court of Appeals for the Third Circuit has held that both but-for causation and concurrent causation are sufficient to satisfy the causal connection required for traceability. *N.J. Bankers Ass'n v. Att'y Gen. N.J.*, 49 F.4th 849, 855 n.1 (3d Cir. 2022). "Employing the 'but for' framework, we ask, had the [defendant]'s conduct that [plaintiff] challenges not occurred, would she have suffered injury? If she would have, then the challenged conduct did not actually cause [plaintiff]'s injury; if not, then it did." *LaSpina v. SEIU Pa. State Council*, 985 F.3d 278, 285 (3d Cir. 2021). Here, had Plaintiffs' license not been suspended, Plaintiffs would have no injury from which to seek relief.[11] Thus, the second prong is met.

Third, Plaintiffs' alleged injury would be redressable if Plaintiffs were awarded the relief that they seek. "The redressability requirement ensures that the asserted injury-in-fact is capable of resolution in a manner consistent with the traditional understanding of the judicial process."

---

[11]     With regards to alleging causation, the Third Circuit noted that DCPP's decision to suspend Plaintiffs' resource parent license was "suggestive of retaliation" in light of DCPP's "prior pattern of antagonism". *See Lasche*, 2022 WL 604025, at *5.

*Lutter*, 86 F.4th at 128.   Here, granting an injunction that Defendants are prohibited from construing or applying their regulations in a discriminatory manner or from suspending Plaintiffs' license based on Plaintiffs' religious beliefs, exercise or speech would redress Plaintiffs' alleged injury.   Thus, the third and final prong is met.

Defendants also assert that Plaintiffs requested injunctive relief "prohibiting Defendants . . . from construing and applying their regulations and policies to discriminate against resource parents on the basis of their religious beliefs, exercise, or speech," (ECF No. 114 ¶ 265), is an "impermissible request for an 'obey the law' injunction," (ECF No. 135 at 3 n.2).   Rule 65(d) requires that an injunction must "state its terms specifically" and "describe in reasonable detail-- and not by referring to the complaint or other document--the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1).   "Broad, non-specific language that merely enjoins a party to obey the law or comply with an agreement . . . does not give the restrained party fair notice of what conduct will risk contempt."  *Louis W. Epstein Fam. P'ship v. Kmart Corp.*, 13 F.3d 762, 771 (3d Cir. 1994). "'[T]he degree of particularity required to satisfy the Rule's specificity provisions will depend on the nature of the subject matter.'"  *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 379 (3d Cir. 2021) (citation modified).   Here, the requested injunction is sufficiently specific and descriptive of the acts that Plaintiffs challenge, as the FAC refers specifically to the construction and enforcement of the Department's regulations that govern resource parents and that the Department not consider the resource parent's religious beliefs, exercise or speech when enforcing those regulations.  (ECF No. 114 ¶ 265.)  *See, e.g.*, *MAG Realty, LLC v. City of Gloucester City*, Civ. No. 10-988, 2010 WL 3210441, at *20 (D.N.J. Aug. 12, 2010) (entering permanent injunction enjoining the defendants from enforcing a city ordinance and state statute against the plaintiffs for exercising their First Amendment rights); *Circle Sch. v. Phillips*, 270 F. Supp. 2d 616, 619, 633 (E.D. Pa. 2003), *aff'd*

20

*in part sub nom. Circle Schs. v. Pappert*, 381 F.3d 172 (3d Cir. 2004) (finding that state statute violated the First and Fourteenth Amendments and entering permanent injunction prohibiting the defendants from enforcing that statute); *Conant v. Walters*, 309 F.3d 629, 634, 639 (9th Cir. 2002) (affirming permanent injunction enjoining the federal government from revoking physicians' Drug Enforcement Administration registration because of their advice regarding medical marijuana, as such action would violate the physicians' First Amendment rights). Accordingly, the Court finds that Plaintiffs have Article III standing to pursue their individual claims for injunctive and declaratory relief.[12]

The Court next turns to the merits of Plaintiffs' claims.

### B.    Official Capacity Claims[13]

The FAC asserts claims against Commissioner Beyer in her official capacity and the individual DCPP employees (Higgins, Lippincot, Epperly, Clark, and Pacius) in both their official

---

[12]    To the extent Defendants assert that Plaintiffs' claims are now moot based on Plaintiffs' failure to renew their license, Defendants have not met their heavy burden of showing that there is no longer a live controversy in this case. *Hartnett*, 963 F.3d at 305-06. In support, Defendants attach to their supplemental briefing a copy of Plaintiffs' resource parent license that was renewed by the Department in 2019 but lapsed in 2022. (ECF No. 135 at 7.) First, courts are "reluctant to declare a case moot . . . when the defendant argues mootness because of some action it took unilaterally after the litigation began." *Id.* at 306; *Beleno v. Lakey,* 306 F. Supp. 3d 930, 949-50 (W.D. Tx. 2009) (declining to find the plaintiffs' claims moot on motion to dismiss where the defendant's conduct is voluntary, as opposed to mandated by statute). Second, Plaintiffs contend that the "only way for us to be resource parents again in New Jersey is for our suspension to be lifted" and they cannot seek a renewal of their lapsed license until they "know [Defendants] cannot use [their] religious beliefs against [them] again." (ECF No. 134-1 ¶¶ 11-12.) The Court cannot find that it is impossible to grant "any effectual relief whatever" to Plaintiffs to render their claims moot at this stage. *Clark v. Gov. of N.J.*, 53 F.4th 769, 775 (3d Cir. 2022).

[13]    Defendants previously argued that Eleventh Amendment sovereign immunity bars Plaintiffs' claims for injunctive and declaratory relief against DCPP. (ECF No. 115-1 at 19-20.) DCPP is not a named defendant, and the Court need not analyze whether it is entitled to sovereign immunity. (ECF No. 117 at 21; ECF No. 121 at 3 n.2.) Additionally, the FAC specifies that "Defendant Department of Children and Families is sued only as a place of public accommodation

and personal capacities.  (ECF No. 114 ¶¶ 20-25.)  "A plaintiff may bring claims for prospective injunctive relief against state actors in their official capacities under 42 U.S.C. § 1983" and § 1985.[14]  *Malacow v. Thompson*, Civ. No. 20-11742, 2020 WL 7711138, at *2 (D.N.J. Dec. 29, 2020); *see also Calabrese v. New Jersey*, Civ. No. 17-4987, 2018 WL 2441763, at *3 (D.N.J. May 31, 2018) (noting that "state officials . . . sued in their official capacity for injunctive or declaratory relief . . . may be considered 'persons' amenable to suit under Section 1983"[15]).  However, "[i]ndividual state employees sued in their official capacity are [] entitled to Eleventh Amendment immunity" for suits seeking monetary relief.  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 (3d Cir. 2010); *Garcia v. Corr. Med. Servs.*, Civ. No. 08-5652, 2010 WL 1644109, at *5 (D.N.J. Apr. 21, 2010) ("The Eleventh Amendment provides state officials with immunity from suits for money damages in federal court brought against them in their official capacities."); *Robertson v. Anglemeyer*, Civ. No. 20-01736, 2022 WL 1133826, at *9 (M.D. Pa. Jan. 31, 2022) ("[C]laims for damages against a state official in [her] official capacity are barred by the Eleventh Amendment[.]") *report and recommendation adopted,* 2022 WL 613773 (M.D. Pa. Mar. 2, 2022).  Thus, Plaintiffs' claims for money damages against Commissioner Beyer and the individual DCPP employees in their official capacities are dismissed.

---

under the New Jersey Law Against Discrimination" and no federal claims are asserted against the Department.  (ECF No. 114 ¶ 19.)

[14]      *Ex parte Young*, 209 U.S. 123 (1908) carves out an exception to sovereign immunity for suits seeking injunctive and declaratory relief against state officials in their official capacities. *Reed v. Goertz*, 598 U.S. 230, 234 (2023) ("[T]he *Ex parte Young* doctrine allows suits like [the plaintiff's] for declaratory or injunctive relief against state officers in their official capacities.").

[15]      "Persons" has the same meaning under § 1983 and § 1985.  *See New Jersey Chinese Cmty. Ctr. v. McAleer*, Civ. No. 21-08320, 2022 WL 3403297, at *7 (D.N.J. Aug. 15, 2022) (collecting cases).

In support of their demand for declaratory and injunctive relief, Plaintiffs assert several causes of action under § 1983 and § 1985 for alleged violations of their First Amendment rights. (*See* ECF No. 114 ¶¶ 168-218 (claims under Free Exercise clause); *id.* ¶¶ 219-236 (claims under Free Speech clause); *id.* ¶¶ 237-245 (First Amendment retaliation claim); *id.* ¶¶ 246-256 (claim for conspiracy to interfere with Plaintiffs' First Amendment rights).)  Defendants argue that Plaintiffs have "not met their burden to plead facts that suggest that [Defendants] have authority over licensing decisions and in fact exercised that authority to suspend Plaintiffs' foster license or could exercise that authority to grant Plaintiffs a new license if the court so ordered." (ECF No. 115-1 at 8.)

The Court previously dismissed Plaintiffs' claims to the extent they sought injunctive relief, holding that: (1) Plaintiffs' pleading "lack[ed] sufficient factual allegations as to the [i]ndividual Defendants' personal involvement in suspension of Plaintiffs' foster license"; (2) Plaintiffs failed to name any of the individual Defendants in their official capacities, making the *Ex Parte Young* exception to Eleventh Amendment sovereign immunity inapplicable; and (3) Plaintiffs failed "to allege that the [i]ndividual Defendants ha[d] the authority to reinstate Plaintiffs' license were an injunction to issue."[16]  *See Lasche*, 2022 WL 17250731, at *7.

In dismissing Plaintiffs' claims for injunctive relief, the Court outlined three ways for Plaintiffs to amend their pleading in pursuit of injunctive relief:

> First, Plaintiffs may include additional allegations as to the [i]ndividual Defendants, which demonstrate that the [i]ndividual Defendants were directly involved in the suspension of Plaintiffs' foster license by virtue of their authority to participate in foster licensing administration or otherwise.  Second, Plaintiffs may

---

[16]   While the SAC—the subject of this earlier dismissal—sought Plaintiffs' reinstatement as resource parents (ECF No. 40 at 11, 12), as did the TAC (ECF No. 52 at 12, 13), the Court notes that Plaintiffs' requested relief in the FAC does not seek reinstatement of their license.  (*See* ECF No. 114 ¶¶ 263-268.)

> identify a defendant who does have authority to suspend a foster license under New Jersey law, and plausibly allege that this individual did, in fact, suspend Plaintiffs' license for retaliatory reasons. Third, Plaintiffs may amend their description of the John Doe defendants to make clear that the unnamed officials have the authority to suspend foster licenses under New Jersey law.

*Id.* at *8.

Defendants argue that Plaintiffs still do not state a viable claim for injunctive relief. (ECF No. 115-1 at 21-29.) More specifically, Defendants contend that Plaintiffs do not plausibly allege each Defendant's personal involvement in the underlying alleged constitutional violations. (*Id.* at 23.) The Court finds that Plaintiffs' claims for injunctive and declaratory relief against Commissioner Beyer may proceed, but Plaintiffs do not state a claim for injunctive or declaratory relief against the remaining individual DCPP employees.

### 1.      *Commissioner Beyer*

The Court previously held that Plaintiffs' claims for injunctive and declaratory relief failed because, although "the relevant administrative regulations make clear that the suspension of foster care licenses is within the purview of the Department of Children and Families Office of Licensing," Plaintiffs failed "to demonstrate that [] Defendants [were] even involved in licensing decisions at all." *Lasche*, 2022 WL 17250731, at *7. Plaintiffs responded by adding Commissioner Beyer as a Defendant. (*See* ECF No. 52 ¶ 3; ECF No. 114 ¶ 20.) In the FAC, Plaintiffs allege that Commissioner Beyer, in her capacity as Commissioner of the Department, "has final authority over the actions, policies, and procedures of [DCPP]." (ECF No. 114 ¶ 20.) But Defendants argue that Plaintiffs' allegations are deficient because they do not "allege facts to indicate that Commissioner Beyer plays any personal role in licensing decisions in general, or [Plaintiffs'] licensing in particular[.]" (ECF No. 115-1 at 24.) Plaintiffs counter that

Commissioner Beyer's alleged authority over licensing decisions "satisfies a showing of personal involvement." (ECF No. 117 at 29 n.2.)

The Court finds Plaintiffs need not allege personal involvement by the Commissioner to succeed in their injunctive or declaratory relief claims. Indeed, "the Third Circuit has explained that a lack of personal involvement does not preclude a plaintiff from obtaining prospective injunctive relief for ongoing violations." *Hayes v. Wilkens*, Civ. No. 18-12006, 2018 WL 4908284, at *3 (D.N.J. Oct. 10, 2018) (collecting cases); *see also Davis v. Yates*, Civ. No. 15-6943, 2016 WL 5508809, at *8 (D.N.J. Sep. 27, 2016) (noting that for "a claim for prospective injunctive relief . . . the legal standard is different" from a claim asserting money damages). "Rather, the focus is remedial; a defendant must be an appropriate person to implement injunctive relief, should it be ordered." *Davis*, 2016 WL 5508809, at *8; *see also Abdur-Raheem v. Kuhn*, Civ. No. 24-9054, 2025 WL 2617838, at *3 (D.N.J. Sep. 10, 2025) (noting that a plaintiff's "claims for injunctive relief against [d]efendants in their official capacities survive as long as he pleads enough facts to show that these officials could provide him with the injunctive relief he seeks").

The Court finds that Plaintiffs, by naming Commissioner Beyer and alleging that she has "final authority over the actions, policies, and procedures" of DCPP, have sued a proper defendant should Plaintiffs succeed on their claims for injunctive and declaratory relief. *See Wilson v. The N.J. Div. of Child Prot. & Permanency*, Civ. No. 13-3346, 2016 WL 316800, at *6 (D.N.J. Jan. 25, 2016) (allowing claims for injunctive relief to proceed against the Commissioner of the Department, noting that it is "customary" for plaintiffs to "sue the head of an agency . . . demanding cessation of the agency's alleged violation of federal law").

Accordingly, Plaintiffs' claims for injunctive and declaratory relief may proceed against Commissioner Beyer in her official capacity.

### 2.    *The DCPP Employees*

Plaintiffs argue that the FAC also states a claim for injunctive and declaratory relief against the individual DCPP employees—Higgins, Lippincot, Epperly, Clark, and Pacius—by alleging that they "were directly involved in the entire series of events leading up to the suspension of [Plaintiffs'] license and that they each contributed to the ultimate suspension." (ECF No. 117 at 23.)  The Court previously dismissed the claims against these Defendants, noting that Plaintiffs failed to allege that they had any authority with respect to resource parent licensing.  Critically, the Court noted that licensing was "an authority delegated to the Department of Children and Families Office of Licensing," but Plaintiffs did not allege that any of these employees worked in that office or were involved in licensing decisions at all.  *See Lasche*, 2022 WL 17250731, at *7.  The FAC contains the same pleading deficiencies.  Plaintiffs again fail to allege that any of these DCPP employees work in the Office of Licensing or have the authority to suspend Plaintiffs' license despite the Office of Licensing, by regulation, being  responsible for denying, suspending, revoking or refusing to renew a license.   N.J. Admin. Code § 3A:51-2.5.   (*See generally* ECF No. 114 ¶¶ 21-25, 34.)  Rather, Plaintiffs allege that, considering their respective positions, these individual Defendants "would have directly contributed to the suspension of [Plaintiffs]." (*Id.* ¶¶ 21-25.)  But this conclusory allegation is insufficient to state a claim for the injunctive and declaratory relief Plaintiffs seek against the individual DCPP employees.  *Lasche*, 2022 WL 17250731, at *7 (holding that Plaintiffs have not "properly alleged that the [i]ndividual Defendants by virtue of their office have some connection with the enforcement of foster license suspensions—an authority delegated to the . . . Office of Licensing.") (citation modified).

26

Accordingly, Plaintiffs' claims for injunctive and declaratory relief against the individual DCPP employees—Higgins, Lippincot, Epperly, Clark, and Pacius—in their official capacities will be dismissed with prejudice.[17]

### C.      Individual Capacity Claims

The DCPP employees argue that they are entitled to qualified immunity for any individual capacity claims brought under § 1983 and § 1985. (ECF No. 115-1 at 26-33.) The Court agrees.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Moreover, "[q]ualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Qualified immunity aims to resolve "insubstantial claims" against government officials prior to discovery. *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987); *Brown v. Cwynar*, 484 F. App'x 676, 680 (3d Cir. 2012) ("The Supreme Court has directed courts to address [qualified immunity] at the earliest possible stage in the litigation." (citation modified)). It protects "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citation modified).

Qualified immunity attaches to state officials sued in their individual capacity unless a plaintiff pleads facts showing "(1) that the official violated a statutory or constitutional right, and

---

[17]      Because Plaintiffs have already amended their pleading four times, the Court finds that any further amendment would be futile. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245-46 (3d Cir. 2008) (noting that a district court may dismiss a claim with prejudice if "amendment would be inequitable or futile").

(2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 735; *see also Brown*, 484 F. App'x at 680 ("Qualified immunity is an affirmative defense available to government officials sued in their personal capacities."). "At the motion-to-dismiss stage, courts evaluate qualified immunity for a constitutional claim by examining (i) whether the complaint contains plausible allegations of a constitutional violation and (ii) whether the asserted constitutional right is clearly established." *Karkalas v. Marks*, 845 F. App'x 114, 118 (3d Cir. 2021). Courts may analyze these prongs in either order. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

Under the "clearly established right" prong, courts must proceed in two steps: first, courts must "define the right allegedly violated at the appropriate level of specificity" and then "ask whether that right was 'clearly established' at the time of its alleged violation." *Mack v. Yost*, 63 F.4th 211, 228 (3d Cir. 2023) (citation modified). In deciding whether a right is clearly established, courts in the Third Circuit "look first for applicable Supreme Court precedent. If none exists, [courts] consider whether there is a case of controlling authority in [the Third Circuit] or a robust consensus of cases of persuasive authority in the Courts of Appeals[.]" *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 449 (3d Cir. 2020).

On appeal from the Court's initial dismissal of Plaintiffs' case, the Third Circuit held that Plaintiffs plausibly alleged a First Amendment retaliation claim, but it left the issue of qualified immunity for the district court to analyze in the first instance. *See Lasche*, 2022 WL 604025, at *4-5. This Court subsequently held that Defendants were entitled to qualified immunity, reasoning that "Plaintiffs cannot point to any Supreme Court or Third Circuit precedent demonstrating that suspension of Plaintiffs' foster license in retaliation for imparting their religious views regarding homosexuality to their foster child violated a clearly established constitutional right." *Lasche*,

2022 WL 17250731, at *5.

Plaintiffs now bring several new First Amendment claims—including under the Free Exercise Clause (Counts One through Four) and the Free Speech Clause (Counts Five and Six)—along with their claim for First Amendment retaliation (Count Seven) and claim for conspiracy to interfere with civil rights (Count Eight). (*See* ECF No. 114 ¶¶ 168-256.)[18] Plaintiffs assert that "the right to be free from religious discrimination in the exercise of DCPP's discretionary decisions over foster care placements and licenses" is clearly established. (ECF No. 117 at 37.) Defendants contend that "[n]othing has changed since" the Court held that Defendants were shielded by qualified immunity, and they argue that "there is still no precedent holding that [DCPP] is barred by the Constitution from considering the impact on the child of a foster parent's/potential adoptive parent's views on sexuality." (ECF No. 115 at 30.)

For many of the reasons previously expressed by this Court, the Court finds that the individual DCPP employees are entitled to qualified immunity as to Plaintiffs' individual capacity claims. *See Lasche*, 2022 WL 17250731, at *5 ("[T]his Court is unaware of, and Plaintiffs have failed to provide, any authority indicating that the [i]ndividual Defendants would have been on notice that the foster license suspension, in 2018, for the reason alleged, clearly violated Plaintiffs' First Amendment rights."). This is so even if Plaintiffs have alleged the violation of a constitutional right.

---

[18]    Plaintiffs' assertion that Defendants waived their right to assert qualified immunity with respect to Counts Two through Eight lacks merit. (*See* ECF No. 117 at 31-32.) Defendants' brief plainly asserts qualified immunity based on any First Amendment violation. (*See* ECF No. 115-1 at 8-9 ("[Plaintiffs'] claims . . . fail for the same reason [the Court] previously rejected their earlier First Amendment 'retaliation' claim, which [Plaintiffs] now seek to repackage as violations to their rights to Free Speech and Free Exercise. Yet, regardless of Plaintiffs' revisions, there remains no robust consensus of case law that would have put these individually named defendants on notice at the time of the purported violations that their conduct was unconstitutional under the specific facts of this case.").)

Plaintiffs fail to overcome Defendants' immunity because Plaintiffs' asserted constitutional right was not clearly established at the time of the alleged violation. The cases on which Plaintiffs rely either (1) post-date the conduct in this case, or (2) deal with religious liberty rights in too general terms. *See Noble v. City of Camden*, 112 F. Supp. 3d 208, 226 (D.N.J. 2015) (noting that in determining whether qualified immunity applies, courts "must examine whether the right at issue was 'clearly established' *at the time of the challenged conduct*") (emphasis added); *Kamienski v. Ford*, Civ. No. 11-03056, 2019 WL 4556917, at *6 (D.N.J. Sep. 17, 2019), *aff'd*, 844 F. App'x 520 (3d Cir. 2021) ("The clearly established law must be particularized to the facts of the case . . . otherwise, plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." (citation modified)).

While this case was before the Third Circuit, Plaintiffs framed the right at issue as Plaintiffs' "right to be free from retaliation for 'sharing their religious views on same-sex marriage with [Jane].'" *Lasche*, 2022 WL 17250731, at *5 (quoting *Lasche*, 2022 WL 604025, at *5). Now, Plaintiffs contend that the right at issue is the "right to be free from religious discrimination in the exercise of DCPP's discretionary decisions over foster care placements and licenses." (ECF No. 117 at 37.) But again, Plaintiffs cite no case in which such right was established prior to the alleged actions of Defendants. Instead, Plaintiffs rely on the more general assertion that it was clearly established in 2018 that "governments cannot 'impos[e] "special disabilities on the basis of religious views"' by conditioning participation in a government program on the abandonment of religious beliefs." (*Id.* at 37-38 (alteration in original) (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458, 460-61 (2017)).)

Plaintiffs' reliance on *Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021) (*See* ECF

30

No. 114 ¶ 10) is telling. In that case, the United States Supreme Court held that the City of Philadelphia violated the First Amendment when it refused to refer foster children to a Catholic social services agency which would not allow same-sex couples to serve as foster parents. *See id.* at 542. But *Fulton* was decided years after the events at issue here and thus cannot put the question of Plaintiffs' rights in this case "beyond debate." *Courney v. City of Englewood*, Civ. No. 22-05181, 2025 WL 2170694, at \*4-5 (D.N.J. July 30, 2025) (noting that the weight of authority in the Third Circuit requires a plaintiff to come forward with sufficient caselaw demonstrating a clearly established right to survive a motion to dismiss). Plaintiffs characterize *Fulton* as the Supreme Court's most recent iteration of the decades-old "bedrock" principle that a "law burdening religious exercise must satisfy strict scrutiny if it gives government officials discretion to grant individualized exemptions." (ECF No. 117 at 32 (quoting *Fulton*, 593 U.S. at 544 (Barrett, J., concurring)).) The Court disagrees with Plaintiffs' characterization of *Fulton*, as the line of cases Plaintiffs rely on in the foster care context either post-date the allegations in this case or rely on *Fulton* to establish such rights. (*See* ECF No. 117 at 36-44 (citing *Burke v. Walsh*, Civ. No. 23-11798, 2024 WL 3548759 (D. Mass. June 5, 2024); *Blais v. Hunter*, 493 F. Supp. 3d 984 (E.D. Wash. 2020)); ECF No. 122 (citing *Bates v. Pakseresht*, Civ. No. 23-4169, 2025 WL 2079875 (9th Cir. July 24, 2025)).)

The handful of Supreme Court cases that Plaintiffs rely on that pre-date this case do not arise in the context of resource parent licensing or resource child placement. *See, e.g.*, *Comer*, 582 U.S. at 454, 466 (holding that the Missouri Department of Natural Resources violated the First Amendment by "categorically disqualifying churches and other religious organizations from receiving grants" they would otherwise be qualified to receive); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 526-28, 546 (1993) (holding that statute prohibiting religious

animal sacrifice, but allowing other animal killings, did not pass strict scrutiny); *Sherbert v. Verner*, 374 U.S. 398, 410 (1963) ("Our holding today is only that South Carolina may not constitutionally apply the [unemployment benefit] eligibility provisions so as to constrain a worker to abandon his religious convictions respecting the day of rest."); *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 884 (1990) ("[O]ur decisions in the *unemployment cases* stand for the proposition that where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." emphasis added)).

The Third Circuit cases cited by Plaintiffs are similarly inapposite. (*See* ECF No. 117 at 39-42 (citing *Blackhawk v. Pennsylvania*, 381 F.3d 202, 204, 205-06 (3d Cir. 2004) (affirming the district court's ruling that a game commission violated the First Amendment by refusing to consider a request for a fee waiver from an individual seeking a permit to own two black bear cubs for religious purposes); *Fraternal Ord. of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (holding that a police department violated the First Amendment by allowing medical—but not religious—exemptions from its no-beard policy)).)

This Court previously held that Plaintiffs could not overcome qualified immunity by relying on cases outlining religious liberty rights at a high level of generality. *See Lasche*, 2022 WL 17250731, at *6 ("While [*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) and *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 584 U.S. 617 (2018)] set forth certain contours of religious liberty rights, neither remotely addresses the alleged conduct and constitutional violation here so as to preclude application of qualified immunity."); *see also Castellani v. City of Atl. City*, Civ. No. 13-5848, 2017 WL 3112820, at *14 (D.N.J. July 21, 2017) ("The clearly established law must be particularized *to the facts of the case*." (citation

modified) (emphasis added)).  The Court sees no reason to alter its original finding that qualified immunity applies.  At bottom, the "absence of controlling authority or a robust consensus of cases of persuasive authority" that are specific to the facts of this case dictates that the individual DCPP employees are entitled to qualified immunity with regards to any claim for monetary relief.[19] *Garcia v. City of Perth Amboy*, Civ. No. 23-22903, 2024 WL 4038172, at \*7 (D.N.J. Sep. 4, 2024) (citation modified).

And because Plaintiffs' § 1983 claims fail to the extent Plaintiffs seek monetary relief, Plaintiffs' § 1985 claim likewise fails.  *See Downey v. Coal. Against Rape & Abuse, Inc.*, 143 F. Supp. 2d 423, 453 (D.N.J. 2001), *aff'd*, 142 F. App'x 645 (3d Cir. 2005) ("The § 1983 qualified immunity analysis applies equally to claims brought against public officials under § 1985; if an official is immune from suit under § 1983, that official also is immunized from suit under § 1985(3).").

Accordingly, Counts One through Eight of the FAC are dismissed with prejudice to the extent they assert claims for monetary relief against the individual DCPP employees—Higgins, Lippincot, Epperly, Clark, and Pacius.

### D.   NJLAD Claim

Finally, Defendants argue that Plaintiffs' NJLAD claim fails as a matter of law.  (ECF No. 115-1 at 33-37.)  The Court did not address the merits of Plaintiffs' NJLAD claim in its most recent Opinion, as the parties agreed that the claim would be more appropriately decided in New Jersey

---

[19]   As this Court previously ruled, *see Lasche*, 2022 WL 17250731, at \*5-7, the Court finds it appropriate to apply qualified immunity at this stage because Defendants' immunity is "established on the face of the complaint."  *Spell v. Allegheny Cnty.*, 642 F. App'x 105, 107 n.4 (3d Cir. 2016) (citation modified); *see also Cresci v. Gyss*, 792 F. App'x 226, 227 (3d Cir. 2020) ("[B]oth qualified and absolute immunity are not just a defense to liability but an entitlement not to stand trial, . . . and therefore may be raised at any point during litigation, including by a motion to dismiss." (citation modified)).

state court if Plaintiffs' federal claims were dismissed. *Lasche*, 2022 WL 17250731, at *8. Now, Defendants assert that if the "Court finds that [Plaintiffs] have met their pleading burden to assert federal claims for injunctive relief against some of the [i]ndividual Defendants . . . this Court can exercise supplemental jurisdiction" and decide whether Plaintiffs state a claim under the NJLAD. (ECF No. 115-1 at 34.) Because Plaintiffs' declaratory and injunctive relief claims against Commissioner Beyer will proceed, the Court will exercise supplemental jurisdiction, *see* 28 U.S.C. § 1367, over Plaintiffs' NJLAD claim and permit it to proceed as well.

"The NJLAD prohibits discrimination in a place of public accommodation." *Santiago v. Elchebli*, Civ. No. 20-650, 2021 WL 4473179, at *5 (D.N.J. Sep. 30, 2021). To plead a *prima facie* case of discriminatory denial of a public accommodation under NJLAD, a plaintiff must allege: "(1) that the defendant operates a public accommodation; (2) that the plaintiff is a member of a protected class; and (3) that she was denied equal treatment on the basis of her membership in a protected class." *Damarr-Faruq v. City of Pleasantville Police Dep't*, Civ. No. 21-11866, 2025 WL 830126, at *15 (D.N.J. Mar. 17, 2025)).

In remanding Plaintiffs' NJLAD claim, the Third Circuit held that the New Jersey Supreme Court would likely find that DCPP is a place of public accommodation. *Lasche*, 2022 WL 604025, at *8. Thus, the court held that Plaintiffs' NJLAD claim "cannot be dismissed on the basis that DCPP is not a place of public accommodation." *Id.* And Defendants do not dispute that Plaintiffs are members of a protected class.

Defendants argue that Plaintiffs have failed to meet their burden on the third element, that Plaintiffs were denied equal treatment based on their membership in a protected class. More specifically, Defendants argue that Plaintiffs have failed to satisfy this element as they have not alleged that other similarly situated resource parents were treated more favorably. (*See* ECF No.

34

115-1 at 39 ("[Plaintiffs] have not alleged . . . that other foster parents who have negative interactions with their foster children (including parents who hold secular-based views against homosexuality) would have been treated differently than they were.")).  Plaintiffs counter that such a showing is not required and that New Jersey courts have held that allegations of differential treatment are "not required where plaintiffs can show defendants acted 'in a markedly hostile manner' that a reasonable person could find objectively discriminatory" and Plaintiffs have successfully pled that Defendants acted in such a hostile manner towards them.  (ECF No. 117 at 45-46 (quoting *Turner v. Wong*, 832 A.2d 340, 358 (N.J. Super. Ct. App. Div. 2003)).)

The NJLAD "is aimed at eradicating the 'cancer' of discrimination, and by its own terms is to be 'liberally construed.'"  *Jones v. Pi Kappa Alpha Int'l Fraternity, Inc.*, 431 F. Supp. 3d 518, 531 (D.N.J. 2019) (quoting N.J. Stat. Ann. § 10:5-3).  The Act provides that "[a]ll persons shall have the opportunity to obtain . . . all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination[.]"  N.J. Stat. Ann. § 10:5-4.  An NJLAD claim based on a public accommodation theory can involve discriminatory policies or practices in relation to membership or access as well as hostile environment claims.  *Jones*, 431 F. Supp. 3d at 531.  And the hostile environment theory has been extended beyond workplace conditions into other contexts such as a school setting and the discriminatory behavior of a business owner.  *Id.* (citing *Doe v. Schwerzler*, No. 06-3529, 2008 WL 4066338 (D.N.J. 2008); *Turner*, 832 A.2d 340, 355-56 (denying defendant's motion for summary judgment on NJLAD claim in which the operator of a doughnut store shouted racial slurs at a customer but did not deny service)).

In this case, Plaintiffs allege that "Defendants' actions have deprived [Plaintiffs] of the ability to serve as resource parents within [DCPP] because of [Plaintiffs'] Christian beliefs."  (ECF No. 114 ¶ 260).  The parties have not cited, nor is the Court aware of, any case analyzing NJLAD

in the context of resource parent licensing.  However, the corresponding regulations provide that the Department "shall not discriminate with regard to the application or licensure of a resource family parent on the basis of race; color; ethnicity; national origin; age; disability; gender; religion; affectional or sexual orientation[.]" N.J. Admin. Code § 3A:51-1.5 (citing N.J. Stat. Ann. 10:5-5 (statute defining terms under NJLAD)).  The Department is likewise tasked with ensuring the general well-being and physical, emotional, social and educational needs of a child in resource family care when determining whether to suspend or revoke a license.  N.J. Admin. Code § 3A:51-2.5(b)(8); *see also* N.J. Stat. Ann. 30:4C-27.9(i) (same). (*See also* ECF No. 114 ¶ 129 (alleging that Epperly stated, "we, as an agency, need to be supportive to all races, sexual orientation[.]")).  Plaintiffs' NJLAD theory raises some novel issues, which are better addressed following further factual development.  *Jones*, 431 F. Supp. 3d at 532.

Defendants argue that Plaintiffs' NJLAD claim should be dismissed for Plaintiffs' failure to allege specific instances of similarly situated individuals receiving different treatment for Plaintiffs' claim to proceed past the pleading stage.  (ECF No. 115 at 34-36.)  In the employment context, the Third Circuit has clarified that "[w]hile a plaintiff *may* make out a prima facie case with evidence that similarly situated individuals were treated more favorably . . . such proof is not required." *Morris v. G.E. Fin. Assurance Holdings*, Civ. No. 00-3849, 2001 WL 1558039, at *5 (E.D. Pa. Dec. 3, 2001) (emphasis in original)[20]; *see also Anderson v. Wachovia Mortg. Corp.*, 621

---

[20] While the court in *Morris* considered a discrimination claim brought under Title VII rather than NJLAD, this case remains instructive as "Title VII and NJLAD discrimination claims are governed by the same legal framework." *Oguejiofo v. Bank of Tokyo-Mitsubishi Ufj, Ltd.*, Civ. No. 14-4513, 2016 WL 5329588, at *6 (D.N.J. Sep. 20, 2016), *aff'd sub nom. Oguejiofo v. Bank of Tokyo Mitsubishi UFJ Ltd*, 704 F. App'x 164 (3d Cir. 2017).  Further, "although the prima facie elements of a discrimination claim vary depending on the particular facts of the case, the plaintiff's task generally is to raise an inference of discrimination." *Carita v. Mon Cheri Bridals, LLC*, Civ. No. 10-2517, 2012 WL 2401985, at *9 (D.N.J. June 25, 2012) (quoting *Vulcan Pioneers v. City of Newark,* 374 F. App'x 313, 318 (3d Cir.2010)).

F.3d 261, 272 (3d Cir. 2010) ("We have repeatedly stated that comparative, or competitive, evidence is not a necessary component of a discrimination plaintiff's prima facie case.").[21]  A plaintiff need not specifically plead comparator evidence to plausibly plead an inference that they were denied equal treatment based on their membership in a protected class.  Rather, "[s]uch an inference could be supported in a number of ways, including, but not limited to, comparator evidence, evidence of similar [] discrimination [towards others], or direct evidence of discrimination from statements or actions" that suggest animus.  *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010); *see, e.g.*, *Wright-Phillips v. United Airlines, Inc.*, Civ. No. 20-14609, 2021 WL 1221111, at *13 (D.N.J. Apr. 1, 2021) (denying defendant's motion to dismiss an NJLAD public accommodation claim because the "reader of the Amended Complaint could plausibly infer that [the] refusal [to provide the plaintiff supplemental oxygen on a flight] was racially motivated").  New Jersey courts have also recognized that "the prohibition of discrimination in relation to public accommodation is functionally distinct from the ban on employment discrimination." *Holmes v. Jersey City Police Dep't*, 160 A.3d 41, 43 (N.J. App. Div. 2017).  "[I]n the context of public accommodation discrimination, hostile comments that might not suffice to create a hostile environment in a work context may nonetheless violate the [NJ]LAD." *Id.*; *see also Sandy v. Twp. of Orange*, Civ. No. A-0034-19, 2021 WL 3197029, at *12 (N.J. Super. Ct. App. Div. July 29, 2021) (reversing and remanding grant of summary judgment for the defendants on NJLAD public accommodation claim because the plaintiff's testimony

---

[21]   While this case considered a discrimination claim brought under 42 U.S.C. § 1981, "[t]he legal standards and the burdens of proof for establishing claims under Title VII, § 1981 and the NJLAD are the same." *Kant v. Seton Hall Univ.*, Civ. No. 03-6135, 2008 WL 65159, at *22 (D.N.J. Jan. 4, 2008), *aff'd,* 289 F. App'x 564 (3d Cir. 2008).

evidenced that defendants acted and spoke to plaintiff in a discriminatory manner based on plaintiff's national origin).

Here, the Court finds that the FAC includes sufficient allegations for Plaintiffs to survive a motion to dismiss.  Accepting Plaintiffs' allegations as true for purposes of this Motion, which the Court must, Plaintiffs allege their resource parent license was suspended and they were precluded from participating as resource parents because of their religious beliefs.  (*See, e.g.*, ECF No. 114 ¶¶ 129, 135, 148-153, 165 ("Given that [Plaintiffs] had met all the requirements imposed by the Office of Licensing, [DCPP's] hostility toward [Plaintiffs'] religious beliefs was the only explanation for their suspension.").)  Thus, Plaintiffs' NJLAD claim shall proceed.  *See Wright-Phillips*, 2021 WL 1221111, at \*13; *Jones*, 431 F. Supp. 3d at 531 (noting that NJLAD is broad enough to accommodate a "hostile environment" claim).

Defendants also argue that even if Plaintiffs state a *prima facie* case, their NJLAD claim fails because Defendants had legitimate non-discriminatory reasons for taking the challenged actions (*e.g.*, removing Jane and investigating the suspension of Plaintiffs' foster parent license due to a state court order).  (*See* ECF No. 115-1 at 34-37.)  Specifically, Defendants state they had a "well-founded concern that, based on [Plaintiffs'] history of interactions with Jane, [Plaintiffs] might cause harm to a vulnerable foster child entrusted to their temporary care that identifies as LGBTQIA+."  (*Id.* at 36.)  In so arguing, Defendants ask the Court to conduct the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under this three-step framework:

> "(1) the plaintiff must come forward with sufficient evidence to constitute a prima facie case of discrimination; (2) the defendant then must show a legitimate non-discriminatory reason for its decision; and (3) the plaintiff must then be given the opportunity to show that defendant's stated reason was merely a pretext or discriminatory in its application."

38

*Thomasian v. N.J. Inst. of Tech.*, Civ. No. 08-2218, 2010 WL 1032653, at \*4 (D.N.J. Mar. 16, 2010) (quoting *Dixon v. Rutgers, The State University of N.J.*, 541 A.2d 1046, 1051 (N.J. 1988)).

However, the Third Circuit has held that "the dismissal stage generally does not allow for the 'burden-shifting' element" of the *McDonnell Douglas* framework. *Boone v. Nose*, 530 F. App'x 112, 114 (3d Cir. 2013); *see also Palmore v. Hornberger*, 813 F. App'x 68, 71 (3d Cir. 2020) (noting that "it makes little sense to apply the burden-shifting framework at the pleading stage" (citation modified)); *Davis v. Wigen*, 82 F.4th 204, 211 (3d Cir. 2023) ("At the pleadings stage, a court asks only whether the plaintiff has plausibly alleged each element of his prima facie case."). As a result, courts in this district have held that "burden shifting is not appropriate on a motion to dismiss." *MacLean v. Wipro Ltd.*, Civ. No. 20-3414, 2022 WL 4550629, at \*6 n.3 (D.N.J. Sep. 29, 2022); *see also Hashem v. Hunterdon Cnty.*, Civ. No. 15-8585, 2016 WL 5539590, at \*13 n.20 (D.N.J. Sep. 29, 2016) (same); *Joshi v. Pub. Consulting Grp., Inc.*, Civ. No. 22-1848, 2022 WL 17340728, at \*7 (D.N.J. Nov. 30, 2022) ("It is important to note that a plaintiff on a motion to dismiss need not allege this burden shifting framework as his/her prima facie case. In other words, it is sufficient to establish a prima facie case if [the p]laintiff is able to sufficiently allege the elements of the discrimination claim.").

In their reply brief, Defendants argue that "there is no absolute prohibition" on applying burden shifting at the pleading stage. (ECF No. 121 at 13.) According to Defendants, the allegations in the FAC are sufficient for the Court to conclude that "Defendants' removal of Jane from Plaintiffs' home was ordered by a court as a result of a finding of 'emotional trauma,' and the ultimate suspension of Plaintiffs' resource-parent license stemmed from an investigation that the same court called for." (*Id.*) Moreover, Defendants contend that the allegation that Plaintiffs asked for the removal of Susan due to "inappropriate sexual boundaries" "undercuts Plaintiffs' assertion

that they would have supported Jane if she chose to explore her sexuality." (*Id.* at 13-14.) But as correctly noted by Plaintiffs, Defendants cite no case in which a court applied the burden shifting analysis at the pleading stage. (ECF No. 117 at 45 & n.5.) Defendants' arguments are more appropriate at summary judgment.

Accordingly, Plaintiffs' NJLAD claim may proceed.

## IV.    CONCLUSION

For the foregoing reasons, and other good cause shown, Defendants' Motion to Dismiss (ECF No. 115) is **GRANTED in part** and **DENIED in part**. Plaintiffs' claims for (1) monetary relief under 42 U.S.C. §§ 1983 and 1985 against all Defendants, and (2) injunctive and declaratory relief against Defendants Higgins, Lippincot, Epperly, Clark, and Pacius are dismissed with prejudice. Plaintiffs' claims for declaratory and injunctive relief against Commissioner Beyer may proceed, as well as Plaintiffs' NJLAD claim against all Defendants. An appropriate Order follows.


Dated: May 22, 2026

_____
GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE